**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X

MARY HOLLMAN, as the Administrator of the
Estate of SAMUEL A. COX, and the Estate of
SAMUEL A. COX, on behalf of JOHN COX,

                          Plaintiff,

          -against-

TASER INTERNATIONAL, INC.,

                        Defendant.

-----------------------------------------------------------X

Docket No. 06-CV-3588(JFB)(ARL)


**NOTICE AND MOTION TO EXCLUDE**
**MEDICAL CAUSATION OPINIONS**
**OF WILLIAM MANION, M.D.**

(Hearing Set 1-6-12)

 

Defendant TASER International, Inc. hereby moves to exclude the medical causation opinions of Plaintiff's substituted expert, forensic pathologist William Manion, M.D., as they relate to any alleged contribution of the TASER® X26™ Electronic Control Device to the death of John Cox on April 22, 2005.  This motion is supported by the attached Memorandum of Law, the Declarations of Patrick Smith, Jeffrey Ho, M.D., and John Tait, Esq., with their supporting exhibits filed simultaneously herewith, and the Court's entire file in this matter.

Pursuant to Judge Bianco's August 31, 2011 Order, Plaintiff must file her response in opposition to this motion by November 30, 2011, and TASER will file its reply in further support of this motion by December 15, 2011.  A hearing on this motion is scheduled before Judge Bianco at 11:00 a.m. on January 6, 2012 at the U.S. District Court for the Eastern District of New York, 100 Federal Plaza, Central Islip, NY 11722.

# TABLE OF CONTENTS

I.    RELEVANT FACTUAL BACKGROUND ............................................................................ 1

   A.  Incident Basics and ECD Use. ...................................................................................... 1

   B.  Cox's Ambulance Transport and Subsequent Death. ..................................................... 5

   C.  Autopsy Findings and Excited Delirium Deaths ............................................................ 7

II.   DR. MANION'S ECD-RELATED MEDICAL CAUSATION OPINIONS MUST BE
      EXCLUDED AS UNQUALIFIED, UNSUPPORTED BY ANY FACTUAL BASIS, AND
      WHOLLY UNRELIABLE ........................................................................................... 9

   A.  Dr. Manion's Metabolic Acidosis Opinions ....................................................... 9

   B.  Standards for Admission of Expert Testimony ................................................... 10

   C.  No Relevant ECD Knowledge, Training or Experience ..................................... 12

   D.  False Factual Premise and Rank Speculation .................................................... 14

   E.  No Medical or Scientific Support That TASER ECD Produces Clinically Significant
       Metabolic Acidosis ........................................................................................... 19

III.  DR. MANION'S IRRELEVANT AND UNQUALIFIED CARDIAC AND POSITIONAL
      ASPHYXIA OPINIONS MUST ALSO BE EXCLUDED ................................................. 20

   A.  No Evidence of Direct Cardiac Effect ............................................................... 20

   B.  Positional Asphyxia Opinions Unqualified and Irrelevant As To TASER ........................ 23

IV.  CONCLUSION ............................................................................................................ 25

# TABLE OF AUTHORITIES

## Cases

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256 (2d Cir. 2002) ................................... 11

*Baker v. Urban Outfitters, Inc.*, 254 F. Supp. 2d 346 (S.D.N.Y. 2003) .......................... 10, 12, 18

*Basko v. Sterling Drug, Inc.*, 416 F.2d 417 (2d Cir. 1969) ..................................................... 23

*Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18 (2d Cir. 1996) .................................................. 12

*Brooks v. City of Seattle*, 599 F.3d 1018 (9th Cir. 2010) ......................................................... 14

*Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179 (2d Cir. 2001) ..................................... 11

*Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993) ................................................... 1, 11, 22

*Delehanty v. The Home Depot Inc.*, 663 F. Supp. 2d 127 (E.D.N.Y. 2009) ................................ 11

*Fernandez v. Cent. Mine Equip. Co.*, 670 F. Supp. 2d 178 (E.D.N.Y. 2009) .............................. 12

*General Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ....................................................................... 12

*Green v William Penn Life Ins. Co.*, 74 A.D.3d 570, 902 N.Y.S.2d 542 (1st Dep't 2010) ......... 17

*Hendrix v. Evenflo Co.*, 609 F.3d 1183 (11th Cir. 2010) ............................................................. 11

*In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164 (S.D.N.Y. 2009) ................................... 22

*In re September 11 Prop. Damage & Bus. Loss Litig., Inc. v. Port Auth.*, 468 F. Supp. 2d 508 (S.D.N.Y. 2006) .......................................................................................................................... 23

*Lash v. Hollis*, 2007 U.S. Dist. LEXIS 3633 (E.D. Mo. 2007) ..................................................... 14

*Lee v. New York City Hous. Auth.*, 25 A.D.3d 214, 803 N.Y.S.2d 538 (1st Dep't 2005) ............ 23

*Member Servs. v. Sec. Mut. Life Ins. Co.*, 2010 U.S. Dist. LEXIS 103776 (N.D.N.Y. 2010) ...... 11

*Neal-Lomax v. Las Vegas Metro. Police Dep't,* 574 F. Supp. 2d 1193 (D. Nev. 2008) ............... 14

*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005) ..................................................... 11, 22

*Salinas v. TASER Int'l,* 2010 WL 7697467 (N.D. Cal. 2010) ....................................................... 14

*Wills v. Amerada Hess Corp.*, 379 F.3d 32 (2d Cir. 2004) ........................................................... 11

**Rules**

Fed. R. Evid. 403 ...................................................................................................................... 22

Fed. R. Evid. 702 ........................................................................................................... 1, 10, 11

iii

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendant TASER International, Inc. ("TASER") hereby moves to exclude the medical causation opinions of Plaintiff's substituted expert, forensic pathologist William Manion, M.D., as they relate to any alleged contribution of the TASER® X26™ Electronic Control Device ("ECD") to the death of John Cox ("Cox") on April 22, 2005. Dr. Manion's wholly speculative opinions must be excluded because they are not based on any independent research, personal experience, or peer-reviewed publication, are not supported by any scientific methodology, and do not meet applicable legal standards for reliability and relevance. Dr. Manion further is not qualified to render opinions regarding the physiological effects of TASER ECD applications on the human body, and relies on fundamentally false assumptions regarding ECD operational basics that are fatal to his opinions. Accordingly, pursuant to *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993) and Fed. R. Evid. 702, this Court should exercise its "gatekeeping role" and exclude Dr. Manion's TASER ECD-related medical causation opinions.

## I.   RELEVANT FACTUAL BACKGROUND.

### A.   Incident Basics and ECD Use.

Sgt. Kevin Lixfield is a 28-year veteran road supervisor with the Suffolk County Police Department ("SCPD"). (Ex. 1, Lixfield depo. at 6:18-21). On April 22, 2005, he responded to a highest priority violence call from one of his officers that a TASER ECD might be needed to arrest a highly combative subject "busting up" a Bellport home. (*Id*. at 14:4-17, 27:10-14, 55:21-24). Sgt. Lixfield arrived at 20:12 hours to find Cox, a person known to him to have a violent history and multiple prior arrests, "bare chested, screaming, threatening and moving in a highly agitated state."[1]

---

[1] Sgt. Lixfield said Cox was "in a rage" and basically "acting crazy." "He's been known to me most of his life, and he had no idea who I was." (Ex. 1 at 27:24-28:2). Sgt. Lixfield also said Cox was

1

(*Id.* at 14:10-15:5). Cox was being held at bay in a bedroom blocked by five or six police officers at the bedroom door. (*Id.*). Sgt. Lixfield displayed his ECD, told Cox it would hurt if he had to use it, and ordered Cox three or four times to "kneel down on the floor." (*Id.* at 15:6-16). When Cox failed to comply, Sgt. Lixfield began counting down from three to one. As Sgt. Lixfield counted, Cox suddenly lunged at him and Sgt. Lixfield fired his X26™ ECD in probe mode striking Cox in the chest.[2] (*Id.*, 135:22-25).

Sgt. Lixfield testified the ECD had no effect whatsoever on Cox, who simply "pulled both darts from his chest and continued to come at me." (*Id.* at 15:13-16, 34:19-23, 35:2-3). As Sgt. Lixfield hurriedly attempted to reload a new cartridge, his ECD accidentally discharged causing the darts to lodge in his left hand. (*Id.* at 15:17-19, 136:14-19). What happened next has been described as a "five minute[ ] free-for-all on the floor," as the officers went hands-on in an attempt to subdue Cox using physical force. (*Id.* at 37:2-13, "it was a wrestling match to get him under control."). Cox, "an extremely strong individual" who Sgt. Lixfield determined "was high on something," fought wildly, kicking, biting and punching several officers. (*Id.* at 15:20-23, 37:14-15, 122:23-24). Sgt. Lixfield said at one point three officers were attempting to hold Cox to the floor and "he did a

---

"[p]rofusely sweating, snot running out of his nose, drool coming out of his mouth," and screaming "I'm going to f***ing kill you." (*Id.* at 30:7-15).

[2] In the field, the TASER X26 ECD may be primarily applied in two ways: a probe deployment, where two small metal darts fire via compressed nitrogen, with electrical impulses transmitted into the target through very thin insulated trailing wires; or drive-stun mode, in which the ECD is physically pressed against the target. (Smith Dec. ¶ 18). In probe-deployment mode, the ECD primarily works by motor-nerve mediated stimulation of skeletal muscles. The TASER X26 ECD is designed to transmit stimuli through very short duration low charge electrical pulses that interfere with the command and control systems of the body at the motor-neuron level to temporarily incapacitate the target. The result is known as "NMI" or Neuro-Muscular Incapacitation. (*Id.* ¶ 19). To achieve NMI, an adequate probe spread is required to ensure major muscle groups between the darts are affected by the charge. (*Id.* ¶ 20).

complete push-up with three of them on him."[3] (*Id*. at 41:8-12).

During the brawl, Cox "punched [Sgt. Lixfield] on the head, kicked me a few times. I was thrown on my back on the left side of the room." (*Id*. at 37:10-12). As Sgt. Lixfield was "[g]etting beat up basically," he said "[a]nother officer stepped on my hand and pulled [the ECD darts] out." (*Id*. at 41:5, 143:11-23). "Johnny Cox had me in a headlock, and [the darts] were in my left hand with one pin going in the muscle, and I needed that hand." (*Id*.). Because Sgt. Lixfield did not have another ECD cartridge, he removed the second spent cartridge and attempted to use the ECD in drive-stun mode, physically pressing the device against Cox's skin.[4] (*Id*. at 41:22-42:2, 137:14-18). He attempted "several TASER [ECD] contact shots on [Cox's] back, buttocks, and the back of his legs," but at no point did Cox react to the drive-stuns. (*Id*. at 16:3-9, 44:1-7, 137:21-22 ("it had no visible [e]ffect on him"); 46:17-21 ("he didn't cease what he was doing. He didn't twitch, he didn't jerk or show any reaction. He continued swinging").

Because of Cox's complete nonresponse to the ECD, Sgt. Lixfield testified he was concerned the device was not working. (*Id*. at 140:11-20). He therefore tested it several times in the bedroom by "[a]iming it up in the air and squeezing the trigger, which makes an audible sound." (*Id*. at 138:5-139:2). He said he did this numerous times, 4-5 maybe, "probably more up than down." (*Id*., 140:24-141:3). "When it pointed up in the air, it did arch and made a sound, and I couldn't understand why it didn't work pointed down." (*Id*. at 140:21-23). The data download report for Sgt. Lixfield's X26

---

[3] Cox was 39 years old, 5 feet 9 inches tall, weighed 240 pounds, and had a body mass index of 35:4 making him obese by national standards. (Ex. 8 at 2; Ex. 11 at 47:1-17).

[4] In drive-stun mode, electrical impulses are transmitted superficially through two fixed electrodes on the ECD, which are only 4 centimetres (1.6 inches) apart. (Smith Dec. ¶ 21). Because the electrical current in a drive-stun application is confined to such a small stimulation area between the two electrodes on the surface of the skin, it does not create any major body mass involvement and does not result in NMI. (*Id*.). Thus, an ECD drive-stun is strictly a pain compliance tool. (*Id*.).

3

ECD Serial No. X00-054251 on April 22, 2005, recorded a total of 10 trigger pulls (which does <u>not</u> equate to delivered electrical charge).[5] (Ex. 2). Thus, according to Sgt. Lixfield's testimony, the first two activations would have been the two probe cartridges, with the second firing into his own hand. The remainder of the activations would have been either spark tests in the air or attempted drive-stuns to Cox's backside.

While the officers continued their efforts to restrain Cox, Sgt. David Doherty, a 16-year SCPD veteran, arrived with another TASER ECD. (Ex. 3, Doherty depo. at 7:7-15, 17:12-25). He had heard the radio call for Sgt. Lixfield to respond with a TASER ECD, and made a decision to respond as well. (*Id*.). He explained that only SCPD supervisors and emergency personnel with training had access to TASER ECDs. (*Id*. at 14:10-17). Sgt. Doherty testified the first thing he saw upon his arrival was Sgt. Lixfield standing in the main hallway with an ECD in his hand. Sgt. Lixfield reported that he "had TASERed the subject in the back bedroom and it had no [e]ffect on him." (*Id*. at 20:6-20). Sgt. Doherty then observed several officers in the back bedroom trying to hold a flailing, kicking, screaming subject down. (*Id*. at 21:22-23:14). Sgt. Doherty did not engage with Cox at this time and instead went to his vehicle to get leg restraints. (*Id*. at 24:21-22). Sgt. Lixfield called for an ambulance believing it would be safer to transport Cox on a gurney. (Ex. 1 at 16:9-15).

---

[5] The X26 ECD has data download capabilities that record the date, time and duration of each ECD trigger pull. (Smith Dec. ¶ 28). The data download shows discharges (trigger pulls) only, not whether the electrical charge was delivered to the subject. (*Id*.). Pulling and releasing the trigger automatically activates a 5-second cycle. The ECD operator may cut the cycle short at any time by placing the safety lever in the down (SAFE) position. The operator also may extend the ECD discharge beyond 5 seconds by holding the trigger down. Releasing the trigger any time after 5 seconds will immediately stop the ECD discharge. (*Id*.). An X26 ECD records the time when the firing sequence ends. (*Id*.). Thus, the total time span between Sgt. Lixfield's first trigger pull and the end of the last ECD cycle was 17-minutes and 48-seconds. (Ex. 2).

Eventually the officers were able to handcuff Cox with his hands in front of him, but he continued to actively resist. (Ex. 1 at 40:5-8). Sgt. Doherty testified the leg restraints "weren't very effective at all" because the foot and a half of metal chain between the two cuffs "gives quite a lot of play." (Ex. 3 at 60:6-11). As the officers attempted to carry Cox from the bedroom to the stretcher in the living room, he continued kicking, screaming and grabbing at the officers. (*Id.* at 31:5-25; Ex. 6 at 173:5-7). Cox also grabbed and held on to various fixed objects along the way (*i.e.*, door jam, furniture, lamp) to impede the officers efforts to remove him. (Ex. 3 at 32:2-19; Ex. 1 at 16:16-23).

As the officers attempted to secure Cox to the gurney, "his upper torso was leaning off the top, and he reached underneath the stretcher and grabbed the support bars [with both hands] and would not let go." (Ex. 1 at 33:9-21). In an effort to get Cox to release his grip so his entire body could be safely secured for transport, Sgt. Lixfield tried to drive-stun Cox's shoulder (*Id.* at 45:17-25), and Sgt. Doherty used his X26 ECD to drive-stun Cox's lower back. (Ex. 3 at 36:2-9). Sgt. Doherty testified he placed his ECD into the small of Cox's back and pulled the trigger once. When he saw absolutely no reaction from Cox, Sgt. Doherty pulled the ECD away after 2-3 seconds to see if it was working, saw sparking at the electrodes, and turned it off. (*Id.* at 39:9-25; 40:12-20). The download report for Sgt. Doherty's X26 ECD Serial No. X00-054228 confirms a single 5-second trigger pull on April 22, 2005. (Ex. 4). Thus, after Cox was handcuffed, but obviously not successfully restrained or under control, only two drive-stuns were administered; one by Sgt. Lixfield and one by Sgt. Doherty. When these efforts were unsuccessful, Sgt. Lixfield testified, "we ended up leaving the situation the way it was." (Ex. 1 at 46:2-3).

### B.    Cox's Ambulance Transport and Subsequent Death.

Because Cox was still violent and only partially restrained, Sgt. Lixfield instructed three officers to ride in the ambulance with the EMTs (*Id.* at 17:4-8), including Lindsey Smith, who rode

in the back with Cox and the officers. (Ex. 5 at 3). Sgt. Doherty left to respond to another emergency call, and Sgt. Lixfield drove his own vehicle arriving at Brookhaven Hospital before the ambulance. (Ex. 1 at 17:6-8, 64:12-17; Ex. 3 at 46:23-47:2). There was no further ECD use once Cox was removed from the home.[6]

EMT Smith testified Cox was violent and threatening the "entire time that I was in contact with him until we arrived at the hospital," a period of about 15 minutes.[7] (Ex. 6, Smith depo. at 156:16-24). He described Cox as "physically struggling," "extremely violent," "still extremely combative," yelling and spitting, "threatening to kill people, cursing and screaming," which required police measures to further restrain him in the ambulance. (*Id.* at 146:4-13, 181:5-7, 181:22-182:2, 228:14-17; Ex. 5 at 3). Smith said one officer sat "on the patient's buttocks," one held his shoulders, and the third held Cox's head at the back of his neck with his head turned toward the driver's side door. (Ex. 5 at 3-4; *see also* Ex. 6 at 96:18-21 (officer sitting "on his legs and his lower torso"); 138:5-15). It was Smith's "impression that the police did everything they could to restrain the patient without hurting him, and at the same time protect me and my crew from him." (Ex. 5 at 5). Smith also testified that at no time did he observe Cox exhibit any signs of stress in his ability to breathe while in the ambulance due to the officers' restraint efforts. (Ex. 6 at 183:15-19, 186:5-13). Indeed, Smith described Cox as "still combative" as "we're pulling into the hospital." (*Id.*).

About a minute before reaching the emergency room door, EMT Smith said Cox was still moving, but seemed to calm down. (Ex. 5 at 4). As they reached the trauma room, Smith no longer

---

[6] Smith testified he only witnessed a single ECD application to Cox, which was administered in drive-stun mode during "the process of trying to get him onto the stretcher." (Ex. 6 at 169:19-22, 170:5-19 (no probes or wires, used in handheld contact with body); 172:7-9).

[7] According to the prehospital care report prepared by Smith, the ambulance arrived at the scene at 20:27, departed at 20:33 and arrived at the hospital at 20:42. (Ex. 6 at 33:7-12, 104:5-9).

noticed any movement. (*Id*.). After restraints were secured, Cox was rolled onto his back on a hospital stretcher, hospital staff noticed his chest was not raising, and the room was cleared and CPR started. (*Id*. at 5). Smith testified this was the first time he noticed Cox was having a breathing problem. (Ex. 6 at 193:10-194:3). Resuscitation efforts were not successful and Cox was pronounced dead.

Nine SCPD officers required hospital treatment for injuries sustained during the struggle with Cox, with injuries ranging from several contusions and sprains to a bite on the bicep and a fractured wrist. (Ex. 7 at 3; Ex. 1 at 66:20-22). In addition to Sgt. Lixfield's hand injury from the ECD probes, he also suffered a broken index finger and a severely strained lower back that put him out of work for four months. (*Id*. at 74:17-25, 139:23-24, 142:11-25, 143:4-6).

### C.    Autopsy Findings and Excited Delirium Deaths.

The Suffolk County Deputy Medical Examiner, Gwen Harleman, M.D., performed Cox's autopsy and determined the manner of death was accidental. (Ex. 8 at 1). Dr. Harleman found the cause of death to be "Excited Delirium Syndrome" resulting from "cocaine intoxication" and other contributory medical factors, specifically, "arteriosclerotic and hypertensive type cardiovascular disease" and "chronic psychotic disorder." (*Id*). The toxicology report was positive for cocaine, as was the testing performed by the Suffolk County Crime Lab on the hard substance found in Cox's pocket by hospital personnel. (*Id*. at 12; Ex. 7 at 7). The TASER ECD is not identified anywhere in the autopsy report as a causal or contributory factor in Cox's death. The report and diagram of injuries only identifies five sites of TASER ECD marks on Cox's body labeled 1 through 5 on his right and left upper chest (subclavian), left upper buttocks, left calf and right ankle.[8] (Ex. 8 at 14).

---

[8] Site Nos. 4-5 are consistent with drive-stuns to the back of Cox's legs from Sgt. Lixfield during the bedroom struggle. Site No. 3 is consistent with the "small of back" drive-stun location described by

Skin was removed at each of these locations and examined microscopically. (*Id*. at 9-10). No defects were noted beyond the epidermis and dermis layers of the skin. (*Id*.).

Excited delirium (first described in the mid 1800's, well before TASER ECDs) almost always presents "the exact same sequence of events: delirium with agitation (fear, panic, shouting, violence and hyperactivity), sudden cessation of struggle, respiratory arrest and death." (Ho Dec. Ex. J, "Excited Delirium," *West J Emerg Med* at 77 (Feb. 2011)). Cox displayed the classic symptoms of excited delirium, which include "bizarre and/or aggressive behavior, shouting, paranoia, panic, violence toward others, unexpected physical strength and hyperthermia." (*Id*.). Moreover, like Cox, an extensive review of reported cases reveals that excited delirium is typically precipitated by stimulant drug use and "by far the most prevalent drug of abuse found on toxicology screening was cocaine." (*Id*. at 77-78).

Thus, as stated in this recent peer-reviewed article, it is not surprising that people experiencing excited delirium die in police custody since such highly agitated, violent subjects often require physical restraint. (*Id*. at 79). But while there has been *speculation* regarding the possible contribution of restraint, struggle and ECD use in excited delirium deaths, "[n]o study thus far has been able to demonstrate a causal relationship between [TASER ECD] use and subsequent individuals' deaths." (*Id*., referring to ECD use and positional asphyxia as "widely publicized *proposed* causes" of excited delirium deaths (emphasis added); *see also* Ho Dec. ¶ 25). Recent research, however, points instead "toward central nervous system dysfunction of dopamine signaling as a cause of the delirium and fatal autonomic dysfunction." (Ex. J, *West J Emerg Med* at 81).

---

Sgt. Doherty while Cox's was on the stretcher. It is unclear whether Site Nos. 1-2 are from the initial probes fired by Sgt. Lixfield and/or his drive-stun to Cox's shoulder area during the struggle to get him on the gurney. (Ex. 8 at 14). What is clear, however, is that Cox's autopsy did not reveal TASER ECD marks inconsistent with the officers' testimony concerning the extent of their ECD use.

II.     **DR. MANION'S ECD-RELATED MEDICAL CAUSATION OPINIONS MUST BE EXCLUDED AS UNQUALIFIED, UNSUPPORTED BY ANY FACTUAL BASIS, AND WHOLLY UNRELIABLE.**

A.     **Dr. Manion's Metabolic Acidosis Opinions.**

Plaintiff has designated Dr. Manion as her sole medical causation expert in this case. Dr. Manion did not perform any autopsy on Cox or otherwise view the body or any slides of tissue samples taken at autopsy. He simply read the medical examiner's autopsy report and, without disputing anything in it, drew a different conclusion as to the cause and manner of death. (Ex. 10, Manion depo. at 182:3-7, 183:4-8). Although Dr. Manion agrees that "excited delirium" is used as a cause of death in forensic pathology (*Id.* at 183:9-14), he would state Cox's cause of death as "severe metabolic acidosis secondary to [TASER ECD] application and restraint [ ] interfering with respiration." (*Id.* at 184:5-24). He would also add "cocaine intoxication" as another significant condition and list the death as "homicide." (*Id.*; *see also* Ex. 9, Manion Report at 3, "it is my first opinion to a reasonable degree of medical certainty that the cause of death of Mr. Cox is irreversible metabolic acidosis").

According to Dr. Manion, the ECD applications caused extreme muscle exhaustion which produced metabolic acidosis which Cox could not relieve naturally through his breathing because the officers allegedly reduced his lung capacity by lying on his back or sitting on his torso. (Ex. 9 at 5-6). Dr. Manion states Cox "was repeatedly Tasered, a[t] least seven times in a period of twenty minutes, of which three times were in the upper back and once on the chest between 20:12 to 20:33 hours."[9] He then explains:

_____

[9] It is not clear how Dr. Manion comes up with 7 ECD applications, but he certainly has mistaken Sgt. Doherty's one 3-second drive-stun to Cox's lower back with three separate ECD applications to his upper back, something wholly unsupported by any witness statement or autopsy finding. Indeed, earlier in his report Dr. Manion describes Sgt. Doherty's ECD application as "on the upper back

9

As a result of these Taser shocks an acute metabolic acidosis resulted because of the extreme muscle exhaustion. A young healthy individual may recover from [ECD] shock or shocks in thirty plus minutes by having a resting recovery and compensatory respiratory adjustment with elimination of excess CO2 from the body. An individual will lower CO2 by increasing breathing faster the person the person [sic] in metabolic acidosis will breathe out CO2 and bring his body closer to a normal pH. This return to normal will usually occur in unrestrained healthy individuals. . . .

Mr. Cox did not have any opportunity of recovery period as he could not breathe deep or fast in the situation in which he found himself.

Instead, Mr. Cox was in a prone face down position with his forelimbs cuffed and large police officers weighing more than 200 pounds lying over his back or sitting on his torso with pressure on his shoulders and back of neck. All of this pressure effectively is restricting his respiratory muscles including his diaphragm and accessory muscles of respiration. This is causing a reduction in lung capacity and will make it impossible for Mr. Cox to relieve his metabolic acidosis. The multiple applications in rapid succession of the [TASER ECD] created a life threatening and in this case a deadly outcome for Mr. Cox.

(*Id.*). Such opinions have no basis in fact or science and must be excluded. Dr. Manion's positional

asphyxia opinions concerning the officers' conduct during transport are also factually unsupported

and irrelevant as to TASER.

**B.**    **Standards for Admission of Expert Testimony.**

The proponent of expert testimony bears the burden of establishing its admissibility by a

preponderance of the evidence. *Baker v. Urban Outfitters, Inc*., 254 F. Supp. 2d 346, 353 (S.D.N.Y.

2003). At the outset, Plaintiff must demonstrate that Dr. Manion is "qualified as an expert by

knowledge, skill, expertise, training, or education" as to the subject matter on which he intends to

testify, *i.e.*, the effects of an ECD application on the human body. Fed. R. Evid. 702; *Baker*, 254 F.

---

(bare back) for three seconds." (Ex. 9 at 4). At his deposition, Dr. Manion testified ECD application No. 1 was definitely the probe deployment by Sgt. Lixfield where Cox pulled the probes out "pretty quick," probably within 2-3 seconds. (*Id*. at 156:23-157:12). He said No. 7 was Sgt. Doherty's drive-stun to Cox's back for 3 seconds (*Id*. at 158:23-159:11), but he really has no clue about alleged hits 2-6. (*Id*. at 158:17-20, "I don't know for sure"). Thus, in the twenty minutes from Sgt. Lixfield's arrival to Cox's departure by ambulance, a total of 1,200 seconds, Dr. Manion can only account for 6 seconds of ECD exposure.

Supp. at 352 (court must "make an initial determination as to whether the proposed witness qualifies as an expert"). An expert's credentials must relate to the specific opinions offered. As aptly stated in *Nimely v. City of New York*, 414 F.3d 381, 399 n.13 (2d Cir. 2005), "it is worth emphasizing that, because a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields." *See also Hendrix v. Evenflo Co.*, 609 F.3d 1183, 1201 (11th Cir. 2010) ("Merely demonstrating that an expert has experience does not automatically render every opinion and statement by that expert reliable.").

If the expert's qualifications pass muster, the court is then charged with "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting *Daubert*, 509 U.S. at 597). To be relevant, the expert's testimony, theory or opinion must "fit" the facts of the case, that is, it must assist the trier of fact in understanding the evidence or determining some fact actually at issue. *Daubert*, 509 U.S. at 592-93; *Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184-85 (2d Cir. 2001). To determine whether the proffered testimony has a sufficiently reliable foundation, the court considers whether (1) the testimony is grounded on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case. *Member Servs. v. Sec. Mut. Life Ins. Co.*, 2010 U.S. Dist. LEXIS 103776, *71-72 (N.D.N.Y 2010); Fed. R. Evid. 702.

In examining the reliability of an expert's theory, the district court may consider whether the principle has been or can be tested; whether it has been subjected to peer review and publication; and whether the theory has gained general acceptance in the relevant scientific community. *See Wills v. Amerada Hess Corp.*, 379 F.3d 32, 48 (2d Cir. 2004) (citing *Daubert*, 509 U.S. at 593-94); *Delehanty v. The Home Depot Inc.*, 663 F. Supp. 2d 127, 132-33 (E.D.N.Y. 2009). "Though the

11

weight given to expert testimony should be left to the finder of fact, expert testimony should be excluded altogether if it is 'speculative' or 'conjectural' or if it is based on assumptions 'so unrealistic and contradictory as to suggest bad faith.'" *Baker*, 254 F. Supp. 2d at 353 (quoting *Boucher v. U.S. Suzuki Motor Corp*., 73 F.3d 18, 21 (2d Cir. 1996)). Moreover, courts are not required to admit expert opinion evidence that is "connected to existing data only by the ipse dixit of the expert . . . A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Fernandez v. Cent. Mine Equip. Co.*, 670 F. Supp. 2d 178, 183 (E.D.N.Y. 2009).

Because Plaintiff cannot meet these legal standards and demonstrate the relevance or reliability of Dr. Manion's TASER ECD-related medical causation opinions, his testimony must be excluded. As an initial matter, however, Dr. Manion is simply not qualified to provide any opinions whatsoever regarding the physiological effects of TASER ECD applications on the human body generally or on Cox specifically.

### C.   No Relevant ECD Knowledge, Training or Experience.

Simply being a forensic pathologist does not qualify Dr. Manion to give ECD medical causation opinions.[10] Significantly, Dr. Manion has *never* done an autopsy on *anyone* post-TASER ECD application or post-use of any electronic weapon. (Ex. 10 at 47:9-13, 49:5-10, 133:19-134:3, 185:3-4, "I've never had a Taser death" or otherwise been asked to determine whether an ECD caused death). He also has never treated any living patient following an ECD exposure. (*Id*. at 49:11-

---

[10] Dr. Manion is board certified in anatomic, clinical, and forensic pathology. He graduated from medical school in 1982 and is presently licensed in New Jersey. He is an assistant medical examiner in Burlington and Ocean counties, but his role in this case is as a paid consultant through his own company, Diagnostic Pathology Consultants, PA. (Ex. 9 CV).

17). Indeed, Dr. Manion admits this is his first involvement in any ECD-related case. (*Id*. at 42:14-17, 64:15-22, acknowledging his testifying history is devoid of any ECD opinions).

Dr. Manion admits he is not an expert in electronic weapons, is not an expert in electricity or electrical biomechanics, and is not an expert in the flow of electrical current from an ECD into the human body. (*Id*. at 132:11-13, 110:9-11, 111:17-19, 111:23-112:2, 134:22-25). He concedes he has "absolutely no expertise in Taser electrophysiology safety." (*Id*. at 199:15-22). He has never tested or conducted any medical or scientific ECD research on humans or animals, or written or published anything in the field. Indeed, Dr. Manion has never used, touched or even seen a TASER X26 ECD (or any other model or brand) in real life, and certainly has never experienced an ECD exposure himself. (*Id*. at 125:4-126:4, 129:13-23).

Nor has Dr. Manion done anything to educate himself on crucial aspects of TASER's product or to ensure he has the essential facts straight. Indeed, Dr. Manion testified he thought a TASER model M26™ ECD was used on Cox instead of an X26 ECD. (*Id*. at 25:19). Regardless, Dr. Manion does not know what the waveform, power output or peak main phase voltage is on either ECD model. (*Id*. at 137:8-10, 138:21-139:7). He mistakenly believes an ECD drive-stun (like a probe deployment) causes muscle contractions, although he cannot cite any peer-reviewed articles or product literature to support his belief. (*Id*. at 77:20-78:6, 85:12-86:4). He has never bothered to watch any video of ECD drive-stuns to see how people react to such exposures (*Id*. at 84:11-15), but perhaps that is because he also mistakenly thinks Cox received six probe deployments and only one drive-stun, instead of the other way around. (*Id*. at 154:24-155:3, "I think the first six [ ] times were the probes, the darts being shot. And then the last one was the touch mode.").

Because Dr. Manion has absolutely no relevant ECD knowledge, education, training or experience, he is simply not qualified to offer any expert opinions regarding TASER X26 ECDs

13

generally, or their alleged contribution to Cox's death on April 22, 2005 specifically. *See Neal-Lomax v. Las Vegas Metro. Police Dep't,* 574 F. Supp. 2d 1193, 1203 (D. Nev. 2008) (excluding opinions of forensic pathologist regarding TASER ECD effects on humans where doctor had "little to no knowledge, training, experience, education, or expertise related to electronic control devices generally or the [TASER ECD] specifically."), *aff'd,* 371 Fed. Appx. 752 (9th Cir. 2010); *Lash v. Hollis*, 2007 U.S. Dist. LEXIS 3633, *10-12 (E.D. Mo. 2007) (finding expert not qualified to testify regarding physiological effects of multiple TASER ECD deployments based on reading scholarly article and then attempting to extrapolate facts to fit case), *aff'd,* 525 F.3d 636 (8th Cir. 2008); *Salinas v. TASER Int'l,* 2010 WL 7697467, *2-3 (N.D. Cal. 2010) (excluding ECD causation opinions where former medical examiner turned consultant's "significant experience in forensic pathology d[id] not include substantial experience with ECDs, either in the context of autopsies he performed or otherwise.").

### D.     False Factual Premise and Rank Speculation.

A metabolic acidosis theory of causation is factually dependent on the ECD causing significant muscle contractions in a subject thereby creating lactic acid. Here, however, there is no evidence that the ECD exposures as applied to Cox caused any such muscle contractions. Dr. Manion's opinions to the contrary are based on two fundamental factual flaws – first, that Cox received multiple probe deployments (he did not); and second, that ECD drive-stuns produce the same strong muscle contractions as fired probes (they do not). *See Brooks v. City of Seattle*, 599 F.3d 1018, 1026 (9th Cir. 2010) (discussing differences in effect of drive-stun and probe-mode deployments and finding drive-stun "causes temporary, localized pain only"). Accordingly, Dr. Manion's opinion that the ECD applications to Cox increased his pre-existing acidosis by causing "extreme muscle exhaustion," has absolutely no basis in fact.

14

As is clear from the incident facts set forth above, everyone agrees (except Dr. Manion who just does not know for sure) that Cox received a single probe deployment to the chest, which was ineffective and for some unknown reason did not incapacitate him. But whatever the reason (ECD not working, inadequate probe spread, no completed circuit), the fact that Cox did not go down means there was no substantial muscle stimulation. (Smith Dec. ¶¶ 20, 22). And, as even Dr. Manion admits, whatever muscle stimulation there might have been only lasted 2-3 seconds before Cox pulled the darts from his chest. (Ex. 10 at 156:23-157:12). After that, it is undisputed that the ECDs were only used on Cox in drive-stun mode. Even Plaintiff's other experts agree that with the exception of the first probe shot to the chest, all other ECD applications were drive-stuns. (Ex. 11, Morse depo. at 22:24-23:2, 85:25-86:4; Ex. 14, Mamet depo. at 66:24-68:25).

So here is where Dr. Manion's complete lack of qualifications and basic ECD knowledge becomes critically important. Indeed, his failure to comprehend the physiological differences between a drive-stun and a probe deployment (*supra*, nn.2-3), wholly invalidates his ECD acidosis opinion. Drive-stuns are pain compliance tools plain and simple, and do not cause muscle contractions or incapacitation like successful probe deployments which penetrate the skin and have a minimum 4-inch spread between the probes. (Smith Dec. ¶¶ 20-21). Because electricity takes the path of least resistance and the skin barrier presents significant resistance (approximately 600+ ohms ("$\Omega$")), the electricity from an externally applied drive-stun only travels 1.6 inches along the surface of the skin between the two fixed electrodes on the ECD. (Ho Dec. ¶¶ 16-17). As demonstrated in the illustration below, the electricity never reaches the muscle underlying the skin and fat layers.



Path of electrical circuit

During the course of Dr. Manion's deposition, he realized the errors of his way and acknowledged he had no basis to disagree with this illustration depicting the current flow of an ECD drive-stun. (Ex. 10 at 79:9-22, 83:21-24, Depo. Ex. 9). He agreed electricity takes the path of least resistance and that the skin and fat layers provide shielding mechanisms for skeletal muscles. (*Id*. at 48:24-4, 80:4-10, 196-18-25). He agreed the ECD current "does not go to ground" and only flows between the two electrodes to complete the circuit. (*Id*.). He agreed that a drive-stun does not have the same effect on the body as fired probes because "less electrical energy will go into the body if the probes are close together." (*Id*. at 77:4-15). He admitted he could not cite any peer-reviewed literature supporting his belief that the skeletal muscle directly underneath the electrodes would contract during a drive-stun (*Id*. at 77:20-78:6), and he ultimately agreed that drive-stuns only cause pain while probe deployments cause incapacitation through muscle contractions. (*Id*. at 124:15-23, "Very well. That makes sense."). Thus, Dr. Manion testified that he could not say to a reasonable degree of medical or scientific certainly that TASER ECD drive-stuns cause or result in muscle contractions. (*Id*. at 85:12-17, 100:10-25).

But not wanting to admit "game over," Dr. Manion proceeded to speculate that Cox might still have contracted his muscles "to get away from the source of pain." (*Id*. at 85:2-4, 168:8-10). Sgt. Lixfield, of course, testified that Cox "didn't twitch, he didn't jerk or show any reaction" to the ECD applications (Ex. 1 at 46:17-21), and Dr. Manion, who was not present, has no basis to dispute this. Dr. Manion also admitted his supposition that a person "might flinch [his] muscles to get away from it," was only a possibility and not an opinion that he holds to a reasonable degree of professional certainty. (Ex. 10 at 100:10-25).

Nor is Dr. Manion qualified to testify concerning any pain allegedly experienced by Cox while high on cocaine and in a state of excited delirium. (*Id*. at 89:18-19, 93:4-12, stating Cox pulled

16

probes out of chest because they were causing pain). *See, e.g., Green v William Penn Life Ins. Co. of N.Y.*, 74 A.D.3d 570, 578, 902 N.Y.S.2d 542, 550 (1ˢᵗ Dep't 2010) (forensic pathologist not qualified to testify as expert on psychology or state of mind of individual who commits suicide). Dr. Manion testified that both cocaine and adrenaline dramatically increase a person's pain threshold, and Cox "was probably releasing a lot of adrenaline." He also admitted that what Cox felt would have been "completely different" than a normal person. (Ex. 10 at 92:3-14, 169:7-24, 170:7-10, stating people on adrenaline high can be shot and not know it until after the altercation dies down; *see also* Ex. 11, Morse depo. at 121:3-4, "Theoretically he felt pain; there is no documented evidence of it."). Thus, Dr. Manion must be precluded from speculating about any pain allegedly experienced by Cox as a result of the ECD applications.

But even if Cox did experience pain from his few short encounters with the ECD and momentarily flinched because of it, it is absurd to suggest that any such muscle reaction contributed in any meaningful way to Cox's acidosis or was otherwise a substantial factor leading to his death. (Ho. Dec. ¶ 18). Cox was engaged in a prolonged, violent physical struggle which lasted well over an hour and sent nine police officers to the hospital. Witnesses from the residence reported that Cox had been drinking and started screaming and smashing things, doing karate moves and punching doors around 7:30 p.m. (Ex. 7 at 5-6). Fearing he was going to kill someone, four men rushed Cox, knocking him down and causing his head to hit the wall and bleed. The men were unable to restrain Cox, however, because he was too strong. (*Id.*). The 911 call stating "Johnny Cox is bustin' up the house" was logged at 8:00 p.m. (Ex. 7 at 2). Cox then continued to act in what Dr. Manion concedes was a very highly agitated uncontrollable state until his arrival at the hospital at 8:42 p.m. (Ex. 10 at 93:14-18).

17

Dr. Manion admits that any exertion, any exercise will "absolutely" cause acidosis. (*Id.* at 147:20-22, 148:4-7). He admits that prior to any interaction with police, Cox would have already been acidotic based on his reported behavior. (*Id.* at 146:21-25, 151:8-14). He further admits that, separate and apart from any ECD application, Cox's prolonged violent behavior in fighting multiple police officers and fighting against the restraints constituted exertion that had physiologic effects on Cox, including causing him to become more acidotic and his pH to drop. (*Id.* at 161:2-162:4, 188:12-16, Cox's "exertion, agitation, behavior, fighting, and struggling" all contributed to his metabolic acidosis and his demise). Yet, based on nothing but his own say-so, Dr. Manion opines that Cox "wouldn't have died from his own fighting and struggling." (*Id.* at 188:22-189:10, 191:9-11, "I agree that he contributed to his own acidosis, but not to the degree that would be fatal.").

But Dr. Manion can point to no study, no peer-reviewed literature, nothing to support his outlandish opinion that a few seconds of ECD exposure in the midst of all this bedlam exacerbated Cox's metabolic acidosis to such a degree as to contribute to his death. (*Id.* at 222:17-25). Indeed, such rank speculation is so "unrealistic and contradictory as to suggest bad faith." *Baker*, 254 F. Supp. 2d at 353. There is no science, no methodology supporting Dr. Manion's opinion, and his repeated claim that it is just "common sense" falls flat in the context of this case. (Ex. 10 at 166:21-167:2 (unable to name any medical or scientific literature finding ECD drive-stun to human results in change in metabolic acidosis or pH, but stating, "it's common sense"); 223:6-17 (unable to identify any study demonstrating that any ECD application to human has negative impact on metabolic acidosis, again stating it is "common sense"); 177:8-11, 180:19-181:2 ("Well, I would just think that if someone was stunned more times, that they would have more problems. Just common sense," but unable to cite any supporting authority)).

**E.     No Medical or Scientific Support That TASER ECD Produces Clinically Significant Metabolic Acidosis.**

Moreover, Dr. Manion's ECD acidosis theory has been tested, vetted and debunked. (Ho. Dec. ¶¶ 9-15). His failure to cite any published peer-reviewed literature is not because such studies do not exist, but because none of them support his opinions. Numerous human studies have monitored blood serum pH, lactate, potassium, troponin I, catecholamines and creatine kinase ("CK") following ECD applications to humans, and have uniformly found no clinically significant changes in blood chemistry.[11] (*Id*. ¶¶ 11-12). Indeed, a study funded by the National Institute of Justice ("NIJ") and published in the Annals of Emergency Medicine in April 2009 examined the "rapidly evolving body of literature" regarding the physiologic and cardiovascular effects of ECD applications in humans and found "**no evidence of dangerous respiratory or metabolic effects**" using extended ECD applications up to 45 seconds. (*Id*. ¶ 13 & Ex. E). Dr. Manion admitted at his deposition that he had not read any of these studies, although he acknowledged the importance of an

---

[11] *See, e.g.,* "Acidosis and catecholamine evaluation following simulated law enforcement 'use of force' encounters," *Academic Emerg Med*, 2010;17:E60-E68 (simulating common arrest-related situations such as flight, physical resistance, 10-second continuous ECD probe application, and pepper spray exposure, and finding physical resistance and fleeing on foot led to the greatest changes in markers of acidosis and catecholamines; ECD produced the lowest total catecholamine increase of all groups); "Prolonged TASER [ECD] use on exhausted humans does not worsen markers of acidosis," *Am J Emerg Med*, 2009;27:413-418 (finding prolonged TASER ECD use on already exhausted acidotic volunteers did not worsen acidosis, *i.e.,* no further change in pH, lactate, etc., in repeated blood serum biomarker evaluation); "Lactate and pH evaluation in exhausted humans with prolonged TASER X26 exposure or continued exertion," *Forensic Sci Int*, 2009;190:80-86 (comparing acidosis levels in exhausted subjects who were allowed to continue to exert themselves versus receiving a 15-second continuous TASER X26 ECD probe application, and concluding the ECD application did not worsen acidosis any differently than those allowed to continue to struggle). "Multi-Method Evaluation of Police Use of Force Outcomes," Final Report to NIJ at 8-3 (July 2010) (examining more than 24,000 law enforcement use-of-force incidents in the field, and finding a suspect's risk of being injured *decreased by almost 60%* when an ECD was used instead of hands-on physical force). (Ho Dec. ¶¶ 12, 19, 23 & Exs. A-D, G).

expert staying current on the literature in the areas on which he is offering opinions. (*Id*. at 54:14-18, 172:7-173:6, 175:2-18, 178:11-24).

Significantly, there is no evidence that Cox actually received more than 45 seconds of ECD discharge. Dr. Manion could only account for 6 seconds of exposure; 3 seconds from the initial probe deployment before Cox ripped out the darts, and 3 seconds from Sgt. Doherty's drive-stun to Cox's back, neither of which was reported to have any effect on Cox. Even if Sgt. Lixfield made successful drive-stun contact with Cox 3-4 times during his struggle with multiple officers, it is clear that such contact could not have been maintained for more than a few seconds with each ECD application due to Cox's strength, resistance and violent movement. In any event, no peer-reviewed article or study has ever suggested that an ECD drive-stun directly causes any injury beyond minor contact burns (Ho. Dec. ¶¶ 16, 19-20 & Ex. K), which is consistent with Cox's autopsy findings.

Accordingly, Dr. Manion's metabolic acidosis opinions are wholly unsupported by any medical or scientific study published to date. Because he performed no independent research or testing concerning the potential of ECD drive-stuns to worsen pre-existing metabolic acidosis, failed to identify any scientific methodology used to reach his conclusions, and admitted he is not an expert on TASER ECDs or their secondary effects on blood chemistry in humans, the Court should preclude his ECD-related medical causation opinions at trial as wholly unreliable.

## III.  DR. MANION'S IRRELEVANT AND UNQUALIFIED CARDIAC AND POSITIONAL ASPHYXIA OPINIONS MUST ALSO BE EXCLUDED.

### A.  No Evidence of Direct Cardiac Effect.

Although Dr. Manion does not opine that the ECD's electrical current caused ventricular fibrillation ("VF") or any other direct effect on Cox's heart, his report is filled with ECD cardiac ramblings that do not "fit" the facts of this case. (Ex. 9 at 4-5). Indeed, Dr. Manion's entire acidosis

theory regarding potential *secondary* effects of ECD applications is necessary precisely because the ECD's electricity caused no *primary* injury to Cox. Let's be clear on what is going on here. Plaintiff has designated Michael Morse, Ph.D., a biomedical and electrical engineer who specializes in electric shock injury and the effects of electricity on the human body including, specifically, VF, as her "design" expert. At his deposition, Dr. Morse steadfastly refused to answer questions regarding anything cardiac, stating it was outside the scope of his designation in this case. (Ex. 11, Morse depo. at 18:17-21 ("I've excluded myself from offering opinions on several areas"); 105:1-2 ("The issue of causality I am leaving to other experts to address"); 26:9-16 (refusing to answer whether ECD caused VF in Cox stating, "That's not the expertise I'm bringing to the table today."); 22:7-9 (Harris: "He's here as an expert in terms of the design, not necessarily to talk about the physiological effects on the body")). This refusal, however, comes despite the fact that Dr. Morse recently testified in another TASER case being prosecuted in this same district by Plaintiff's same counsel, Fredrick Brewington, that multiple ECD drive-stuns to David Glowczenski in February 2004 "didn't cause ventricular fibrillation, didn't cause asystole, didn't cause respiratory arrest." (*See* 12-3-10 TASER *Daubert* Motion at 10 filed in 04-CV-4052; Ex. 13, 21:2-6, 109:25-110:2).

Dr. Morse further testified in the Glowczenski matter that, "I do not believe that the application of the [TASER ECD] either by location [lower backside] or in this particular mode [drive-stun] would have been likely to cause ventricular fibrillation and certainly the AED noted that he was in asystole." *Id.*; *see also* Ex. 11 at 68:24-69:2, "if you are asking me if shocking someone in the ass can cause a current pathway to the heart, I would say likelihood is small."). Here too, Cox's presenting heart rhythm was asystole (not VF) and the ECD drive-stuns were primarily to his lower backside. (Ex. 10 at 205:8-12). Moreover, both Dr. Morse and Dr. Manion agree, as they must, that if electricity is going to put a human in VF, it will occur "almost instantly," within milliseconds, not

21

sometime after a 10 minute ambulance ride. (*Id.* at 25:14-21; Ex. 11, Morse depo. at 24:7-9 (electrically induced VF occurs within close proximity chronologically to the application of the shock); 32:2-3 ("As a general rule, delayed cardiac arrest following electric shock is rare"); 42:4-10 (acknowledging it was at least 10 minutes from chest application until when Cox appeared to calm down)).

Thus, the Court cannot allow Dr. Manion to give any testimony whatsoever regarding ECD electrical properties, TASER "cardiac events," or ECD VF pig studies he knows nothing about (Ex. 10 at 110:9-11, 111:17-112:2, 132:11-13, 134:22-25, 197:16-20, 198:16-23, 199:15-18), while at the same time withholding Dr. Morse's more qualified opinions, which would clearly favor TASER under the facts of this case. In any event, because Dr. Morse refused to give a cardiac causation opinion, and Dr. Manion could not testify to a reasonable degree of medical certainty that the TASER ECD had any direct impact on Cox's heart (*Id.* at 201:17-20), all cardiac-related testimony is irrelevant and must be excluded because it will not assist the trier of fact in understanding the evidence or determining any fact actually at issue. *Daubert*, 509 U.S. at 592-93. Indeed, under Fed. R. Evid. 403, such testimony must also be excluded as it is likely to confuse and mislead the jury, unduly prejudice TASER, and waste everyone's time. *Id.* at 595 (noting expert testimony "can be both powerful and quite misleading because of the difficulty in evaluating it"); *Nimely*, 414 F.3d at 397 (noting important role Rule 403 plays in district court's scrutiny of expert testimony); *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 174 (S.D.N.Y. 2009) ("like all evidence, expert testimony may be excluded under Rule 403 if its 'probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury'").

**B.    Positional Asphyxia Opinions Unqualified and Irrelevant As To TASER.**

Even if the ECD applications resulted in some minute increase in lactic acid, Dr. Manion acknowledges that the body naturally rids itself of excess $C0_2$ through quickened breathing. He only gets to contribution to death based on the officers' independent alleged conduct in restricting Cox's breathing during his transport to the hospital after all ECD activity had undisputedly ceased. (Ex. 9 at 6). Indeed, Dr. Manion expressly testified that "**if the [TASER ECD] hadn't been used on him, and they had still strapped him down and sat on him, he still would have died.**" (Ex. 10 at 215:15-216:9). Thus, since Dr. Manion could not testify to a reasonable degree of medical certainty that Cox would have survived if no ECD was used on him," there is no "but for" causation and TASER is entitled to judgment as a matter of law. *See Basko v. Sterling Drug, Inc*., 416 F.2d 417, 429 (2d Cir. 1969) ("Ordinarily, the concept of proximate cause can be stated in terms of a 'but for' test"); *In re September 11 Prop. Damage & Bus. Loss Litig., Inc. v. Port Auth*., 468 F. Supp. 2d 508, 519 (S.D.N.Y. 2006) ("Where such an intervening act separates the alleged tortfeasor from the injury sustained, the required causal link is absent as a matter of law."); *Lee v. New York City Hous. Auth.*, 25 A.D.3d 214, 803 N.Y.S.2d 538, 542-43 (1st Dep't 2005) ("New York tort law uses 'substantial factor' to refer to the subset of but for causes that will be said to be the proximate or legal cause of an actionable harm.").

In any event, Dr. Manion has once again stepped outside his area of expertise and offered speculative opinions without factual support. Dr. Manion admits he has never trained as a law enforcement officer, has never published anything related to law enforcement, and is not an expert in law enforcement use of force, tools or techniques or their effects. (Ex. 10 at 107:9-19, 109:23-25, 110:2-4). Yet, Dr. Manion opines that, "Police don't understand . . . that you can't sit on them for minutes at a time. You have to let their chest expand, and they don't understand that as they can't

23

breathe, they're struggling even more." (*Id*. at 95:7-12). Dr. Manion has absolutely no knowledge, training or experience that would allow him to testifying as to what police officers "understand" about safe restraint techniques or a subject's response.

He also has no factual basis that the officers' restraint efforts in the ambulance did not let Cox's chest expand or otherwise interfered with his breathing. No one was sitting on Cox's back or applying pressure on his diaphragm. Two officers were holding his shoulders and neck with his head turned to the side, and the third was sitting on his "buttocks" and legs, leaving his entire back exposed. (Ex. 5 at 3-4; Ex. 6 at 96:18-21, 138:5-15). They were also riding with an experienced EMT who is specifically trained to pay attention to a patient's breathing, and who has testified based on his own personal observation that at no time did Cox exhibit any difficulty breathing due to the officers' restraint. (Ex. 6 at 183:15-19, 186:5-13). Indeed, EMT Smith testified that the police "did everything they could to restrain the patient without hurting him" (Ex. 5 at 5), and even Dr. Manion agreed, "I had the feeling they were probably trying to keep him from hurting himself." (Ex. 10 at 211:16-18). In any event, Dr. Manion only testified that holding someone's neck down "*can* interfere with their airway," not that it did so in this case. He admitted that an officer could also stabilize the neck to prevent injury without having a negative impact on his airway, and could point to nothing in Cox's autopsy report to support any kind of neck injury or airway obstruction. (*Id*. at 211:21-212:12).

Dr. Manion also admitted he did not know how much the officer sitting on Cox's lower torso weighed, or how many seconds or how many pounds of pressure were applied. (*Id*. at 208:14-209:21). He further admits that it is "a good question" how much weight force can be placed on a person's back without causing clinically significant respiratory compromise in a restrained position. He just doesn't know the answer. (*Id*. at 99:19-100:9). Dr. Manion could not name any literature finding that sitting on a person's low back will have a clinically significant effect on respiration,

again relying only on "common sense" instead of any scientific support. (*Id*. at 206:12-21). He admitted his embarrassment in not knowing who the leading researchers Reay, Neuman, Chan or Vilke are, and in not having read their publications on respiratory compromise allegedly associated with law enforcement restraint. (*Id*. at 99:2-18). "All I know is when all this was going on, he suddenly stopped breathing." (*Id*. at 210:20-211:4).

That is simply not good enough for expert medical causation testimony.  Dr. Manion concedes these facts only support a temporal relationship between the officers' restraint and Cox's subsequent cessation of breathing (*Id*.), and that "association" and "temporality" do not equal causation. (*Id*. at 56:20-57:7, "speculative allegations, claims, or possibilities in the absence of medical, scientific, engineering, or electrical support or proof is not evidence of causation"). Dr. Manion has nothing more. Accordingly, the Court must exclude Dr. Manion's non-ECD-related positional asphyxia opinions as unqualified, factually and scientifically unsupported, and wholly irrelevant to the issue of TASER ECD causation.

## IV.    CONCLUSION.

The Court should preclude Dr. Manion from testifying at trial or otherwise providing any medical causation opinions in this case. He has not done his homework, does not have his facts straight, and offers nothing of value to assist the jury. The jury has "common sense" and Dr. Manion adds no "knowledge, skill, expertise, training, or education" as to the subject matter on which he intends to testify, *i.e.*, the effects of an ECD application on the human body. He offers only unsubstantiated speculation that simply cannot be stamped "expert." And, at the end of the day, he admits that even if the TASER ECD had not been used at all, Cox "still would have died." Game over.

Dated:  White Plains, New York
          October 17, 2011

                              Respectfully submitted,

          By:     /s/  *John V. Tait*_____
                  John Renzulli (JFR 2917)
                  jrenzulli@renzullilaw.com
                  Christopher Renzulli (CR 8840)
                  crenzulli@renzullilaw.com
                  John V. Tait (JT 4835)
                  jtait@renzullilaw.com
                  **RENZULLI LAW FIRM, LLP**
                  81 Main Street, Suite 508
                  White Plains, NY 10601
                  Telephone: (914) 285-0700
                  Facsimile:  (914) 285-1213

                          -and-

                  Michael Brave (*Pro Hac Vice*)
                  brave@laaw.com
                  Holly L. Gibeaut (*Pro Hac Vice*)
                  hgibeaut@taser.com
                  TASER International, Inc.
                  17800 North 85th Street
                  Scottsdale, AZ 85255
                  Telephone: (800) 978-2737
                  Facsimile:  (480) 905-2027

                  Attorneys for Defendant
                  TASER International, Inc.

26

**CERTIFICATE OF SERVICE**

I hereby certify that on October 17, 2011, the foregoing document was filed with the Clerk of the Court and served in accordance with the Federal Rules of Civil Procedure, and/or the Eastern District's Local Rules, and/or the Eastern District's Rules on Electronic Service upon the following parties and participants:

Fredrick K. Brewington, Esq.
Ira F. Fogelgaren, Esq.
Law Offices of Frederick K. Brewington
556 Peninsula Boulevard
Hempstead, NY 11550

/s/  *John V. Tait*
John V. Tait (JT 4835)