**Exhibit E**

INJURY PREVENTION/ORIGINAL RESEARCH

# Safety and Injury Profile of Conducted Electrical Weapons Used by Law Enforcement Officers Against Criminal Suspects

William P. Bozeman, MD
William E. Hauda II, MD
Joseph J. Heck, DO
Derrel D. Graham, Jr, MD
Brian P. Martin, MD, MS
James E. Winslow, MD, Mph

From the Department of Emergency Medicine, Wake Forest University, Winston Salem, NC (Bozeman, Winslow); the Department of Emergency Medicine, Virginia Commonwealth University, Richmond, VA, and the Department of Emergency Medicine, George Washington University, Washington, DC (Hauda); the Department of Emergency Medicine, University Medical Center Las Vegas, Las Vegas, NV (Heck); and the Department of Emergency Medicine, Louisiana State University Health Sciences Center Shreveport, Shreveport, LA (Graham, Martin).

The opinions, findings, and conclusions or recommendations expressed in this publication are those of the authors and do not necessarily reflect the views of the Department of Justice.

**Study objective:** Conducted electrical weapons such as the Taser are commonly used by law enforcement agencies. The safety of these weapons has been the subject of scrutiny and controversy; previous controlled studies in animals and healthy humans may not accurately reflect the risks of conducted electrical weapons used in actual conditions. We seek to determine the safety and injury profile of conducted electrical weapons used against criminal suspects in a field setting.

**Methods:** This prospective, multicenter, observational trial tracked a consecutive case series of all conducted electrical weapon uses against criminal suspects at 6 US law enforcement agencies. Mandatory review of each conducted electrical weapon use incorporated physician review of police and medical records. Injuries were classified as mild, moderate, or severe according to *a priori* definitions. The primary outcome was a composite of moderate and severe injuries, termed *significant injuries*.

**Results:** Conducted electrical weapons were used against 1,201 subjects during 36 months. One thousand one hundred twenty-five subjects (94%) were men; the median age was 30 years (range 13 to 80 years). Mild or no injuries were observed after conducted electrical weapon use in 1,198 subjects (99.75%; 95% confidence interval 99.3% to 99.9%). Of mild injuries, 83% were superficial puncture wounds from conducted electrical weapon probes. Significant injuries occurred in 3 subjects (0.25%; 95% confidence interval 0.07% to 0.7%), including 2 intracranial injuries from falls and 1 case of rhabdomyolysis. Two subjects died in police custody; medical examiners did not find conducted electrical weapon use to be causal or contributory in either case.

**Conclusion:** To our knowledge, these findings represent the first large, independent, multicenter study of conducted electrical weapon injury epidemiology and suggest that more than 99% of subjects do not experience significant injuries after conducted electrical weapon use. [Ann Emerg Med. 2009;53:480-489.]

0196-0644/$-see front matter
Copyright © 2008 by the American College of Emergency Physicians.
doi:10.1016/j.annemergmed.2008.11.021

## INTRODUCTION
### Background
Conducted electrical weapons are commonly used by law enforcement agencies. These weapons deliver a series of electrical pulses intended to temporarily incapacitate and allow apprehension of violent or combative subjects through pain compliance and involuntary muscle contractions. Modern conducted electrical weapons such as the Taser model X26 (Taser International, Scottsdale, AZ) (Figure 1) deliver electrical energy either by direct contact or by a pair of metal probes fired from the weapon by compressed gas. An estimated 640,000 criminal suspects and human volunteers have been exposed to conducted electrical weapon discharges, and more than two thirds of law enforcement agencies in the United States currently use conducted electrical weapons.[1,2]

### Importance
Conducted electrical weapons are one of several intermediate force options available to officers faced with violent or combative suspects. Other available options include hand-to-hand combat techniques, chemical irritant sprays, and handheld impact weapons such as metal batons. The use of conducted electrical weapons has been associated with reduced injury rates among both criminal suspects and officers, as well as with reductions in the use of lethal force.[3,4] However, a number of unexpected deaths have been

> **Editor's Capsule Summary**
>
> *What is already known on this topic*
> Anecdotal reports have associated use of conducted electrical weapons such as the Taser with death of restrained individuals. The frequency of adverse events associated with conducted electrical weapons is not known.
>
> *What question this study addressed*
> In this prospective, multicenter, observational study, the frequency and seriousness of injury from conducted electrical weapons was assessed in 1,201 patients.
>
> *What this study adds to our knowledge*
> Serious injury occurred in 3 patients who had received administration of conducted electrical weapons. No cardiac dysrhythmias associated with conducted electrical weapons were documented.
>
> *How this might change clinical practice*
> Patients brought to the emergency department after receiving a conducted electrical weapon apprehension should not have serious symptoms solely attributed to the conducted electrical weapon. Instead, a comprehensive evaluation of appropriate traumatic, medical, and toxicologic causes is indicated.



**Figure 1.** The Taser model X-26 conducted electrical weapon.

observed after conducted electrical weapon use. Though conducted electrical weapons have not been conclusively linked to these deaths, the temporal relationship has led to controversy about the use and safety of conducted electrical weapons.[5-7] Despite extensive use, the overall risk of serious injury or death after conducted electrical weapon exposure has not been previously reported.

**Goals of This Investigation**

Controlled studies of the cardiac and physiologic effects and risks of conducted electrical weapons in animals and healthy human volunteers have begun to address the topic of conducted electrical weapon safety. However, these studies may not accurately reflect risks among criminal suspects in whom coexisting medical and psychiatric conditions, alcohol and drug use, and other factors are often present. These factors may increase risk in this population and make epidemiologic investigations during actual use critical to provide a realistic risk assessment of these weapons. We performed the first large multicenter study to determine the incidence of injuries and adverse outcomes after law enforcement use of conducted electrical weapons.

## MATERIALS AND METHODS
**Study Design**

A prospective multicenter observational study was performed to identify and classify injuries related to conducted electrical weapon use during apprehension of criminal suspects by law enforcement officers. Physician site investigators reviewed police and medical records to identify and classify injuries sustained by subjects after conducted electrical weapon use.

Conducted electrical weapons are battery-operated devices, similar in appearance to a handgun, that incapacitate by delivering a series of brief electrical pulses that produce pain and muscular tetany. The most commonly used conducted electrical weapon (Figure 1) produces 19 pulses per second. Each 100-ms pulse contains approximately 0.36 J of energy at up to 50,000 V.[8] The devices can be used from a distance by firing 2 barbed metal probes that become imbedded in skin or clothing and remain tethered to the weapon by insulated wires. Both probes must make contact or be in close proximity to the subject (within 1 to 2 inches) to complete an electrical circuit and successfully deliver a discharge. Alternatively, conducted electrical weapons can be used in a direct contact or "drive stun" mode by touching the metal contacts at the front of the weapon to a subject. A standard conducted electrical weapon discharge cycle lasts 5 seconds; this can be terminated early by the operator or extended by holding or repeatedly depressing the trigger.

**Setting and Selection of Participants**

Participating sites were recruited from among law enforcement agencies across the United States with printed and electronic announcements via law enforcement and medical specialty associations. These included the National Tactical Officers Association, American College of Emergency Physicians, Society for Academic Emergency Medicine, and National Association of EMS Physicians. To qualify for consideration, law enforcement agencies had to use conducted electrical weapons, have a physician already affiliated with the agency's tactical team with access to agency records, provide

**Table 1.** Injury severity stratification (a priori definitions).

|  | Mild | Moderate | Severe |
|---|---|---|---|
| Description | Outpatient treatment and Mild or no long-term disability expected | Inpatient treatment and/or Moderate long-term disability expected | Inpatient treatment and Severe long-term disability expected or Threat to life |
| Examples | Abrasions, contusions, minor lacerations | Hemopneumothorax, Hepatic/splenic lacerations Long bone fracture | Severe head injury Loss of limb or eye Ventricular dysrhythmias |

routine preincarceration medical screening examinations to all arrestees, and perform mandatory use-of-force review after each conducted electrical weapon use. The medical screening examination could include jail intake screening, paramedic evaluation at the scene, or physician evaluation at an emergency department (ED).

### Methods of Measurement

An *a priori* classification of injury severity was developed (Table 1). This classification was used by site investigators to stratify injury severity as mild, moderate, or severe. Injuries related to the metal probes or electrical discharge of the conducted electrical weapon were termed *direct injuries*, whereas injuries related to falls or other effects caused by conducted electrical weapon use were termed *indirect injuries*. Injuries that were of uncertain relationship to conducted electrical weapon use were recorded and classified as uncertain. Injuries determined to be unrelated to conducted electrical weapon use (eg, vehicular trauma, impact weapon use, firearm use) were not recorded.

The primary outcome measure was significant injuries, a composite of moderate and severe injuries. These injuries require hospital admission, may produce significant long term disability, or may represent a threat to life. These are believed to be most pertinent to both clinical and administrative perspectives about the use of conducted electrical weapons. Cases with no identified injuries and mild injuries were also grouped for analysis.

An *a priori* sample size determination was performed. According to a desired confidence interval (CI) of no greater than ±1.5% for the observed proportion of significant injuries, this indicated a required sample size of at least 335 subjects.

A study steering committee composed of medical and law enforcement experts served as a data and safety monitoring committee during the course of the study. The committee advised investigators on study design and site selection. At 2 predefined enrollment intervals, the committee reviewed results of interim analyses to assess overall safety and consider early study termination if excessive risk was demonstrated.

Institutional review board approval was obtained initially at the central study site and at each participating site before initiation of prospective case surveillance.

To qualify for inclusion, each case had to include delivery of a conducted electrical weapon electrical discharge to a criminal suspect. Cases in which a conducted electrical weapon was displayed or discharged without delivery of the electrical current to the subject did not qualify for inclusion.

### Data Collection and Processing

Conducted electrical weapon uses were prospectively identified from June 2005 through June 2008. Individual sites began case surveillance on approval from their own institutional review board and continued until completion of the study period. Two sites terminated collection early because of investigator relocation and reassignment. Deidentified case report forms were completed by site investigators based on police and medical records gathered in the process of the use-of-force investigation. Data included incident and deployment information, subject demographics, injury information, and outcomes. Probe impact sites and injury sites were recorded on body outline sketches by site investigators. Study staff regionalized these using standardized data abstraction techniques and anatomic markers into 7 body regions: head/face/neck, chest, abdomen/pelvis, back, upper extremities, lower extremities and buttocks, and genitals (Figure 2). For reporting, these were further grouped into trunk, extremities, and potentially sensitive (head/face/neck and genitals) areas.

### Primary Data Analysis

Data were entered into a database and spreadsheet (Excel, Microsoft Corporation, Redmond, WA). Descriptive analysis was performed and observed proportions were determined with standard methods. CIs were calculated with the Blyth-Still-Casella CI (StatXact, version 8.0; Cytel Software Corporation, Cambridge, MA), an exact method specific to small numerators. A consulting biostatistician performed or reviewed all statistical calculations.

### RESULTS
### Characteristics of Study Subjects

During the study period, officers at 6 participating law enforcement agencies used conducted electrical weapons against 1,201 criminal suspects. All uses were reviewed. Participating agency characteristics are shown (Table 2). All subjects received preincarceration medical screening, 386



Figure 2. Body impact and injury regions.

Table 2. Characteristics of participating law enforcement agencies.

| State | Agency | Population Served | Land Area, Square Miles | FTEs | Sworn FTEs | Data Collection Period, Months | CEW Uses |
|---|---|---|---|---|---|---|---|
| AZ | Chandler Police Department | 247,097 | 70 | 500 | 330 | 10 | 46 |
| IL | NIPAS* | 5,288,655 | 945 | N/A | N/A | 32 | 7 |
| VA | Fairfax County Police Department | 991,000 | 395 | 1,772 | 1,390 | 31 | 214 |
| NV | Las Vegas Metropolitan Police Department | 1,070,972 | 7,560 | 3,970 | 2,635 | 30 | 663 |
| LA | Shreveport Police Department | 202,000 | 101 | 831 | 346 | 36 | 205 |
| FL | Marion County Sheriff's Office, Ocala Police Department | 259,277 | 1579 | 1139 | 734 | 18 | 66 |

FTE, Full time equivalent; CEW, conducted electrical weapon; N/A, not applicable.
*The Northern Illinois Police Alarm System (NIPAS) is a multiagency police emergency services team that responds to high-risk tactical situations in 80 police jurisdictions in the Chicago, IL, area. The system responds to approximately 30 activations per year.

subjects (32%) were evaluated by emergency medical services personnel, and 205 subjects (17%) were transported to a hospital for medical or psychiatric evaluation.

The mean subject age was 32 years (range 13 to 80 years; median 30 years; SD 10.7). Mean height was 69 inches (range 54 to 80 inches; median 69 inches; SD 3.7), mean weight was 184 pounds (range 90 to 390 pounds; median 180 pounds; SD 38), and 1,125 suspects (94%) were men. Alcohol or other drug intoxication was documented in 593 cases (49.5%).

In 1,183 cases in which the conducted electrical weapon model was recorded, the Taser model X26 was used in 1,148 (97%), whereas the Taser model M26 was used in 35 (3%). Deployment details are shown (Table 3). Probe mode was used in 784 cases (65.3%), drive stun (direct contact) mode in 327 cases (27.2%), and both modes in 90 cases (7.5%). The mean number of conducted electrical weapon discharges was 1.8; the median was 1. The back and chest were most commonly contacted when conducted electrical weapons were used in probe mode, whereas the back and lower

Bozeman et al

**Table 3.** Conducted electrical weapon deployment details.

| Cases | Deployment Mode | | | Total |
|---|---|---|---|---|
| | Probe | Drive Stun | Both | |
| No. | 784 | 327 | 90 | 1,201 |
| % | 65.3 | 27.2 | 7.5 | 100.0 |
| **Discharges** | | | | |
| Mean | 1.6 | 1.8 | 3.3 | 1.8 |
| Minimum | 1 | 1 | 1 | 1 |
| Maximum | 9 | 6 | 10 | 10 |
| Median | 1 | 1 | 3 | 1 |
| **Discharges** | | | | |
| 1 | 484 | 173 | 2 | 659 (54.9%) |
| 2 | 195 | 88 | 37 | 320 (26.6%) |
| 3 | 70 | 46 | 22 | 138 (11.5%) |
| 4+ | 35 | 20 | 29 | 84 (7.0%) |

**Table 4.** Body impact areas in 1,201 conducted electrical weapon uses (n=2,239 recorded impact areas).

| Body Area | Probe Mode (n=1,703 Impact Areas) | | | Drive Stun Mode (n=536 Impact Areas) | | |
|---|---|---|---|---|---|---|
| | No. | (%) | Region, % | No. | (%) | Region, % |
| Back | 628 | (36.9) | Trunk, 80 | 249 | (46.5) | Trunk, 66 |
| Chest | 424 | (24.9) | | 50 | (9.3) | |
| Abdomen/pelvis | 301 | (17.7) | | 52 | (9.7) | |
| Lower extremities | 189 | (11.1) | Extremities, 19 | 116 | (21.6) | Extremities, 31 |
| Upper extremities | 134 | (7.9) | | 50 | (9.3) | |
| Head/face/neck | 24 | (1.4) | Sensitive, 1.6 | 16 | (3.0) | Sensitive, 3.5 |
| Genitals | 3 | (0.2) | | 3 | (0.6) | |

**Table 5.** Injuries sustained after conducted electrical weapon use.

| Injuries | No. | Percent | 95% CI |
|---|---|---|---|
| None | 938 | 78.1 | 75.7-80.4 |
| Mild | 260 | 21.6 | 19.4-24.1 |
| Moderate | 2 | 0.2 | 0.03-0.6 |
| Severe | 1 | 0.1 | 0-0.5 |

extremities were most commonly contacted when conducted electrical weapons were used in drive stun mode (Table 4).

**Main Results**

Overall, 1,198 of the 1,201 subjects (99.75%; 95% CI 99.3% to 99.9%) experienced no injuries or mild injuries only (Table 5). Of the 492 mild injuries identified, the majority (n=408; 83%) were superficial puncture wounds from conducted electrical weapon probes. Other mild injuries occurred in 62 of the 1,201 subjects (5.2%; 95% CI 4.0% to 6.6%) and were primarily related to blunt trauma from falls. These included contusions (n=49), lacerations (n=29), and others, including 2 superficial burn marks, a finger fracture, a nasal fracture, a case of epistaxis, and a chipped tooth.

Three subjects (0.25%; 95% CI 0.07% to 0.7%) sustained significant injuries after conducted electrical weapon use. Two were head injuries sustained in falls related to conducted electrical weapon use. The less severe of these was a 6.5-mm temporoparietal intraparenchymal contusion. The more severe was an 8-mm cerebellar epidural hematoma. Both subjects were admitted to the hospital for observation and discharged after 48 to 72 hours without neurosurgical intervention or long-term sequelae.

The third significant injury was a case of rhabdomyolysis of unclear relationship to conducted electrical weapon use. In that case, a 33-year-old man was apprehended by police on a hot summer day after a foot pursuit, physical struggle, and 3 discharges from a conducted electrical weapon fired in probe mode. The subject was evaluated at the scene by paramedics and transported to an ED for evaluation. He admitted to crack cocaine use but had no complaints and after a negative evaluation result was discharged to jail. An officer participating in the apprehension was also treated for heat exhaustion. Two days later, the suspect presented again to the ED from jail with flank pain and decreased urine output. Rhabdomyolysis was diagnosed and he was admitted to the hospital for supportive care. Admission creatine phosphokinase level was 61,116 units/L and creatinine level was 5.5 mg/dL. A renal ultrasonogram was normal. Dialysis was not required, and all results trended back to normal by discharge. He was discharged after 8 days without permanent sequelae.

Two suspects in the study cohort died unexpectedly while in police custody. Both cases were men in their 30s who struggled violently with police both before and after conducted electrical weapon use and on whom other physical force was used to take them into custody. One subject had a high body mass index and was involved in a foot pursuit and prolonged physical struggle with police, during which 2 conducted electrical weapon

discharges were used. He collapsed approximately 20 minutes later. At autopsy, he was found to have a dilated cardiomyopathy and cocaine was present in the serum. The second subject was agitated and violent, with a history of mental illness. After an extensive struggle, during which pepper spray and 2 conducted electrical weapon discharges were used, he was restrained in a prone position. He collapsed an estimated 5 minutes after conducted electrical weapon use. An autopsy revealed no anatomic cause of death, but olanzapine at 170 ng/mL was present in the serum. Conducted electrical weapon use was not determined to be causal or contributory to death by the medical examiner in either case.

## LIMITATIONS

This study has several limitations. The information abstracted for study purposes was based on review of written officer reports and medical records, which has well-recognized limitations. Criminal suspects may be less than fully cooperative and forthcoming during the apprehension and incarceration process. Some subjects may have sustained injuries that were self-assessed as mild or trivial and denied complaints on medical screening. Because specific testing could not be mandated in this observational trial, the incidence of minor injuries may have been underestimated. Anticipating this limitation, subjects with mild injuries and no injuries were grouped together by an *a priori* decision. Because routine medical screening was performed, it is thought to be unlikely that subjects with the primary outcome measure (significant injuries requiring hospitalization or likely to produce long-term disability or threat to life) were missed. The presence of alcohol or drugs was based on officer reports, rather than toxicologic testing, which may overestimate or underestimate the association of conducted electrical weapon use and drug or alcohol intoxication. Although the number and duration of conducted electrical weapon discharges are recorded in law enforcement reports and confirmed by an electronic recording device within the weapon, confirming the number or duration of discharges that subjects actually received is not currently possible. A subject may fail to receive the energy from a conducted electrical weapon discharge because of incomplete contact by one or both probes or electrodes on the front of the weapon. A number of subjects likely received partial discharges or fewer discharges than recorded, especially in cases in which conducted electrical weapon use did not have any discernable effect. Although site investigators had access to use of force investigation materials, only deidentified summary case report forms could be submitted for study purposes. This precluded assessments of interobserver agreement. It is believed that expert physician review, along with clear guidelines developed for injury severity assessment, minimize this limitation.

## DISCUSSION

In the course of their duties, law enforcement officers are required to apprehend combative and violent subjects by using various levels of physical force up to and including deadly force. Conducted electrical weapon use is generally regarded as an intermediate level of force and is authorized in situations that would also justify the use of physical strikes, chemical irritant sprays, and handheld impact weapons such as metal batons. Mild injuries such as contusions and abrasions are common among both officers and suspects after such encounters, and serious or fatal injuries are known to occur.[3] Prevention of significant or fatal injuries is desirable and an important consideration in discussion of the safety of intermediate force options, including conducted electrical weapons.

Reports from a variety of law enforcement agencies indicate that the implementation of conducted electrical weapons has been associated with reductions in suspect injuries (24% to 82% reduction), officer injuries (20% to 93% reduction), and the use of firearms (50% to 66% reduction).[3,9] Although suggesting a significant overall safety benefit of conducted electrical weapon use compared with alternative force options, these reports are limited because they are based on internal agency reviews. If conducted electrical weapon use is associated with a substantial risk of serious injury or death, then these weapons may pose a significant public health concern because more than two thirds of United States law enforcement agencies currently use conducted electrical weapons.

To our knowledge, this investigation represents the first large multicenter assessment of injuries sustained by criminal suspects after conducted electrical weapon use. The primary finding that 99.75% of subjects experienced mild or no injuries represents the first assessment of the safety of this class of weapons when used by law enforcement officers in field conditions. Most of the mild injuries observed (83%) were skin punctures caused by the conducted electrical weapon probes; this is an expected consequence of conducted electrical weapon use. Other mild injuries were observed in 5.2% of subjects. This injury profile compares favorably with other intermediate force options available.[3,4,10] These findings support the continued use of conducted electrical weapons in settings in which they can be safely substituted for more injurious intermediate force or lethal force options.

Two of the 3 significant injuries after conducted electrical weapon exposure were head injuries sustained in falls. Although both subjects were observed without surgical intervention and ultimately had good outcomes, conducted electrical weapons do have the potential to cause serious or fatal injuries because of falls, and at least 1 such fatality has occurred.[11,12] This study observed the incidence of such injuries to be 0.16% of subjects after conducted electrical weapon exposure. This low incidence of significant injuries does not allow identification of subgroups that may be at greater risk for serious injury.

The third significant injury in this series was a case of rhabdomyolysis diagnosed 2 days after incarceration, with an uncertain relationship to conducted electrical weapon exposure. Although a conducted electrical weapon was discharged 3 times (up to 15 seconds of total exposure) during apprehension,

Table 6. Experimental studies of conducted electrical weapon applications in human volunteers, grouped by duration of conducted electrical weapon exposure.

| Study | Abstract vs Manuscript | CEW Exposure (Seconds) | Other Conditions | No. | Vital Signs | ECG | Cardiac Enzymes | Metabolic Laboratory Tests | Respiratory Function | Other | Duration of Follow-up[†] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Vilke, 2008[37] | M | 1-5 | | 32 | | X | | | | | Immediate |
| Levine, 2007[35] | M | 1-5 | | 105 | X | (X) | | | | | Immediate |
| Barnes, 2006[34] | A | 1-5 | | 84 | X | (X) | | | | | Immediate |
| Sloan, 2008[36] | M | 1-5 | | 66 | | (X) | X | | | | 6 h |
| Vilke, 2007[26] | M | 5 | | 32 | X | | X | X | X | | 6 h |
| Ho, 2006[14] | M | 5 | | 66 | X | X | X | | | | 24 h |
| Vilke, 2007[30] | A | 5 | Exercise | 8 | X | | | X | | | 1 h |
| Vilke 2008[31] | A | 5 | Exercise | 22 | | | | X | | | 1 h |
| Dawes, 2007[51] | A | 5 | | 15 | | | | | | Salivary α-amylase, cortisol | 1 h |
| Ho, 2008[38] | M | 10 | | 34 | X | | | | | Cardiac ultrasonography | Immediate |
| Ho, 2008[15] | A | 10, 15 | | 21 | | X | X | | | | 24 h |
| Ho, 2007[24] | M | 15 | | 52 | X | | | | X | | Immediate |
| Dawes, 2007[22] | A | 15 | | 18 | X | | | X | X | | Immediate |
| Ho, 2008[52] | A | 15 | | 44 | X | | | | | Cardiac ultrasonography | Immediate |
| Ho, 2007[29] | A | 15 | Exercise | 44 | | | X | X | | | Immediate |
| Ho, 2007[27] | A | 15 | Exercise | 25 | | X | | | | | Immediate |
| Ho, 2007[28] | A | 15 | Exercise | 37 | X | | | | | Cardiac ultrasonography | Immediate |
| Moscati, 2007[25] | A | 15 | Alcohol | 26 | | | X | X | | EtOH level | 24 h |
| Dawes, 2008[53] | M | 15 | | 31 | | | | | | Core Temp | Immediate |
| Dawes, 2007[23] | A | 15-45 | | 50 | | | | X | X | | Immediate |

A, Abstract; M, manuscript.
*Assessments of vital signs include pulse rate, respiratory rate, and blood pressure. ECGs include serial 12-lead ECGs, indicated with an "X," and single-lead rhythm strips during a period of time, indicated with an "(X)." Cardiac enzymes include serum measurements of troponin, creatine kinase, or myoglobin levels. Metabolic laboratory tests include serum measurements of venous or arterial pH, lactate level, electrolyte levels, bicarbonate level, renal function, or others. Respiratory function measurements include tidal volume, minute ventilation, end-tidal $O_2$ and $CO_2$, transcutaneous oximetry, etc.
[†]Follow-up durations of less than 1 hour are indicated as immediate.

several other potential causes or contributors were present, as have been described in other reports of rhabdomyolysis after conducted electrical weapon exposure.[13] These include high ambient temperatures, prolonged physical exertion, and cocaine use. Experimental studies have not demonstrated evidence of rhabdomyolysis after conducted electrical weapon exposures of up to 15 seconds in healthy volunteers, making the association between conducted electrical weapon exposure and rhabdomyolysis speculative.[14,15]

Two in-custody deaths occurred after conducted electrical weapon exposure among the study cohort. These were judged to be unrelated to conducted electrical weapon exposure, excluding these cases from analysis according to *a priori* design decisions. Both subjects actively resisted arrest both before and after conducted electrical weapon use, and physical collapse occurred at least 5 and 20 minutes after conducted electrical weapon exposure, making electrically induced fatal dysrhythmias unlikely. Both of these cases are consistent with previous reports of unexpected deaths in police custody, which commonly involve bizarre or combative behavior, psychiatric disease, heart disease, or drug use.[16-19] Only a minority, approximately one third, of these deaths appear to occur after conducted electrical weapon use.[20] Other factors that have been described but are more controversial include restraint in the prone position, use of pepper spray, and neck restraint holds. Both fatalities in this series involved features typical of these in-custody deaths. The olanzapine level found in one case was above that in which deaths have been attributed to olanzapine toxicity alone.[21] None of the significant head injuries or deaths occurred after numerous (3 or more) conducted electrical weapon discharges.

A rapidly evolving body of literature has examined a range of physiologic and cardiovascular effects of conducted electrical weapon exposure in human volunteers (Table 6). These studies, which include articles and published preliminary reports in abstract form, demonstrate no evidence of dangerous respiratory or metabolic effects using standard (5-second), prolonged (15-second), and extended (up to 45-second) conducted electrical weapon discharges.[14,15,22-26] Other studies of conducted electrical weapon exposure in combination with exercise designed to simulate the physiologic effects of fleeing from or

struggling with police demonstrate changes in pH, lactate, and other markers comparable to that induced by exercise of the same duration.[27-31] No study has demonstrated a pathophysiologic mechanism or effect that would account for delayed deaths minutes to hours after conducted electrical weapon exposure. Findings from independent investigations have been concordant with those performed with industry support. Collectively, these data are broadly reassuring and constitute the current best understanding of the human physiologic effects of conducted electrical weapons.

The possibility of direct cardiac effects is a common concern with conducted electrical weapons.[32,33] Experimental studies in human volunteers have found no cardiac dysrhythmias, ischemia, or necrosis after standard (5-second) or prolonged (15-second) conducted electrical weapon exposure.[14,15,25-27,29,34-38] However, animal studies of conducted electrical weapon discharges in anesthetized swine have produced contradictory results. Some have shown no cardiac dysrhythmias with standard conducted electrical weapon outputs and large safety margins before dysrhythmia induction.[39,40,41] Other studies have observed myocardial capture or ventricular dysrhythmias with standard conducted electrical weapon discharges.[39,42-45] Extrapolation of these contradictory results to humans is problematic, and conclusive human evidence is currently lacking.[1,46] Additional investigations of the dysrhythmogenic potential of conducted electrical weapons are needed in human subjects and animal models.[47]

Although this study of 1,201 consecutive conducted electrical weapon uses with subsequent medical screening does not document any cases with an immediate fatal collapse suggesting conducted electrical weapon–induced dysrhythmia, the possibility is not excluded.[48] The upper limit of the 95% CI of such a fatal event is 0.3%. This is in concordance with a previously reported experience of 421 consecutive conducted electrical weapon uses in a single city, with immediate subsequent medical evaluation, which also found no fatal dysrhythmias or major injuries.[49] This information is useful in assessing the overall risk of conducted electrical weapons.

In addition to assessing the risk of significant injury or fatality, this case series provides an important description of current conducted electrical weapon usage. Findings include that the mean number of conducted electrical weapon discharges used is less than 2 5-second cycles and that 93% of subjects receive 3 or fewer discharges. None of the subjects with significant injuries or death were in the group with more than 3 discharges. Approximately two thirds of conducted electrical weapon uses were with the probe mode, whereas one quarter used the drive stun (direct contact) mode, and fewer than 10% used both modes. When the weapon is used in probe mode, approximately 80% of probe impact sites are at the trunk. When it is used in drive stun mode as an adjunct to physical restraint techniques, conducted electrical weapon impact sites most commonly occur at the back and lower extremities.

Several novel design methods were used in this study. Conducted electrical weapon uses were identified through the law enforcement agency's mandatory use-of-force investigation and review process, allowing reliable identification of conducted electrical weapon deployments within each agency. Because federal privacy laws permit law enforcement agencies to access protected health information in specific instances, including abuse, neglect, and criminal and administrative investigations, law enforcement agencies were able to retrieve medical records as part of their use-of-force investigation process.[50] Interpretation of these records by a physician was incorporated in the use-of-force review process, and deidentified information was extracted for study purposes. These methods improve on previous studies that collect only the subset of subjects brought to medical attention. Physician review of medical and police records allows injury identification, classification, and severity stratification that is very important from both clinical and policy perspectives and represents a significant improvement on previous reports using a binary injured/uninjured determination based on officer impression alone.

In this large multicenter cohort, the observed risk of significant injury after conducted electrical weapon use by law enforcement officers is 0.25%. This risk compares favorably to other force options available to officers, and these findings support the overall safety of conducted electrical weapon use.

Although uncommon, conducted electrical weapons are clearly capable of producing serious injuries. Subjects exposed to a conducted electrical weapon discharge should be assessed for injuries, and appropriate medical evaluation should be provided when nontrivial injuries are evident or suspected. It should also be appreciated that existing medical or psychiatric conditions may cause or contribute to behavior that leads to law enforcement intervention. These underlying conditions may require medical assessment and treatment independent of conducted electrical weapon exposure.

Continued studies of conducted electrical weapon safety are necessary and should focus on assessing and reducing risks to criminal suspects and law enforcement officers. The ongoing discussion of appropriate use of conducted electrical weapons should continue among researchers, law enforcement agencies, oversight agencies, human rights organizations, and the general public. These discussions must be based on scientific study and should consider both the demonstrated risks and benefits of conducted electrical weapon use within the context of available alternative force options.

*The authors thank the site investigators and command staff of the participating sites for their contributions to this study and to public safety. In addition to the authors, site investigators include Matthew Wilkes, MD, Andrew Dennis, DO, and Douglas M. Kleiner, PhD. The authors also wish to acknowledge the members of the study steering committee for volunteering their guidance and expertise: Lawrence E. Heiskell, MD, International School of Tactical Medicine; Lt. Don Kester, Pima County, AZ, Sheriff's Department, National Tactical Officers' Association; Robert Norris, MD, Stanford University Medical Center; Nelson Tang, MD,*

Johns Hopkins University; Joshua Vayer, BA, Uniformed Services University of the Health Sciences/Casualty Care Research Center.

*Supervising editors:* David P. Sklar, MD; Debra E. Houry, MD, MPH

*Author contributions:* WPB conceived the study, designed the trial, and obtained research funding. WPB supervised recruitment of participating centers and collection of data. All authors participated in data analysis and article development. WPB takes responsibility for the paper as a whole.

*Funding and support:* By *Annals* policy, all authors are required to disclose any and all commercial, financial, and other relationships in any way related to the subject of this article that might create any potential conflict of interest. See the Manuscript Submission Agreement in this issue for examples of specific conflicts covered by this statement. This project was supported by grant No. 2004-IJ-CX-K047, awarded by the United States Department of Justice, Office of Justice Programs, National Institute of Justice, Office of Science and Technology's Directed Energy Research Program, managed by Joseph Cecconi. Funding included direct and administrative costs and case reporting fees, which were provided as donations to the participating law enforcement agencies. Site investigators were unpaid for the initial 2 years of the study and then were provided a stipend of $500 per year for the final year. The funding agency did not participate in or direct study design, site selection, data analysis, or manuscript preparation. There was no funding or other support provided by any conducted electrical weapon manufacturer.

*Publication dates:* Received for publication September 15, 2008. Revisions received October 24, 2008, and November 10, 2008. Accepted for publication November 25, 2008. Available online January 21, 2009.

Presented at the 2007 American College of Emergency Physicians Scientific Assembly Research Forum, October 2007, Seattle, WA.

Reprints not available from authors.

*Address for correspondence:* William P. Bozeman, MD, Wake Forest University School of Medicine, Department of Emergency Medicine, Medical Center Blvd, Winston Salem, NC 27157; 336-716-1740, fax 336-716-1705; E-mail wbozeman@wfubmc.edu.

**REFERENCES**

1. Kroll M, Luceri RM, Calkins H. A very interesting case study involving a Taser conducted electrical weapon (CEW) used on a patient with a pacemaker. *J Cardiovasc Electrophysiol.* 2007;18: E29-E30.
2. Taser International. Law enforcement frequently asked questions. Available at: http://www.taser.com/research/Pages/LawEnforcementFAQs.aspx. Accessed May 22, 2008.
3. Jenkinson E, Neeson C, Bleetman A. The relative risk of police use-of-force options: evaluating the potential for deployment of electronic weaponry. *J Clin Forensic Med.* 2006;13:229-241.
4. Smith MR, Kaminski RJ, Rojek J, et al. The impact of conducted energy devices and other types of force and resistance on officer and suspect injuries. *Policing.* 2007;30:423-446.
5. Amnesty International. *Excessive and Lethal Force? Amnesty International's Concerns About Deaths and Ill-Treatment Involving Police Use of TASERs.* Amnesty International; 2004. Available at: http://www.amnesty.org/en/library/info/AMR51/139/2004.en. Accessed December 18, 2008.
6. Amnesty International. *Amnesty International's Continuing Concerns About Taser Use.* 2006. Available at: http://www.amnesty.org/en/library/info/AMR51/030/2006.en. Accessed December 18, 2008.
7. National Institute of Justice. *Study of Deaths Following Electro Muscular Disruption: Interim Report.* Washington, DC: US Dept of Justice, Office of Justice Programs; 2008.
8. Taser International. X26E series electronic control device specification. Available at: http://www2.taser.com/SiteCollection Documents/Controlled%20Documents/Spec%20Sheets/Law%20 Enforcement/RD-SPEC-X26E-001-H.pdf. Accessed May 22, 2008.
9. Taser International. TASER electronic control devices (ECDs): field data and risk management http://www.taser.com/research/ statistics/Pages/FieldUseandStatistics.aspx. Accessed May 20, 2008.
10. Bozeman WP, Winslow JE. Medical aspects of less lethal weapons. *Internet J Rescue Disaster Med.* 2005;5(1). Available at: http://www.ispub.com/ostia/index.php?xmlFilePath=journals/ ijrdm/vol5n1/lethal.xml. Accessed December 18, 2008.
11. Kroll MW, Calkins H, Luceri RM, et al. Electronic control devices. *CMAJ.* 2008;179:342-343.
12. Williams HE. *Taser Electronic Control Devices and Sudden In-custody Death: Separating Evidence From Conjecture*: Charles C Thomas Pub Ltd; 2008.
13. Sanford JM, Jacobs GJ, Roe EJ, et al. Two patients subdued with a Taser(R) device: cases and review of complications. *J Emerg Med.* In press.
14. Ho JD, Miner JR, Lakireddy DR, et al. Cardiovascular and physiologic effects of conducted electrical weapon discharge in resting adults. *Acad Emerg Med.* 2006;13:589-595.
15. Ho J, Dawes D, Lapine A, et al. Prolonged TASER "drive stun" exposure in humans does not cause worrisome biomarker changes. *Prehosp Emerg Care.* 2008;12:128.
16. Pollanen MS, Chiasson DA, Cairns JT, et al. Unexpected death related to restraint for excited delirium: a retrospective study of deaths in police custody and in the community. *CMAJ.* 1998;158: 1603-1607.
17. Sathyavagiswaran L, Rogers C, Noguchi TT. Restraint asphyxia in in-custody deaths: medical examiner's role in prevention of deaths. *Leg Med (Tokyo).* 2007;9:88-93.
18. Southall P, Grant J, Fowler D, et al. Police custody deaths in Maryland, USA: an examination of 45 cases. *J Forensic Leg Med.* 2008;15:227-230.
19. Martinez-Selles M. Sudden death after police detention in young males in Spain. A new syndrome with a possible cardiovascular origin. *Eur Heart J.* 2008;29(Abstract Supplement):644.
20. Ho J, Reardon R, Heegaard W. Deaths in police custody: an 8 month surveillance study. *Ann Emerg Med.* 2005;46:S94.
21. Robertson MD, McMullin MM. Olanzapine concentrations in clinical serum and postmortem blood specimens—when does therapeutic become toxic? *J Forensic Sci.* 2000;45:418-421.
22. Dawes D, Ho J, Johnson M, et al. 15 Second conducted electrical weapon application does not impair basic respiratory parameters, venous blood gases, or blood chemistries and does not increase core body temperature. *Ann Emerg Med.* 2007;50:S6.
23. Dawes D, Ho J, Johnson M, et al. Breathing parameters, venous blood gases, and serum chemistries with exposure to a new

wireless projectile conducted electrical weapon in human volunteers. *Ann Emerg Med.* 2007;50:S133.

24. Ho JD, Dawes DM, Bultman LL, et al. Respiratory effect of prolonged electrical weapon application on human volunteers. *Acad Emerg Med.* 2007;14:197-201.

25. Moscati R, Ho J, Dawes D, et al. Physiologic effects of prolonged conducted electrical weapon discharge on intoxicated adults. *Acad Emerg Med.* 2007;14:S63.

26. Vilke GM, Sloane CM, Bouton KD, et al. Physiological effects of a conducted electrical weapon on human subjects. *Ann Emerg Med.* 2007;50:569-575.

27. Ho J, Dawes DM, Calkins H, et al. Absence of electrocardiographic change following prolonged application of a conducted electrical weapon in physically exhausted adults. *Acad Emerg Med.* 2007;14:S128-S129.

28. Ho J, Reardon R, Dawes D, et al. Ultrasound measurement of cardiac activity during conducted electrical weapon application in exercising adults. *Ann Emerg Med.* 2007;50:S108.

29. Ho JD, Dawes DM, Bultman LL, et al. Physiologic effects of prolonged conducted electrical weapon discharge on acidotic adults. *Acad Emerg Med.* 2007;14:S63.

30. Vilke G, Sloane C, Suffecool A, et al. Physiologic effects of the Taser on human subjects after exercise. *Ann Emerg Med.* 2007;50:S55.

31. Vilke G, Sloane C, Suffecool A, et al. Crossover-controlled human study of the physiologic effects of the Taser after vigorous exercise. *Acad Emerg Med.* 2008;15:S155-156.

32. Kim PJ, Franklin WH. Ventricular fibrillation after stun-gun discharge. *N Engl J Med.* 2005;353:958-959.

33. Cao M, Shinbane JS, Gillberg JM, et al. Taser-induced rapid ventricular myocardial capture demonstrated by pacemaker intracardiac electrograms. *J Cardiovasc Electrophysiol.* 2007;18:876-879.

34. Barnes DG Jr, Winslow JE III, Alson RL, et al. Cardiac effects of the Taser conducted energy weapon. *Ann Emerg.Med.* 2006;48:S102.

35. Levine SD, Sloane CM, Chan TC, et al. Cardiac monitoring of human subjects exposed to the Taser. *J Emerg Med.* 2007;33:113-117.

36. Sloane CM, Chan TC, Levine SD, et al. Serum troponin I measurement of subjects exposed to the Taser X-26(R). *J Emerg Med.* In press.

37. Vilke GM, Sloane C, Levine S, et al. Twelve-lead electrocardiogram monitoring of subjects before and after voluntary exposure to the Taser X26. *Am J Emerg Med.* 2008;26:1-4.

38. Ho JD, Dawes DM, Reardon RF, et al. Echocardiographic evaluation of a TASER-X26 application in the ideal human cardiac axis. *Acad Emerg Med.* In press.

39. Lakkireddy D, Wallick D, Ryschon K, et al. Effects of cocaine intoxication on the threshold for stun gun induction of ventricular fibrillation. *J Am Coll Cardiol.* 2006;48:805-811.

40. McDaniel WC, Stratbucker RA, Nerheim M, et al. Cardiac safety of neuromuscular incapacitating defensive devices. *Pacing Clin Electrophysiol.* 2005;28(suppl 1):S284-S287.

41. Jauchem JR, Sherry CJ, Fines DA, et al. Acidosis, lactate, electrolytes, muscle enzymes, and other factors in the blood of sus scrofa following repeated TASER exposures. *Forensic Sci Int.* 2006;161:20-30.

42. Lakkireddy D, Wallick D, Verma A, et al. Cardiac effects of electrical stun guns: does position of barbs contact make a difference? *Pacing Clin Electrophysiol.* 2008;31:398-408.

43. Nanthakumar K, Billingsley IM, Masse S, et al. Cardiac electrophysiological consequences of neuromuscular incapacitating device discharges. *J Am Coll Cardiol.* 2006;48:798-804.

44. Dennis AJ, Valentino DJ, Walter RJ, et al. Acute effects of TASER X26 discharges in a swine model. *J Trauma.* 2007;63:581-590.

45. Walter RJ, Dennis AJ, Valentino DJ, et al. TASER X26 discharges in swine produce potentially fatal ventricular arrhythmias. *Acad Emerg Med.* 2008;15:66-73.

46. Kroll M, Calkins H, Luceri R. Electronic control devices and the clinical milieu. *J Am Coll Cardiol.* 2007;49:732.

47. Link MS, Estes NAM. Cardiac safety of electrical stun guns: letting science and reason advance the debate. *Pacing Clin Electrophysiol.* 2008;31:395-397.

48. Hanley JA, Lippman-Hand A. If nothing goes wrong, is everything all right? interpreting zero numerators. *JAMA.* 1983;249:1743-1745.

49. Eastman AL, Metzger JC, Pepe PE, et al. Conductive electrical weapons: a prospective, population-based study of the safety of application by law enforcement. *J Trauma.* 2007;62:265-275.

50. Dugan D. The Health Insurance Portability and Accountability Act (HIPAA) in a use of force context. In: Ederheimer J, ed. *Critical Issues in Policing Series: Strategies for Resolving Conflict and Minimizing Use of Force.* Washington, DC: Police Executive Research Forum; 2007:122-123.

51. Dawes D, Ho J, Miner J, et al. The neuroendocrine effects of the TASER X26 conducted electrical weapon as compared to oleoresin capsicum. *Ann Emerg Med.* 2007;50:S132-S133.

52. Ho J, Dawes D, Reardon R, et al. Echocardiographic evaluation of human transcutaneous TASER application along the cardiac axis. *Heart Rhythm.* 2008;5:S348.

53. Dawes DM, Ho JD, Johnson MA, et al. 15-Second conducted electrical weapon exposure does not cause core temperature elevation in non-environmentally stressed resting adults. *Forensic Sci Int.* 2008;176:253-257.

**Did you know?**

You can personalize the new *Annals of Emergency Medicine* Web site to meet your individual needs.

Visit **www.annemergmed.com** today to see what else is new online!

| Name1 | Name2 | Firm | Address1 | Address2 | City | State | Zip | Phone | Case Caption | Subject | | In Court |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Geoffrey | Allen | Allen, Sparks & De Bernardis | 1939 17th Street NW | | Washington | DC | 20009 | 202-797-8200 | Roper vs. DC | Firearm | Forensic | Y |
| A. Samuel | Atkins, Jr. | | Courthouse Square | PO Box 268 | Watkinsville | GA | 30677 | 404-769-5552 | Robt Wallace | Firearm | Failure | N |
| Joel | Bailey | The Bailey LAw Firm | P.O. Box 1437 | | Beaufort | SC | 29901 | | | Ballistic | Forensic | N |
| Robert | Biddle | Nathans & Biddle | 120 E. Baltimore St | Suite 1800 | Baltimore | MD | 21202 | | Rensberry vs. Beretta | Firearm | Blk Powder | Y |
| Sam | Blair, Jr. | Williams, & Kirsch | 2000 1st Tenn. Bldg | 165 Madison | Memphis | TN | 38103 | 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 | Martin Abell | Failure | Pl Bottle | N |
| Stuart | Blatt | Blatt & Rosenburg | 1101 St. PAul St | | Baltimore | MD | 21202 | 410-539-7800 | Lyons vs. Sportman | Ballistic | Primer | N |
| Ron | Bleir | Chase, Rotchford, Drucker & Bogust | 606 S. Olive Street | S-402-403 | Los Angeles | CA | 90014 | 213-626-8711 | Murphy's Oil | Failure | Chisel | N |
| John F. | Blevins | Lentz, Hooper, Jacobs & Blevins | 222 St. PAul | | Baltimore | MD | 21202 | 410-8798030 | Aesquivel vs Colt | | | N |
| Arnold D. | Bruckner | | 6411 Baltimore Ave. | | Riverdale | MD | 20840 | 410-779-6700 | Chilcoat | Failure | Houseboat | N |
| Stephen | Buser | Freirdich, Lopinot, Buser & Morris | #2Columbia Ofc Ctr | 108 Edelweiss Rd | Columbia | IL | 62236 | 618-281-4134 | Bank vs Kelly | Ballistic | Body Arm | N |
| Brian | Cave | | One Renaissance Dr | Two N. Central Ave | Phoenix | AZ | | | Yarbrough | Ballisitcs | Patent | Y |
| Leon | Cheek | | 251 Maitland Ave | | Altamonte Springs | FL | 32701 | 305-834-6808 | Firetrace | Firearm | Forensic | N |
| Charles | Chesney | Toplis and Harding | 2700 Broening Highway | | Baltimore | MD | 21222 | 410-288-1447 | St vs Marasa | Failure | Water Pipe | N |
| Michelle | Clifton | | | | | | | | Alex Cooper | | | |
| Moony | Cole | Gray, Witter, & Graham, LLC | 704 Market St | Suite 800 | St. Louis | MO | 63101 | | Santoyo v. Bear Lake | Firearm | Liability | Y? |
| Victor L. | Crawford | | 9 Norht Adams Street | | Rockville | MD | 20850 | 301-762-1000 | St vs Hughes | Ballisitcs | Forensics | Y |
| Pat | Cresta-Savage | Cresta-Savage Law | 503 D Street NW | Suite 320 | Washington | DC | 20001 | | U.S. Vs. Brown | Ballisitcs | Firearm | Y |
| Pat | Cresta-Savage | Cresta-Savage Law | 504 D Street NW | Suite 321 | Washington | DC | 20002 | | U.S. Vs. Bright | Ballisitcs | Firearm | N |
| Pat | Cresta-Savage | Cresta-Savage Law | 505 D Street NW | Suite 322 | Washington | DC | 20003 | | U.S. vs. Moore | Ballisitcs | Firearm | Y |
| Pat | Cresta-Savage | Cresta-Savage Law | 506 D Street NW | Suite 323 | Washington | DC | 20004 | | U.S. vs. Banks | Ballisitcs | Firearm | Y |
| Maria V. | Dailey | Crawford Risk Mgmt Serv | 920 Providence Rd | Rm 400 | Towson | MD | 21204 | 410-821-0010 | Pennock | Failure | Auto Acc | N |
| Pat | Denhase | TASA | | | | | | | Various | Ballistic | Forensics | Y |
| Thomas | Dickey | Law Offices of Thomas Dickey | | | | | | | Commwealth vs. Gerholt | Ballisitcs | Firearm | Y |
| Melissa | Diggenback | | | | | | | | | | | N |
| Christopher F. | Drummond | Franch & Jarashow | 111 Cathedral St | PO Box 827 | Annapolis | MD | 21404 | 301-268-5600 | Davco Food vs McCarty | Failure | Wire | N |
| Kent | Duckworth | | | | | | | | | | | N |
| Gary | Eaton | Eaton & Sparks | 1717 East 15th Street | | Tulsa | OK | 74104 | 918 743 8781 | Katzenmeir v. BPI | Firearm | Liability | Y |
| Matthew | Evans | | | | | | | | | | | N |
| Kenneth | Farrar | Farrar & Serkes | PO Box 354 | | Lovington | VA | 22949 | 804-263-4886 | St vs. Campbell | Firearm | Forensic | N |
| Mark | Feldman | Menn, Teetaert, & Beisenstein, Ltd | 222 N. Oneida Street | | Appleton | WI | 54127 | 920-731-6631 | Bentley vs. Cub Cadet | Failure | Mower/wire | N |
| Dennis B. | Francis | Whelchel & Attansio | PO Box 11407 | P.O. Box 785 | Knoxville | TN | 37939 | 615-588-0504 | Fawver vs 2nd Chance | Ballistic | Body Arm | N |
| Stephen | Funk | Roetzel & Andress | 222 S. Main St | | Akron | OH | 44308 | | Chappell v. City of Cleveland | Ballisitcs | Forensics | N |
| Earle | Garret III | Garret, Smith & Garret | 824 Masonic Bldg | | Danville | VA | 24541 | 804-793-7511 | Bass vs Freedom | Firearm | Failure | N |
| E.C. | Gilbreath | Gilbreath Law firm | | | | | | | | | | N |
| Michael I. | Gordon | Gordon & Heneson | Suite 500-Blaustein Bldg | 1 North charles St | Baltimore | MD | 21201 | 410-539-0666 | Bryant vs Mont Ward | Failure | Bike | N |
| William | Hadley | | | | | | | | | | | N |
| Kim | Hallmark | | | | | | | | | | | N |
| William P. | Harris | Harris & Black | 1004 Court St | | Lynchburg | VA | 24504 | 804-846-5288 | St vs Brooks | Firearm | Forensic | N |
| Veronice | Holt | | 303 Van Ness St, NW | | Washington | DC | 20008 | | U.S. v. Short | Ballisitcs | Forensics | Y |
| John | Howell | | | | | | | | | | | N |
| Paul | Jannuzzo | The Sperduto LAw Firm, P.L.C. | 6000 Highland Parkway | | Smyrna | GA | 30082 | 770-319-4778 | Plaintiff vs. Glock | Firearm | Statistics | N |
| Ronald H. | Jarashow | Franch & Jarashow | 111 Cathedral Street | PO BOx 827 | Annapolis | MD | 21404 | 301-268-5600 | Fred Smith | Failure | Bk Inj | N |
| Jessie | Jones | | | | | | | | | | | N |
| Jack N. | Kegley | | 415 Fourth St N.E. | | charlottesville | VA | 22901 | 804-293-4751 | Hutton | Firearm | Failure | N |
| James | Kennedy | Arnold & Porter | 555 12th St NW | | Washington | DC | 20004 | | U.S. v. Jones | Ballisitcs | Firearm | N |
| Thomas A. | Kennelly | Duiguid, Kennelly & Epstein | 1000 Conn. Ave. | Suite 1107 | Washington | DC | 20036 | 202-872-0700 | Perazzi | Failure | Trigger | N |
| Eric | Klien | Public Defender Service for D.C. | 633 Indiana Ave. NW | | Washington | DC | 20004 | | U.S. v. Coles | Ballisitcs | Firearm | Y |
| Joseph | Lamari | | 414 Hungerford Drive | Suite 104 | Rockville | MD | 20850 | 301-762-2018 | Niastr vs Victor Gauge | Failure | Gauge | N |
| Donald | Lester | Mahoney Adams & Criser | 3300 Barnett Center | 50 Norhl Laura St | Jacksonville | FL | 32201 | 904-354-1100 | Sanders vs. Am BA | Ballistic | Body Arm | Y |
| Gordon | Levy | Levy & Iamele | 114 E. LExington St | Suite 702 | Baltimore | MD | 21202 | 410-752-6160 | Mays vs Glock | Firearm | Glock | Y |
| Robert W. | Lewis | Lewis, Wilson, Lewis & Jones | 2054 Norht 14th St | PO Box 827 | Arlington | VA | 22216 | 703-527-8800 | Michael Smith | Firearm | Forensic | Y |
| Thomas | Lilly | Webb, Burnett & Simpson | 115 Broad Street | | Salisbury | MD | 21801 | | J. Killman | Failure | Grnd Whl | N |
| Thomas E | Lloyd | LLoyd, Kane & wieder | 3716 Court Place | | Ellicott City | MD | 21043 | 410-461-9400 | Hop-Flight vs Varga | Failure | Elev Horn | N |
| Elizabeth | Logeman | Public Defender Service for D.C. | 633 Indiana Ave. NW | | Washington | DC | 20004 | | | | | N |
| Sissi | Maleki | Reader's Digest | Editorial Research | | Pleasantville | NY | 10570 | 1726/x5247 | JFK Assassination | Ballistic | Forensic | Y |
| David | Maxted | Public Defender Service for D.C. | 633 Indiana Ave. NW | | Washington | DC | 20004 | | U.S. v. Headspeth | Ballisitcs | Firearm | N |
| Carroll | McCabe | | | | | | | | | | | N |
| Hannah | McElhinny | Public Defender Service for D.C. | 633 Indiana Ave. NW | | Washington | DC | 20004 | | U.S. v. McMillin | Ballisitcs | Firearm | N |
| Larry | McGlothlin | | | | | | | | | | | N |
| T. Bryan | McIntire | McIntire & Johnson | 11 North court Street | | Westminister | MD | 21157 | 410-848-8888 | Hrycek vs. IBC | Failure | Gl Bottle | N |
| Douglas | McManamy | Bovis, Kyle & Burch | 53 Perimeter Center East | Suite 350 | Atlanta | GA | 30346 | 770-391-9100 | Haymaker vs Ct Valley Arms | Firearm | Blowback | N |
| Amit | Mehta | Zuckerman Spaeder, LLP | 1800 M Street | Suite 100 | Washington | DC | 20036 | | U.S. vs. Mitchell Patriot | Forensic Material | Crime Scene Armor Patent | Y N |
| | Mohr | | | | | | | | | | | |
| Elizabeth | Mullin | Public Defender Service for D.C. | 633 Indiana Ave. NW | | Washington | DC | 20004 | | | Ballisitcs | Firearm | Y |
| Joseph | Murtha | Miller, Murtha & Psoras, LLC | Heavier Plaza | 1301 York Rd | Lutherville | MD | 21003 | | St v. Adelberg | Forensics | Cr Scene | N |
| Evan | Nappen | | 21 Throckmorton Ave | | Eatontown | NJ | 7724 | | Middlesex Trading Co. | Firearm | Liability | N |
| Jeremy | North | Delverine A. Dessel & Asoc | 814 Munsey Bldg | Calvert & Fayette St | Baltimore | MD | 21202 | 410-547-7123 | Harley Davidson | Failure | Golf Cart | N |
| Joseph J. | Perez | Brian C. Shevlin & Associates | Suite 610, PArk Ilace | 1655 N. Fort Myer Dr | Arlington | VA | 22209 | 703-522-2202 | Sadler vs Sadler | Ballistic | Cr Scn | N |

| First | Last | Firm | Address | Address2 | City | State | Zip | Phone | Case | Cat1 | Cat2 | Cat3 | Y/N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Janet | Pesack | | | | | | | | | Ballistic | Cr Scn | | N |
| A. Dwight | Pettit | | | 222 St. Paul | Baltimore | MD | 21202 | 410-539-5822 | St vs Perry | Ballistic | Cr Scn | | Y |
| Thomas L. | Phillips | Kizer, Phillips & Petty | 615 Church Street | | Lynchburg | VA | 24504 | 804-846-5255 | St vs Bryant | Ballisitcs | Forensics | | Y |
| Katherine | Philpott | Public Defender Service for D.C. | 633 Indiana Ave. NW | | Washington | DC | 20004 | | U.S. v. Short | Firearm | Liability | | N |
| John | Ramagli | Kolar Arms | 1925 Roosevelt Ave | | Racine | WI | 53406 | | Kolar Shotgun | Failure | Axel | | N |
| Michael | Ramsey | Ramsey & Ramsey | 206 Equitable Bldg | | Baltimore | MD | 21202 | 410-752-1646 | Costly vs. Ford | | | | N |
| Jim | Richardson | Richardson & Birdsong | | | | | | | | | | | N |
| Les | Roane | H.P. White Laboratories | 3114 Scarboro Road | | Street | MD | 20004 | | | Ballistic | Forensics | | Y |
| Maro | Robbins | Public Defender Service for D.C. | 633 Indiana Ave. NW | | Washington | DC | | | U.S. v. Jevante | Ballisitcs | Firearm | | N |
| Frank | Romano | Public Defender's Office | 4103 Chain Brudge Road | Suite 500 | Fairfax | VA | 22030 | | | | | | N |
| Andrew | Sacks | Sacks & Sacks | PO Box 3874 | | Norfolk | VA | 23514 | 804-523-2753 | VA vs. Smalls | Firearm | Rev | | N |
| David | Scherfler | Schafer & Onoroto | 575 7th St | Suite 300 South | Washington | DC | 20004 | | U.S. v. Gordon | Forensics | Crime Scene | | Y |
| Carl | Schiffman | Schiffman, Wojdowski, Chiurazzi | | | | | | | | Firearm | | | N |
| Richard C. | Shadyac | Metzger, Shadyac & Schwarz | 7540 Little River Trpk | | Annandale | VA | 22003 | 703-642-9100 | St vs Nachod | Ballistic | Cr Scn | | N |
| Eugene A. | Shapiro | | 104 Water St | | Baltimore | MD | 21202 | 410-539-2766 | Martin | Failure | Ladder | | N |
| Jeffrey | Shere | Orandle & Shere | 15 Sudbrook LAne | | Baltimore | MD | 21208 | 410-486-4670 | Marchant vs Mont Ward | Failure | Tractor | | N |
| Donald | Sidbury | | | | | | | | U.S. v. Woldetsadik | Ballistics | Forensics | | N |
| Raymond | Simmons | | PO Box 753 | | Cambridge | MD | 21615 | 301-228-2200 | Willey vs Rustoleum | Failure | Paint Can | | N |
| David | Simpson | Simpson & Simpson | 909 Mar Walt Drive | | Fort Walton Beach | FL | 32547 | 850-862-1134 | Smith vs. Norinco | Firearm | Safety | | N |
| James | Singer | Bovis, Kyle & Burch, LLC | | | | | | | | Ballistic | BB Gun | | N |
| Joseph R. | Slights | Morris, James, Hutchins & Williams | 222 Delaware Ave | PO Box 2306 | Wilmington | DE | 19899 | 302-888-6800 | Winchester vs. Hertrich | Firearm | BB Gun | | N |
| Ginny | Stearley | John Hancock Pro & Casualty Ins Co. | 7000 Lincoln Drive East | PO Box 987 | Marlton | NJ | 8053 | 800-647-7011 | Shanahan vs. Hambleton | Ballistic | Forensic | | N |
| Leslie A. | Stein | Stein, Sperling, Bennett, DeJong, | 5513 Harford Rd | | Baltimore | MD | 21219 | | | | | | N |
| Soloman | Sterenberg | Driscoll & Greenfeig | 25 West Middle Lane | | Rockville | MD | 2E+05 | | Wade v. ATK | Ballistics | Forensics | | N |
| Liela | Thamer | Public Defender Service for D.C. | 633 Indiana Ave. NW | | Washington | DC | 20004 | | U.S. v. Evans | Ballisitcs | Firearm | | N |
| Michael | Treadaway | | 399 Washington Avenue | | Marietta | GA | 30060 | 770-429-8119 | St vs Pickren | Firearm | Forensic | | N |
| Jason | Tulley | Public Defender Service for D.C. | 633 Indiana Ave. NW | | Washington | DC | 20004 | | U.S. v. Johnson | Ballisitcs | Firearm | | Y |
| J. Michael | Turner | Culbertson, Whiteside & Turner | PO Box 54 | | Laurens | SC | 29360 | 803-984-6565 | Wright | Ballistic | Powder | | N |
| Daniel | Varline | Davczyk & Varline, LLC | 2100 Stewart Ave | Suite 230 | Wausau | WI | 54402 | | Rifle analysis | Firearm | Liability | | N |
| MArk A. | Venuti | | Suite 100, Car Barn | 3600 M Street N.W. | Washington | DC | 20007 | 202-965-9700 | Poirier vs D.C. | Ballistic | Cr Scn | | Y |
| Roland | Walker | Walker & Van Bavel | 306 Court Square Bldg | 200 E. LExington St | Baltimore | MD | 21202 | 410-377-9400 | MD vs Hill | Firearm | Forensic | | N |
| Derick | Walker | | 1000 Domino Tower | 990 Waterside Dr. | Norfolk | VA | 23510 | | Explosives | Ballistics | Liability | | N |
| Thomas E. | Webb | | Chas Center South | Suite 2110 | Baltimore | MD | 21201 | 410-752-7651 | McNerney vs Ramset | Failure | Nailgun | | N |
| Paul | Weiland | | RR I | Box 4063 | Delmar | DE | 19940 | | Bailey | Forensic | Murder | | N |
| Jonathan | Willmott | | PO Box 72 | | Mt. Vernon | VA | 22121 | | U.S. v. Miller | Ballisitcs | Liability | | N |
| Ralph | Wood | Toplis and Harding | 2700 Broening Highway | | Baltimore | MD | 21222 | 410-288-1447 | Alex Cooper | Failure | Sprinkler | | N |