UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

MARY HOLLMAN, as the Administrator of the          Docket No. 06-CV-3588(JFB)(ARL)
Estate of SAMUEL A. COX, and the Estate of
SAMUEL A. COX, on behalf of JOHN COX,

                                                   **NOTICE OF MOTION;**
                              Plaintiff,           **MOTION FOR SUMMARY**
                -against-                          **JUDGMENT; AND**
                                                   **MEMORANDUM OF LAW**
TASER INTERNATIONAL, INC.,

                              Defendant.
------------------------------------------------------------X

Pursuant to FRCP 56, defendant TASER International, Inc. ("TASER") files this motion for summary judgment on Plaintiff's product liability-based claims because: (1) Plaintiff has no evidence that TASER knew or should have known of alleged risks of metabolic acidosis sufficient to contribute to sudden death from multiple drive-stun applications in August 2004 when the TASER® X26™ electronic control devices ("ECD") at issue here were distributed to the Suffolk County Police Department ("SCPD"); (2) TASER had no duty to warn that ECD drive stuns cause pain and might cause a suspect to instinctively recoil to get away from the source of pain, since such facts are open, obvious, and within the common knowledge of law enforcement officers and the general public; and (3) in any event TASER warned of risks associated with the precise circumstances presented by Plaintiff's decedent John Cox ("Cox") on April 22, 2005, when he encountered SCPD officers, including:

• TASER ECDs "involve a degree of risk that someone will get hurt or may even be killed due to physical exertion, unforeseen circumstances and individual susceptibilities;"

• TASER ECDs "cause pain which can be stressful. This stress may be injurious to some people;"

1

• "Especially when dealing with persons in a health crisis such as excited delirium, it is advisable to minimize the physical and psychological stress to the subject to the greatest degree possible."  To that end, "officers should only apply the number of cycles reasonably necessary to allow them to safely approach and restrain the subject;" and

• An ECD "drive stun does not cause incapacitation" and may not be successful in achieving "pain compliance" in someone "in a mental health crisis state, [or] under the influence of a mind altering substance" because of a "mind-body disconnection."

Plaintiff's warranty and punitive damages claims also have no merit.  Summary judgment is therefore warranted on Plaintiff's entire Complaint.

This motion is supported by the following Memorandum of Law, the attached Rule 56.1 Statement of Material Facts ("SOF"), the simultaneously filed declarations of Patrick Smith and Jeffrey Ho, M.D., together with their supporting exhibits, the previously filed declaration and exhibits of John V. Tait, Esq. (Dkt. 87), and the Court's entire file in this matter.

Pursuant to the schedule established by the Honorable Joseph F. Bianco, Plaintiff must file her response in opposition to this motion by May 16, 2102, and TASER shall file its reply in further support of this motion by May 30, 2012.

Dated:  White Plains, New York
         April 16, 2012

Respectfully submitted,

By:     /s/  *John V. Tait*_____
        John Renzulli (JFR 2917)
        Christopher Renzulli (CR 8840)
        John V. Tait (JT 4835)
        **RENZULLI LAW FIRM, LLP**
        81 Main Street, Suite 508
        White Plains, NY 10601
        Attorneys for Defendant TASER

2

**TABLE OF CONTENTS**

I.  PLAINTIFF'S CLAIMS AGAINST TASER ................................................................. 1

II.  RELEVANT FACTUAL BACKGROUND ................................................................. 2

    A.  Incident Basics and ECD Use ........................................................................... 2

    B.  Autopsy Findings ............................................................................................. 5

    C.  Physiological Effects of ECD Drive Stuns and the State of Medical and
        Scientific Knowledge Concerning Drive Stun Risks ........................................ 6

    D.  TASER's Applicable Warnings and Training Materials ................................. 10

III.  PLAINTIFF'S FAILURE-TO-WARN CLAIM FAILS AS A MATTER OF LAW. 14

    A.  TASER's Warnings Were Adequate As A Matter of Law As Applied To the
        Facts of This Case ........................................................................................... 14

    B.  TASER Had No Reason To Know or Warn About Any Drive-Stun Risks In
        August 2004 Beyond Minor Skin Burns .......................................................... 15

    C.  TASER Had No Duty To Warn of Open and Obvious Risks Known To All
        Law Enforcement Officers and the General Public .......................................... 19

IV.  PLAINTIFF'S EXPRESS AND IMPLIED WARRANTY CLAIMS WERE
      PROPERLY DISCLAIMED AND MUST BE DISMISSED ................................... 21

V.  THIS IS NOT A PUNITIVE DAMAGES CASE ...................................................... 23

VI.  CONCLUSION ...................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Camillo v. Geer*, 185 A.D.2d 192 (1st Dep't 1992) ........................................................ 2

*Carbo Indus., Inc. v. Becker Chevrolet, Inc.*, 112 A.D.2d 336 (2nd Dep't 1985) ........... 21

*Carlin v. Superior Court,* 13 Cal. 4th 1104 (1996) ......................................................... 18

*Don Buchwald & Assocs. v. Rich*, 281 A.D.2d 329 (1st Dep't 2001) .............................. 23

*Ellis v. Columbus City Police Dept.*, 2009 U.S. Dist. LEXIS 95821 (N.D. Miss. 2009).... 8

*Enright v. Eli Lilly & Co.*, 77 N.Y.2d 377 (1991) ............................................................ 1

*Fane v. Zimmer, Inc.*, 927 F.2d 124 (2d Cir. 1991) ........................................................ 1

*Gambardella v. G. Fox & Co.*, 716 F.2d 104 (2d Cir. 1983) ........................................... 23

*Geressy v. Digital Equip. Corp.*, 980 F. Supp. 640 (E.D.N.Y. 1997) .............................. 16

*Glowczenski v. Taser Int'l, Inc.*, 2012 U.S. Dist. LEXIS 39438 (E.D.N.Y. 2012) ....... 7, 19

*Gould v. Rexon Indus. Corp.*, 2006 U.S. Dist. LEXIS 55323 (N.D.N.Y. 2006) ................ 1

*Guarascio v. Drake Assocs.*, 582 F. Supp. 2d 459 (S.D.N.Y. 2008) .......................... 15, 20

*Howard v. Poseidon Pools, Inc.*, 72 N.Y.2d 972 (1988) ................................................. 16

*Hoyt v. Cooks*, 2012 U.S. App. LEXIS 3899 (11th Cir. 2012) ......................................... 8

*Imp v. Wallace,* 2011 U.S. Dist. LEXIS 107666 (D. Minn. 2011) .................................... 8

*In re Rezulin Prods. Liab. Litig.*, 331 F. Supp. 2d 196 (S.D.N.Y. 2004) ......................... 14

*Krohn by Krohn v. Agway Petroleum Corp.*, 168 A.D.2d 858 (3rd Dep't 1990) ......... 2, 24

*Lancaster Silo & Block Co. v. Northern Propane Gas Co.*, 427 N.Y.S.2d 1009 (N.Y. App. Div. 1980) ............................................................................................................... 14

*Landis & Staefa Ltd. v. Flair Int'l Corp.*, 60 F. Supp. 2d 14 (E.D.N.Y. 1999) ............... 23

*Loughry v. Lincoln First Bank, N.A.*, 67 N.Y.2d 369 (1986) ......................................... 24

*Lupa v. Jock's*, 500 N.Y.S.2d 962 (N.Y. City Ct. 1986)...................................................23

*Martin v. Hacker*, 83 N.Y.2d 1 (1993) ...........................................................................14

*Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011) ...............................................................8

*Neal-Lomax v. Las Vegas Metro. Police Dept.*, 574 F. Supp. 2d 1170 (D. Nev. 2008) ..... 8

*Prozeralik v Capital Cities Commc'ns, Inc.*, 82 N.Y.2d 466 (1993) ...............................24

*Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 2011 U.S. Dist. LEXIS 102404 (S.D.N.Y. 2011) .......................................................................................23

*Rolen v. Burroughs Wellcome Co.*, 856 S.W.2d 607 (Tex. App. 1993)...........................14

*Rosa v. City of Seaside*, 675 F. Supp. 2d 1006 (N.D. Cal. 2009)...............................17, 18

*Ross v. Louise Wise Servs., Inc.*, 8 N.Y.3d 478 (2007) .....................................................17

*Travelers Ins. Cos. v. Howard E. Conrad, Inc.*, 233 A.D.2d 890 (4th Dep't 1996) .........23

*Walker v. Sheldon*, 10 N.Y.2d 401 ( 1961) ......................................................................24

**Statutes**
UCC § 1-201(10)................................................................................................................22

UCC § 2-313........................................................................................................................1

UCC § 2-314........................................................................................................................1

UCC § 2-316....................................................................................................................2, 25

UCC § 2-316(2) .................................................................................................................21

**Other Authorities**
PJI § 2:120 ........................................................................................................................16

**Treatises**
RESTATEMENT (THIRD) OF TORTS § 2(c) (1998)........................................................15, 16

RESTATEMENT (THIRD) OF TORTS § 2(c) cmt. a, j.............................................................20

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     PLAINTIFF'S CLAIMS AGAINST TASER.

At the January 27, 2012 hearing on defendants' various *Daubert* motions, counsel for Plaintiff stated on the record that Plaintiff's strict products liability (Count 4) and negligence (Count 1) claims against TASER are exclusively based on an alleged failure to warn.  (Dkt. 103, 1-27-12 TR at 12, MR. FOGELGAREN: "I'm going to be straightforward with you. It's strictly a duty to warn."). Thus, Plaintiff's product liability claims on this motion must be analyzed solely on New York warning standards, which are identical under strict liability and negligence theories.  *E.g., Fane v. Zimmer, Inc.*, 927 F.2d 124, 124 (2d Cir. 1991) ("Our holding that the warnings provided . . . were adequate as a matter of law with respect to the . . . claim in strict products liability also resolves the [ ] claim of negligent failure to warn."); *Gould v. Rexon Indus. Corp.*, 2006 U.S. Dist. LEXIS 55323, *11, 2006 WL 2301852, *4 (N.D.N.Y. 2006) ("Plaintiff's failure to warn claims, although predicated alternatively upon theories of negligence and strict liability, are essentially equivalent and the Court will treat them as such."); *Enright v. Eli Lilly & Co.*, 77 N.Y.2d 377, 568 N.Y.S.2d 550, 555-56 (N.Y. 1991) (where liability is predicated on a failure to warn of dangers manufacturer knew or should have known, "[s]uch a claim, though it may be couched in terms of strict liability, is indistinguishable from a negligence claim . . . . Concepts of reasonable care and foreseeability are not divorced from this theory of liability, as they may be under other strict liability predicates.").

Plaintiff's January 25, 2007 Amended Compliant (Dkt. 14) also asserts claims for breach of express (Count 3) and implied (Count 2) warranties of merchantability and fitness "for the ordinary purposes for which the product was intended to be used," to wit, "safely apprehending suspects," pursuant to UCC §§ 2-313 and 2-314.  (Complaint ¶¶ 47, 55).  These claims must be

dismissed, however, because TASER expressly disclaimed any such warranties in compliance with UCC § 2-316.

Plaintiff's further claim for punitive damages also must be dismissed because such damages in New York are reserved for cases involving "exceptional misconduct which transgresses mere negligence" and approaches "criminality." *Camillo v. Geer*, 185 A.D.2d 192, 194 (1st Dep't 1992). Summary judgment is warranted here because Plaintiff's Complaint contains no allegation, and Plaintiff has no evidence, that TASER "acted with criminal indifference to civil obligations" in connection with its sales and marketing of its X26 ECD product to SCPD in August 2004. *See Krohn by Krohn v. Agway Petroleum Corp.*, 168 A.D.2d 858, 859-60 (3rd Dep't 1990) (granting summary judgment on punitive damages claim based on breach of warranty and negligence stating, "absent claims . . . equivalent to willful or intentional misdoing -- exemplary damages are not appropriately awarded in tort actions.").

## II.    RELEVANT FACTUAL BACKGROUND.

### A.    Incident Basics and ECD Use.

On April 22, 2005, SCPD Sgt. Kevin Lixfield responded to a highest priority violence call that a TASER ECD might be needed to arrest a highly combative subject "busting up" a Bellport home. (SOF ¶ 8). Sgt. Lixfield arrived at 20:12 hours to find Cox, a person known to him to have a violent history and multiple prior arrests, bare chested, sweating profusely, screaming, threatening and moving in a highly agitated state. (*Id*. ¶ 9). Sgt. Lixfield displayed his ECD, told Cox it would hurt if he had to use it, and ordered Cox three or four times to "kneel down on the floor." (*Id*. ¶ 10). When Cox failed to comply and suddenly lunged at Sgt. Lixfield, the officer fired his X26 ECD in probe mode striking Cox in the chest.[1] (*Id*.). Sgt. Lixfield

---

[1] In the field, the TASER X26 ECD may be primarily applied in two ways: a probe deployment,

testified the ECD had no effect whatsoever on Cox, who simply "pulled both darts from his chest and continued to come at me."[2] (*Id*. ¶ 11).  It is undisputed that all other ECD applications to Cox were in drive-stun mode. (*Id*. ¶ 12).

The data download report for Sgt. Lixfield's X26 ECD for April 22, 2005, recorded a total of 10 trigger pulls during a 17-minute 48-second time span.[3] (SOF ¶ 13).  It is undisputed that the second trigger pull accidentally resulted in a second set of probes being fired into Sgt. Lixfield's own left hand as he hurriedly attempted to reload a new ECD cartridge.  (*Id*. ¶ 13). What happened next has been described as a "five minute[ ] free-for-all on the floor," as the officers went hands-on in an attempt to subdue Cox using physical force.  (*Id*. ¶ 14, "it was a wrestling match to get him under control.").  Cox was 39 years old, 5 feet 9 inches tall, weighed 240 pounds, and had a body mass index of 35:4 making him obese by national standards.  (*Id*. ¶ 15).  Sgt. Lixfield described Cox as "an extremely strong individual" who "was high on something," and fought wildly, kicking, biting and punching several officers. (*Id*. ¶ 16).  Indeed,

where two small metal darts fire via compressed nitrogen, with electrical impulses transmitted into the target through very thin insulated trailing wires; or drive-stun mode, in which the ECD is physically pressed against the target. (SOF ¶ 1). In probe-deployment mode, the ECD primarily works by motor-nerve mediated stimulation of skeletal muscles. The TASER X26 ECD is designed to transmit stimuli through very short duration low charge electrical pulses that interfere with the command and control systems of the body at the motor-neuron level to temporarily incapacitate the target. The result is known as "NMI" or Neuro-Muscular Incapacitation. (*Id*. ¶ 2). To achieve NMI, an adequate probe spread is required to ensure major muscle groups between the darts are affected by the charge. (*Id*. ¶ 3).

[2] Significantly, Plaintiff's medical causation expert, Dr. William Manion, has conceded that Cox pulled the probes out of his chest within 2-3 seconds.  (SOF ¶ 12).

[3] The X26 ECD has data download capabilities that record the date, time and duration of each ECD trigger pull. (SOF ¶ 6). The data download shows discharges (trigger pulls) only, not whether the electrical charge was delivered to the subject. (*Id*.). Pulling and releasing the trigger automatically activates a 5-second cycle. The ECD operator may cut the cycle short at any time by placing the safety lever in the down (SAFE) position. The operator also may extend the ECD discharge beyond 5 seconds by holding the trigger down. Releasing the trigger any time after 5 seconds will immediately stop the ECD discharge. (*Id*. ¶ 7). An X26 ECD records the time when the firing sequence ends. (*Id*.).

following the incident, nine SCPD officers required hospital treatment for injuries sustained during the struggle with Cox ranging from several contusions and sprains to a bite on the bicep and a fractured wrist. (*Id.*).

Sgt. Lixfield testified that because he did not have another ECD cartridge, he removed the second spent cartridge and attempted to use the ECD in drive-stun mode by physically pressing the device against Cox's back, buttocks, and the back of his legs.  (SOF ¶ 17).  At no point did Cox react to the drive-stuns.  (*Id.* ¶ 18, "it had no visible effect on him;"  "he didn't cease what he was doing. He didn't twitch, he didn't jerk or show any reaction. He continued swinging").  Because of Cox's complete nonresponse to the ECD, Sgt. Lixfield was concerned the device was not working.  (*Id.* ¶ 19).  He therefore tested the ECD several times by "[a]iming it up in the air and squeezing the trigger, which makes an audible sound." (*Id.*).  Sgt. Lixfield testified he did this maybe 4-5 times, "probably more up than down." (*Id.*).  Thus, according to Sgt. Lixfield, the remaining eight ECD activations on his data download report were a combination of spark tests in the air and attempted drive-stuns to Cox's backside.  (SOF ¶¶ 10, 12).

Eventually the officers were able to handcuff Cox with his hands in front of him, but he continued to actively resist.  (SOF ¶ 20).  As the officers attempted to carry Cox from the bedroom to an ambulance stretcher in the living room, Cox continued kicking, screaming and grabbing at the officers.  (*Id.*).  Cox also grabbed and held on to various fixed objects along the way (*i.e*., door jam, furniture, lamp) to impede the officers efforts to remove him. (*Id.*).  Sgt. Lixfield testified that as the officers attempted to secure Cox to the gurney, "his upper torso was leaning off the top, and he reached underneath the stretcher and grabbed the support bars [with both hands] and would not let go." (*Id.* ¶ 21).  In an effort to get Cox to release his grip so his

entire body could be safely secured for transport, Sgt. Lixfield tried to drive-stun Cox's shoulder (*Id.*), and SCPD Sgt. David Doherty who had arrived at the scene used his X26 ECD to drive-stun Cox's lower back.  (*Id.*).  Sgt. Doherty testified he placed his ECD into the small of Cox's back and pulled the trigger once.  When he saw absolutely no reaction from Cox, Sgt. Doherty pulled the ECD away after 2-3 seconds to see if it was working, saw sparking at the electrodes, and turned it off.  (*Id.* ¶ 22).  The download report for Sgt. Doherty's X26 ECD confirms a single 5-second trigger pull on April 22, 2005.  (*Id.* ¶ 23).

Sgt. Lixfield instructed three officers to ride in the ambulance with the emergency medical technicians, including EMT Lindsey Smith, who rode in the back with Cox and the officers.  (SOF ¶ 24).  It is undisputed there was no further ECD use once Cox was removed from the home.  (*Id.* ¶ 25).  According to the prehospital care report prepared by EMT Smith, the ambulance arrived at the scene at 20:27, departed at 20:33 and arrived at the hospital at 20:42.  (*Id.* ¶ 27).  Smith testified Cox was violent and threatening the "entire time that I was in contact with him until we arrived at the hospital," a period of about 15 minutes.  (*Id.*).  Smith described Cox as "physically struggling," "extremely violent," "still extremely combative," yelling and spitting, "threatening to kill people, cursing and screaming," which required police measures to further restrain him in the ambulance.  (*Id.* ¶ 27).  Smith testified that Cox was "still combative" as "we're pulling into the hospital." (*Id.* ¶ 28).   Once in the trauma room, however, it was observed that Cox was no longer breathing and CPR was started. (*Id.*). Resuscitation efforts were not successful and Cox was subsequently pronounced dead.

### B.    Autopsy Findings.

The Suffolk County Deputy Medical Examiner, Gwen Harleman, M.D., performed Cox's autopsy and determined the manner of death was accidental.  (SOF ¶ 29).  Dr. Harleman found

the cause of death to be "Excited Delirium Syndrome" resulting from "cocaine intoxication" and other contributory medical factors, specifically, "arteriosclerotic and hypertensive type cardiovascular disease" and "chronic psychotic disorder."[4]  (*Id.* ¶ 30).  The toxicology report was positive for cocaine.  (*Id.* ¶ 31).  The TASER ECD is not identified anywhere in the official autopsy report as a causal or contributory factor in Cox's death.  (*Id.* ¶ 32).  The report and diagram of injuries only identifies five sites of TASER ECD marks on Cox's body labeled 1 through 5 on his right and left upper chest (subclavian), left upper buttocks, left calf and right ankle. (*Id.* ¶ 33).  Skin was removed at each of these locations and examined microscopically. (*Id.* ¶ 34).  No defects were noted beyond the epidermis and dermis layers of the skin. (*Id.*). Thus, Cox's autopsy did not reveal TASER ECD marks inconsistent with the officers' testimony concerning the extent of their ECD use.

### C.  Physiological Effects of ECD Drive Stuns and the State of Medical and Scientific Knowledge Concerning Drive Stun Risks.

It is crucial to understand the significant difference in physiological effect on the human body of an ECD drive stun and a probe deployment.  In drive-stun mode, electrical impulses are transmitted superficially between two fixed electrodes on the front of the ECD, which are only 4 centimeters (1.6 inches) apart. (SOF ¶ 4).  Because the electrical current in a drive-stun application is confined to such a small stimulation area between the two electrodes on the surface of the skin, it does not create any major body mass involvement and does not result in NMI. (*Id.*).  To achieve NMI in a probe deployment, a minimum 4-inch spread is required to ensure

---

[4] Excited delirium (first described in the mid 1800's, well before TASER ECDs) almost always presents "the exact same sequence of events: delirium with agitation (fear, panic, shouting, violence and hyperactivity), sudden cessation of struggle, respiratory arrest and death." (Ho Dec. Ex. Q, "Excited Delirium," *West J Emerg Med* at 77 (Feb. 2011)). Cox displayed the classic symptoms of excited delirium, which include "bizarre and/or aggressive behavior, shouting, paranoia, panic, violence toward others, unexpected physical strength and hyperthermia." (*Id.*; *see also* Ho Dec. ¶¶ 26-27 & Exs. O-P).

major muscle groups between the darts are affected by the charge.  (*Id.* ¶ 3).  Accordingly, an ECD drive-stun is strictly a pain compliance tool.  (*Id.* ¶ 4).

The illustration below depicts a drive-stun application to a person's skin, and accurately reflects the path of the electrical current between the electrodes on the ECD.  (SOF ¶ 72).  The current only penetrates the outermost layers of the skin, the epidermis and the dermis, and dips slightly into the underlying fat layer.  None of the current reaches the skeletal muscle below. (*Id.*).



Numerous courts have recognized the fact that the electrical current from an ECD drive-stun application does not cause NMI or affect the underlying muscle, including mostly recently *Glowczenski v. Taser Int'l, Inc.*, 2012 U.S. Dist. LEXIS 39438, *21 (E.D.N.Y. Mar. 22, 2012) (noting flow of electrical charge from a TASER ECD in drive-stun mode, "does not penetrate the

dermal fat layer into the skeletal muscle of the recipient," as demonstrated by same skin diagram, which Dr. Manion agreed was a "fair representation"). *See also Hoyt v. Cooks*, 2012 U.S. App. LEXIS 3899, *7-8, nn.4-5 (11th Cir. 2012) (**recognizing "stark contrast between the prong mode** (which overrides the central nervous system and disrupts muscle control) **and the much less serious [drive] stun mode** (which results merely in pain, a burning sensation)" but does not disrupt muscle control) (emphasis added); *Mattos v. Agarano*, 661 F.3d 433, 443 (9th Cir. 2011) (noting differences in probe and drive-stun deployment modes, including fact that drive stun does not override central nervous system); *Neal-Lomax v. Las Vegas Metro. Police Dept.*, 574 F. Supp. 2d 1170, 1176 (D. Nev. 2008) *aff'd*, 371 Fed. App'x 752 (9th Cir. 2010) (explaining when dart cartridge is removed, "ECD becomes a simple stun gun" used for pain compliance and "works only on the area of the body to which the [ECD] is applied."); *Imp v. Wallace*, 2011 WL 4396941, 2011 U.S. Dist. LEXIS 107666, *14-15 n.10 (D. Minn. Sept. 21, 2011) (TASER ECD "in drive-stun mode is more than trivial force, but it is a **less intrusive — and less risk-laden —** use of force than a taser in dart mode.") (emphasis added); *Ellis v. Columbus City Police Dept.*, 2009 WL 3347300, 2009 U.S. Dist. LEXIS 95821, *6 n.2 (N.D. Miss. Oct. 14, 2009). ("Drive stunning does not incapacitate or damage a suspect, but it does cause pain" until the trigger is released or skin contact broken).[5]

These findings, of course, are based on significant testing and peer-reviewed published works of medical doctors and scientists who have now studied the physiological effects of

---

[5] Courts have also recognized, as do TASER's warnings and training materials, that it is difficult to maintain drive-stun contact for more than a few seconds with a thrashing suspect. *See, e.g., Neal-Lomax*, 574 F. Supp. 2d at 1176 (noting ECD in drive-stun mode "does not typically remain in contact with the subject during the entire duration of the discharge due to the subject already struggling against the officers and his reaction to the ECD, causing it to bounce in and out of contact with him."); (SOF ¶ 78, combative subject "is likely to recoil and try to get away from the stun electrodes.").

TASER ECDs for more than a decade, as well as numerous epidemiological studies based on actual ECD field-use experience and emergency room surveillance data. (Ho Dec. ¶¶ 9-15, 22-27 & Exs. G-Q). Significantly, there have been an estimated 2.86 million TASER ECD volunteer and law enforcement field-use exposures to date, and the collective experience is that ECD drive stuns cause nothing more than superficial skin burns. (SOF ¶ 73). Indeed, in July 2010 the American Academy of Emergency Medicine released its Clinical Practice Statement recommending that medical screening of patients post ECD drive-stun applications "focus on local skin effects at the exposure site, **which may include local skin irritation or minor contact burns**. This recommendation is based on a literature review in which thousands of volunteers and individuals in police custody have had drive stun [ECDs] used **with no untoward effects beyond local skin effects**." (*Id.* ¶ 74). This conclusion is wholly consistent with Cox's autopsy finding that "[n]o defects were noted beyond the epidermis and dermis layers of the skin" at the drive-stun sites. (*Id.* ¶ 35). The simple truth is no published peer-reviewed article or study has ever suggested that an ECD drive stun directly causes any injury beyond minor contact burns. (*Id.* ¶ 67).

Moreover, no peer-reviewed literature has ever linked multiple TASER ECD drive-stun exposures to an increased risk of sudden death, or found any clinically significant changes in blood chemistry in humans following ECD applications in either probe or drive-stun mode. (SOF ¶¶ 66, 68). In fact, numerous human studies have specifically tested Plaintiff's metabolic acidosis causation theory and debunked it. These studies have monitored blood serum pH, lactate, potassium, troponin I, catecholamines and creatine kinase ("CK") following ECD applications to humans, and have uniformly found no clinically significant changes in blood

chemistry.[6] (*Id*. ¶ 75). Indeed, an independent study funded by the National Institute of Justice ("NIJ") and published in the Annals of Emergency Medicine in April 2009 examined the "rapidly evolving body of literature" regarding the physiologic and cardiovascular effects of ECD applications in humans and found "**no evidence of dangerous respiratory or metabolic effects" using extended ECD applications up to 45 seconds.** (*Id*. ¶ 76, emphasis added). Significantly, there is no evidence that Cox received anywhere near 45 seconds of ECD discharge.[7]

### D. TASER's Applicable Warnings and Training Materials.

The X26 ECDs used by Sgt. Lixfield and Sgt. Doherty on Cox on April 22, 2005 were shipped to SCPD on August 19, 2004. (SOF ¶ 38). Packaged with each of these units were TASER's Version 11 Training CD (released January 2004) and 2003 X26 ECD Operating Manual, both containing product warnings and instructions for safe use. (*Id*. ¶ 39). The Version 11 CD contained a variety of training aids for law enforcement agencies to use in training their

---

[6] *See, e.g.,* "Acidosis and catecholamine evaluation following simulated law enforcement 'use of force' encounters," *Academic Emerg Med*, 2010;17:E60-E68 (simulating common arrest-related situations such as flight, physical resistance, 10-second continuous ECD probe application, and pepper spray exposure, and finding physical resistance and fleeing on foot led to the greatest changes in markers of acidosis and catecholamines; ECD produced the lowest total catecholamine increase of all groups); "Prolonged TASER [ECD] use on exhausted humans does not worsen markers of acidosis," *Am J Emerg Med*, 2009;27:413-418 (finding prolonged TASER ECD use on already exhausted acidotic volunteers did not worsen acidosis, *i.e.,* no further change in pH, lactate, etc., in repeated blood serum biomarker evaluation); "Prolonged TASER [ECD] 'Drive Stun' Exposure in Humans Does Not Cause Worrisome Biomarker Changes," Poster presented June 2008 Canadian Ass'n Emerg Physicians and January 2008 Nat'l Ass'n of EMS Physicians (finding 15-second continuous drive-stun application did not support a causal relationship with worsening physiology). (Ho Dec. ¶¶ 12, 14, 19, 23 & Exs. A-F).

[7] The best estimate is 2-3 seconds from the initial probe deployment before Cox ripped out the darts (if a circuit was completed at all), 2-3 seconds from Sgt. Doherty's drive-stun to Cox's lower back, and maybe 5-10 seconds for the drive stuns to Cox's calf and ankle – much less if Cox flinched to "get away from the source of pain," as Dr. Manion speculates, thereby breaking ECD contact before the cycle ends. (SOF ¶¶ 11-12, 23, 77).

own officers, including recommended lesson plans, PowerPoint® presentations, demonstration and field-use videos, sample training tests, suggested practice drills, etc. (*Id.* ¶ 45). SCPD then sent four of its own trainers, Officers Mark Fernandez, Roland Grant, William Jablonsky, and Frank Simone, to attend a 12-hour course and become certified TASER X26 ECD Instructors on September 24, 2004. (*Id.* ¶ 46). Each of these officers would have received copies of, and been trained directly on, TASER's Version 11 X26/M26™ ECD Instructor Course PowerPoint presentation. (*Id.*).

The 2003 Manual states that the "TASER X26 is a less-lethal weapon," that is "designed to incapacitate a target from a safe distance without causing death or permanent injury." However, the Manual warns at the top of page 1 that:

> it is important to remember that the very nature of physical confrontation involves a degree of **risk that someone will get hurt or may even be killed due to unforeseen circumstances and individual susceptibilities.** Accordingly, the TASER X26 should be treated as a serious weapon and should only be deployed in situations where the alternative would be to use other force measures which carry similar or higher degrees of risk.

(SOF ¶ 40, emphasis added).  Regarding ECD drive stuns, the Version 11 Instructor PowerPoint made clear that unlike ECD probe deployments, "drive stun mode affects the sensory nervous system ONLY making it a pain compliance weapon that will not cause EMD [electro-muscular disruption]." (SOF ¶ 47). The Instructor Notes also warned that drive stuns may not be successful in achieving pain compliance in psychotic suspects like Cox:

> Someone in a mental health crisis state, under the influence of a mind altering substance, or extremely focused are prone to "mind-body disconnection."  If only the stun mode is used, the X/M26 becomes a pain compliance technique with **limited threat reduction potential** for subjects at the high end of the three mind-body disconnect categories.

(*Id.*, emphasis added). The PowerPoint then detailed warning signs and behaviors common to subjects suffering from possible cocaine psychosis or excited delirium, and stated: "Instruct your

11

officers to watch for these danger signs.  If a suspect exhibits any of these signs, get them to medical attention as quickly as possible **as these people are at elevated risk for in-custody death.**"  (SOF ¶ 48, emphasis added).

Moreover, with the aid of its Training Advisory Board and Scientific and Medical Advisory Board created in May 2003 and May 2004, respectively, TASER regularly reviews and revises its warnings and training materials to stay current with the generally recognized and prevailing best scientific and medical knowledge regarding ECDs and their risks. (SOF ¶¶ 21, 34-36).  As updates or new versions of TASER's warnings and training materials are released, or as new product information or Training Bulletins are issued, TASER forwards these materials directly to all certified ECD Instructors in its database. (*Id.* ¶ 49).  Accordingly, when TASER released its Version 12 Training CD (copyrighted November 2004), CDs were mailed directly to SCPD Officers Ferandez, Grant, Jablonsky and Simone on December 23, 2004. (*Id.* ¶ 50). TASER's Version 12 Training was in effect on the date of Cox's death, April 22, 2005. (*Id.* ¶ 51).

The X26 User Course PowerPoint presentation contained on the Version 12 Training CD provided ECD users with the following "**Warnings and Risks**" pertaining to Plaintiff's claims, among others:

> • TASER ECDs "are designed to incapacitate a person . . . [and] the very nature of physical incapacitation involves a degree of **risk that someone will get hurt or may even be killed due to physical exertion, unforeseen circumstances and individual susceptibilities.** As with any weapon system, there can be unforeseen and severe consequences and **there will always be risk involved in this use of force."**
>
> • **TASER ECDs "cause pain which can be stressful. This stress may be injurious to some people."**

12

(SOF ¶ 52, emphasis added).  The presentation also expressly warned officers to minimize the number of ECD applications to the greatest extent possible, and to transition to other force options if the ECD is not having the desired effect:

> **Duration of Field Applications**
> **The application of the TASER is a physically stressful event**. Although there is no predetermined limit to the number of cycles that can be administered to the subject, officers should only apply the number of cycles reasonably necessary to allow them to safely approach and restrain the subject.  **Especially when dealing with persons in a health crisis such as excited delirium, it is advisable to minimize the physical and psychological stress to the subject to the greatest degree possible**.

(*Id*. ¶ 53, emphasis added).  Like Version 11, Version 12 continued to warn that drive stuns have "limited threat reduction potential" in such individuals, who tend to be impervious to pain due to a mind-body disconnect, and that such persons are at an "elevated risk for in-custody death" and require immediate medical attention.   (Smith Dec. Ex. F at 129, 144).  The accompanying instructor notes further provide:

> **INSTRUCTOR NOTES**: . . . **the TASER stimulation is a stressful physical exertion.** It is advisable to minimize the number of TASER applications by working quickly to restrain the subject. **If repeated TASER applications are not having the desired effect, for whatever reason**, it may be reasonable to redeploy to a different location on the body or **transition to another force option rather than continue to expose the subject to the stress of further TASER applications** if such applications are not making progress toward the goal of restraining the subject.

(*Id*., emphasis added).  Then, in discussing the use of an ECD drive stun as a backup to a failed probe deployment, TASER warned:

> **Instructors must be clear with students that the drive stun does not cause incapacitation**. Because of this, officers frequently find themselves in prolonged struggles with violent suspects whom they end up drive stunning several times in several different locations. This often results in multiple discharges and numerous signature marks and scratches on the suspect's body. It is in these types of situations that officers are often facing accusations of excessive force.

(*Id*. ¶ 54, emphasis added).  Thus, there was no failure to warn.

III.   **PLAINTIFF'S FAILURE-TO-WARN CLAIM FAILS AS A MATTER OF LAW.**

   A.   **TASER's Warnings Were Adequate As A Matter of Law As Applied To the Facts of This Case.**

Although in New York it is generally true that the adequacy of a product warning is a jury question, "nevertheless, in a proper case the court can decide . . . that the duty [to warn] has been discharged as a matter of law." *Lancaster Silo & Block Co. v. Northern Propane Gas Co.*, 75 A.D.2d 55, 65, 427 N.Y.S.2d 1009, 1015 (N.Y. App. Div. 1980); *see, e.g., In re Rezulin Prods. Liab. Litig.*, 331 F. Supp. 2d 196, 199 (S.D.N.Y. 2004) ("In appropriate cases, [ ] a warning may be held adequate as a matter of law and the issue resolved on summary judgment."). As stated by the New York Court of Appeals in *Martin v. Hacker*, 83 N.Y.2d 1, 10 n.3 (1993) (collecting cases in New York and other jurisdictions), numerous cases "have resolved the issue of a warning's adequacy as a matter of law." This is particularly true where, as here, "a warning specifically mentions the circumstances complained of." *In re Rezulin Prods. Liab. Litig.*, 331 F. Supp. 2d at 199 (citing *Rolen v. Burroughs Wellcome Co.*, 856 S.W.2d 607, 609 (Tex. App. 1993) (holding "if a warning specifically mentions the circumstances complained of, the warning is adequate as a matter of law.").  This is such a case.

TASER's warnings expressly encompassed the circumstances presented by Cox on April 22, 2005 when he encountered SCPD police. TASER warned of risks of death due to physical exertion and individual susceptibilities; warned that an ECD application is a physically stressful event and that such pain and stress may be injurious to some people; warned against multiple ECD use on persons in a mental health crisis (specifically naming excited delirium) to minimize the physical and psychological stress to such subjects, who were identified as being at an "elevated risk for in-custody death" and in need of immediate medical attention; warned that ECD drive stuns may not be effective and have "limited threat reduction potential" when used on

14

persons in an altered mental state by drugs or otherwise who may be impervious to pain; and instructed officers to transition to other force options if the ECD is not producing desired incapacitation or compliance effects rather than continue to subject the person to the stress of further applications. All of these warnings capture the precise scenario alleged by Plaintiff – multiple ECD drive-stun applications to a person in a state of excited delirium and cocaine intoxication. Thus, under the facts particular to this case, TASER's warnings were adequate as a matter of law.

But even if the Court finds any issue of fact concerning the adequacy of TASER's warnings to SCPD, as discussed below, summary judgment should still be granted because: (1) Plaintiff has no evidence that TASER knew or should have known of alleged risks of metabolic acidosis sufficient to contribute to sudden death from multiple drive-stun applications in August 2004 when the TASER X26 ECDs at issue here were distributed to SCPD; and (2) TASER had no duty to warn that ECD drive stuns cause pain and might cause a suspect to instinctively recoil to get away from the source of pain, since such facts are open, obvious, and within the common knowledge of law enforcement officers and the general public alike.

### B.   TASER Had No Reason To Know or Warn About Any Drive-Stun Risks In August 2004 Beyond Minor Skin Burns.

In New York, a product "is defective because of inadequate instructions or warnings when the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the seller . . ., and the omission of the instructions or warnings renders the product not reasonably safe." *Guarascio v. Drake Assocs.*, 582 F. Supp. 2d 459, 465 (S.D.N.Y. 2008) (quoting RESTATEMENT (THIRD) OF TORTS § 2(c) (1998). The absence of warnings must be a proximate cause of plaintiff's injuries such that, if adequate warnings had been provided, the injury would not have occurred. *See, e.g., Howard v.*

*Poseidon Pools, Inc.*, 72 N.Y.2d 972, 974-75 (N.Y. 1988).  Here, Dr. Manion has opined that Cox's cause of death was "irreversible metabolic acidosis" due to "extreme muscle exhaustion" from "multiple applications in rapid succession of the [TASER ECD]."[8]  (*See* Dkt. 84, TASER's 10-17-11 Manion *Daubert* at 9-10).  Plaintiff's entire ECD causation theory therefore is premised on "multiple applications."  Because it is undisputed that Officer Lixfield only applied a *single* probe deployment to Cox, and this probe deployment was the *first* ECD application to Cox (SOF ¶ 12), any and all "multiple" applications were ECD drive stuns.  Accordingly, Plaintiff must establish that the absence of ECD drive-stun warnings proximately caused Cox's death.  This she cannot do.

A manufacturer's duty to warn only arises when it knows, or in the exercise of reasonable care should have known, of product dangers which the user of the product ordinarily would not discover.  *Geressy v. Digital Equip. Corp.*, 980 F. Supp. 640, 649 (E.D.N.Y. 1997); PJI § 2:120.  The key timeframe for this inquiry is what the manufacturer knew or should have known "at the time of marketing" or product distribution.  *Geressy,* 980 F. Supp. at 649 (citing RESTATEMENT § 2(c), "A product is defective when, *at the time of sale or distribution*, it . . . is defective because of inadequate instructions or warnings.").  Here, the subject ECDs were distributed to SCPD in August 2004.  (SOF ¶ 38).  At the time of distribution, TASER had no knowledge of any risk of

---

[8] Factually, however, there is no evidence of back-to-back or "rapid succession" ECD deployments to Cox in the first instance. (SOF ¶ 13, Lixfield download report showing 10 ECD activations over a 17-minute 48-second time span; Ex. 9 at 5, Dr. Manion report stating Cox "was repeatedly Tasered, a[t] least seven times in a period of twenty minutes."  Moreover, Plaintiff's police practices expert Edward Mamet's statement in his report that "TASER did not provide any materials or warnings to SCPD regarding multiple applications in rapid succession," is without factual basis.  (Ex. 15 at 11-12; *see* Section II (D) above).  At his deposition, Mamet conceded he does not know what manufacturer warnings were shipped with TASER's X26 ECDs in August 2004, and has no idea which version of TASER's training program was in effect on April 22, 2005. (*See* Dkt. 83, TASER's 10-17-11 Mamet Daubert at 5).

clinically significant metabolic acidosis from multiple ECD drive stuns. (SOF ¶ 55).  Since metabolic acidosis is caused by lactic acid from muscle exertion, and the electrical current from an ECD drive stun does not reach or otherwise stimulate or cause skeletal muscle to contract, there was no medical or scientific reason for TASER to believe in August 2004 (or today) that multiple ECD drive stuns could cause or contribute to dangerous levels of acidosis.  (*Id*. ¶ 56).

In or before August 2004, no study (animal or human) and no published medical or scientific literature had ever found, concluded or suggested in any way that multiple ECD drive stuns could potentially cause adverse metabolic effects or otherwise increase the risk of sudden death. (*Id*. ¶ 57). The ECD pig studies typically used by the plaintiffs' bar as support for metabolic acidosis cause-of-death theories were ALL published *after* August 2004, and ALL involved *probe* deployments that caused significant prolonged muscle contractions not applicable to drive stuns, among other important distinctions. (*Id*. ¶¶ 4, 58, 72).  Clearly, in August 2004, there was no test, study or report in the public domain suggesting that multiple ECD drive stuns, regardless of duration or application in rapid succession, could adversely affect a person's blood chemistry to any clinically significant degree.  (*Id*. ¶ 60). There simply was no generally accepted or prevailing view in the medical or scientific community that ECD drive stuns posed any significant health risk requiring additional warnings.  (*Id*. ¶ 59). Indeed, as discussed in detail in Section II(C) above, there was no evidence in August 2004 or today that ECD drive stuns cause anything more than minor localized skin burns.

The summary judgment ruling in favor of TASER in *Rosa v. City of Seaside*, 675 F. Supp. 2d 1006 (N.D. Cal. 2009), is directly on point here.  Rosa died on August 29, 2004 following an encounter with police involving 10 ECD discharges for a presumed 50 seconds from two TASER M26 ECDs fired in *probe* mode. *Id*. at 1010.  Plaintiffs there claimed that

17

TASER was liable under both strict liability and negligence theories because it allegedly failed to warn the officers that extended ECD applications could lead to acidosis-induced cardiac arrest. *Id*. at 1011. TASER sought summary judgment arguing (1) the alleged propensity of ECDs to cause metabolic acidosis was not known at the time the ECDs in question were distributed in December 2003; (2) TASER's warnings with respect to the dangers posed by application of its ECDs were adequate; and (3) there was no causal connection between the ECD applications and Rosa's death. *Id*. at 1012. Finding that TASER's "first two points are well-taken," including the adequacy of the warnings, the *Rosa* court granted summary judgment to TASER without reaching the issue of causation. *Id*. at 1010, 1014-15.

Plaintiffs in *Rosa* relied on two obscure publications dated prior to December 2003 as support for the notion that TASER should have known and warned of risks of metabolic acidosis. *Id*. at 1012. The court found, however, that those publications were not generally available, involved ECDs not manufactured by TASER, and "merely hypothesize[d] that ECD application *may* affect acid-base balances in humans, and do not establish in any scientific sense that in fact it does." *Id*. at 1012-14 (emphasis in original). Accordingly, the court found there simply was no basis upon which a reasonable jury could conclude that plaintiffs' acidosis theory "was either 'generally recognized' or 'prevailing' in the scientific and medical communities, let alone that it was both." *Id*. at 1014. *See Carlin v. Superior Court,* 13 Cal. 4th 1104, 1112 (1996).

Here, neither Plaintiff nor any of her experts have identified a single study or publication in the public domain as of August 2004 that should have put TASER on notice of risks of potentially dangerous levels of metabolic acidosis from multiple ECD drive-stun applications so as to trigger a duty to provide a more specific warning.  (SOF ¶ 71).  No Plaintiff expert has opined that TASER knew or should have known in August 2004 that multiple ECD drive-stun

applications could produce clinically significant metabolic acidosis or otherwise increase a person's risk of sudden death. (*Id.* ¶ 70). No Plaintiff expert has proposed a warning of an ECD drive-stun risk not contained in TASER's product warnings or training materials accompanying the August 2004 ECD shipment to SCPD that was generally known or recognized in the medical and scientific community at that time. (SOF ¶ 69). Thus, Plaintiff's failure-to-warn claim fails as a matter of law since she has no evidence that any new or different drive-stun warning was required in August 2004 based on TASER's actual knowledge or any medical or scientific knowledge reasonably imputed to it, or that the lack of any such warning proximately caused Cox's death.

### C.     TASER Had No Duty To Warn of Open and Obvious Risks Known To All Law Enforcement Officers and the General Public.

Plaintiff's ever-shifting ECD causation theory in this case has morphed from direct ventricular fibrillation (Dr. Thanning withdraws after deposition and full *Daubert* briefing demonstrating impossibility of drive stun to ever cause VF, as confirmed by Plaintiff's other expert, Dr. Morse); to metabolic acidosis from electrically-induced severe muscle contractions (Dr. Manion waffles after being educated at his deposition as to physiological differences between probe and drive-stun deployments, specifically, that drive-stun current does not reach skeletal muscle or cause NMI);[9] to drive stuns cause pain and Cox likely flinched or contracted his muscles to pull away from the pain source, which *may* have exacerbated Cox's preexisting acidosis. Dr. Manion admits, however, that this latest iteration is only a possibility and <u>not</u> an

---

[9] *See also Glowczenski*, 2012 U.S. Dist. LEXIS 39438, *21-22 (granting TASER's *Daubert* motion to exclude Dr. Manion finding he "has inadequate understanding or knowledge about tasers and how they work" following Dr. Manion's deposition admissions that he felt "uncertain" about his theory, "wish[ed] I had understood better about muscle contractions in the drive stun mode" at the time he issued his metabolic acidosis opinion, and could no longer "state to a reasonable degree of professional certainty, that a Taser ECD applied to a human in stun drive mode causes muscle contractions.").

opinion that he holds to a reasonable degree of professional certainty.  (Ex. 10, Manion depo. at 85:12-17; *see also* Ex. 11, Morse depo. at 121:3-4, "Theoretically he felt pain; there is no documented evidence of it."; SOF ¶ 18, "He didn't twitch, he didn't jerk or show any reaction. He continued swinging").  Dr. Manion's new theory fails on so many levels, it is hard to know where to start – rank speculation, no factual predicate, no medical certainty, grasping at straws, etc.

A product seller is not liable for failing to warn regarding risks and risk-avoidance measures that should be obvious to, or known by, foreseeable product users. *Guarascio,* 582 F. Supp. 2d at 466 (citing RESTATEMENT § 2(c) cmt. j).  A manufacturer's duty to warn is limited where the user has certain knowledge or sophistication, professionally or otherwise, in regard to the product, *i.e.*, there is no duty to warn members of a profession about the dangers generally known to that profession.  *Id*. (citing cmt. a and holding failure to warn claim "fails as a matter of law" where party trained in commercial diving and use of manifolds should have known of dangers associated with such diving equipment).  Police officers are specially trained in restraint and pain compliance techniques, including TASER ECDs, pepper spray and batons.  They are well aware that the use of such tools and equipment causes pain, may induce a variety of suspect reactions, and may cause injury.  They do not need TASER to tell them that.

Moreover, it is common knowledge in the general population that exposure to electric shock, including TASER ECDs, causes pain.  It is also within the common human experience that pain causes stress and significant stress may cause a whole host of health and cardiac risks.  TASER had no duty to warn of such obvious general risks.  But it did.  TASER expressly warned that (1) an ECD used in drive-stun mode is solely a pain compliance technique, *i.e.*, it is intended to cause pain (SOF ¶ 47); (2) an ECD application "is a physically stressful event," and that ECDs

"cause pain which can be stressful. This stress may be injurious to some people." (*Id*. ¶ 52); and (3) combative subjects are "likely to recoil and try to get away from the stun electrodes." (*Id*. ¶ 42). Nothing more was required.

In August 2004 there was no test, study or report in the public domain or other suggestion in the medical or scientific literature that ECD pain, either alone or in combination with any momentary flinching or recoiling of muscles to move away from the pain source, could contribute to potentially fatal metabolic acidosis. (SOF ¶ 61). Indeed, it is absurd to suggest that any instinctive muscle reaction to pain, such as jerking a hand away from a hot burner on a stove, contributed in any meaningful way to Cox's preexisting acidosis in the midst of a violent 30-minute physical struggle that sent nine police officers to the hospital. (SOF ¶¶ 9, 14-16, 20-21, 26-28). Since Plaintiff has no evidence that TASER knew or should have known of potentially dangerous exacerbation of a subject's acidosis due to a *secondary* muscle reaction to an ECD's painful stimulus, TASER cannot be liable for failing to warn of any such specific risk. For all these reasons, this Court should grant summary judgment and dismiss Plaintiff's warnings claims.

**IV. PLAINTIFF'S EXPRESS AND IMPLIED WARRANTY CLAIMS WERE PROPERLY DISCLAIMED AND MUST BE DISMISSED.**

Plaintiff's claims for alleged breach of the warranties of merchantability and fitness "for the ordinary purposes for which the product was intended to be used," must be dismissed because TASER expressly disclaimed all such warranties in compliance with UCC § 2-316. *See, e.g.*, *Carbo Indus., Inc. v. Becker Chevrolet, Inc.*, 112 A.D.2d 336, 339, 491 N.Y.S.2d 786, 789 (2d Dep't 1985) (warranty of merchantability may be disclaimed if disclaimer language mentions "merchantability" and is conspicuous, as required by UCC § 2-316(2)).

TASER's standard quotation form used in connection with the sale of the X26 ECD units

shipped to SCPD on August 19, 2004, stated in bold print on the front of the quote:

> **The attached TASER Sales Terms and Conditions are essential terms and conditions of this Quotation. Acceptance of this Quotation by a Company purchase order is expressly limited to the terms and conditions of this Quotation. Any term or condition of a Company purchase order that is inconsistent or in conflict with the TASER Sales Terms and Conditions are rejected and shall be deemed null and void.**

(SOF ¶ 44).  The back of the quote then contained TASER's "SALES TERMS AND CONDITIONS,"

including paragraph 7, "**Warranty Exclusions.**"  (*Id*.).  The exclusion language stated in all

capital letters in pertinent part:

> TASER'S WARRANTY AS STATED ABOVE[10] IS THE EXCLUSIVE WARRANTY WITH RESPECT TO THIS PRODUCT. TASER DISCLAIMS ANY AND ALL OTHER WARRANTIES, WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY, DESIGN OR FITNESS FOR A PARTICULAR PURPOSE OR ARISING FROM A COURSE OF DEALING, USAGE OR TRADE PRACTICE, OR ANY WARRANTY AGAINST PATENT INFRINGEMENT.

(*Id*.).  This same exclusion was stated in the 2003 Operating Manual shipped with the subject

ECD units.  (SOF ¶ 43).  This disclaimer precludes Plaintiff's breach of warranty claims here.

Whether a particular disclaimer is conspicuous is a question of law for the Court.  UCC §

1-201(10).  "A term or clause is conspicuous when it is so written that a reasonable person

against whom it is to operate ought to have noticed it."  *Id*.  For example, a heading printed in

capitals is conspicuous, as is body type that is larger or presented in a contrasting type face or

color. *Id*.  Courts have upheld a seller's placement of disclaimer language on the reverse side of

its documents, as long as it fairly discloses that fact to the purchaser, such as where the front of

the order acknowledges that terms and conditions appear on the reverse side. *Landis & Staefa*

---

[10] The paragraph 6 Limited Warranty stated in part: "TASER warrants that its products are free from defects in workmanship and materials for a period of one year from the date of purchase." (Smith Dec. Ex. B at 2).

*Ltd. v. Flair Int'l Corp.*, 60 F. Supp. 2d 14, 22 (E.D.N.Y. 1999) (citing *Gambardella v. G. Fox & Co.*, 716 F.2d 104, 111 (2d Cir. 1983). *See also Travelers Ins. Cos. v. Howard E. Conrad, Inc.*, 233 A.D.2d 890, 891 (N.Y. App. Div. 4th Dep't 1996) (finding provision in capital letters on back of boat purchase agreement waiving all express and implied warranties was conspicuous and enforceable). *Lupa v. Jock's*, 131 Misc. 2d 536, 537, 500 N.Y.S.2d 962, 963 (N.Y. City Ct. 1986) (disclaimer language in bold print on back of contract is sufficient in itself to exclude implied warranty of merchantability).

Here, TASER's exclusion of all express and implied warranties, including specifically the warranty of merchantability, is valid and enforceable as a matter of law.  The front of TASER's standard quotation form expressly referenced, in bold type, the sales terms and conditions on the back of the form, and incorporated them as "essential terms" that could not be modified by purchase order.  The warranty exclusion on the back of the quote was then printed in all capital letters.  SCPD's subsequent purchase order therefore accepted the warranty exclusion, which became part of the basis of the bargain.  Where such an exclusion is clearly expressed, as it was here, the Code supports such limitations under freedom of contract principles. Accordingly, the Court should grant summary judgment to TASER on Plaintiff's warranty claims.

## V.    THIS IS NOT A PUNITIVE DAMAGES CASE.

"To sustain a claim for punitive damages in tort, one of the following must be shown: intentional or deliberate wrongdoing, aggravating or outrageous circumstances, a fraudulent or evil motive, or a conscious act that willfully and wantonly disregards the rights of another." *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp*, LLC, 2011 U.S. Dist. LEXIS 102404, *82-83 (S.D.N.Y. 2011) (quoting *Don Buchwald & Assocs. v. Rich*, 281 A.D.2d 329, 330, 723

N.Y.S.2d 8 (1st Dep't 2001). Punitive damages are permitted when the defendant's wrongdoing is not simply intentional but "evince[s] a high degree of moral turpitude and demonstrate[s] such wanton dishonesty as to imply a criminal indifference to civil obligations." *Ross v. Louise Wise Servs., Inc.*, 8 N.Y.3d 478, 489, 836 N.Y.S.2d 509 (2007) (quoting *Walker v. Sheldon*, 10 N.Y.2d 401, 405, 223 N.Y.S.2d 488 (1961)). Indeed, in *Prozeralik v Capital Cities Commc'ns, Inc.*, 82 N.Y.2d 466, 479, 626 N.E.2d 34, 605 N.Y.S.2d 218 (1993), the court wrote that punitive damages may be sought when the wrongdoing was deliberate "and has the character of outrage frequently associated with crime."

The mere negligent conduct alleged in Plaintiff's Complaint regarding TASER's sales and marketing of its X26 ECD product by no means meets this high standard. *See Krohn by Krohn*, 168 A.D.2d at 859-60 (granting summary judgment on punitive damages claim based on breach of warranty and negligence absent claims "equivalent to willful or intentional misdoing"). The Complaint also fails to allege that any TASER superior officer participated in or ratified any outrageous conduct giving rise to punitive damages, as required by *Loughry v. Lincoln First Bank, N.A.*, 67 N.Y.2d 369, 373 (1986), to sustain such an award against a corporation. Thus, the Court should bar Plaintiff from proceeding with any claim for punitive damages against TASER.

As discussed in detail above, TASER provided extensive warnings and training materials to SCPD with its X26 ECD products. (SOF ¶¶ 39-42, 45, 47-48, 52-54). It created a Training Advisory Board contemporaneously with the release of the X26 in May 2003, and a Scientific and Medical Advisory Board a year later to ensure that the company stays current on the generally recognized and prevailing best scientific and medical knowledge regarding ECDs and their risks. (*Id.* ¶¶ 21, 34-36). With the aid of these boards, TASER regularly reviews and

24

updates its warnings and training materials, and forwards these materials directly to all certified ECD Instructors in its database, as it did with SCPD's trainers in December 2004. (*Id.* at 46, 49-50). This is simply not a punitive damages case and Plaintiff's punitive damages claim should be stricken regardless of the Court's ruling on the remaining claims.

## VI.     CONCLUSION.

For all the reasons stated herein, this Court should grant TASER's motion for summary judgment and dismiss Plaintiff's Complaint against it. The long and short of it is that Plaintiff has no evidence that TASER knew or should have known of alleged risks of metabolic acidosis sufficient to contribute to sudden death from multiple drive-stun applications in August 2004 when the TASER X26 ECDs at issue here were distributed to SCPD. This fact alone mandates summary judgment on Plaintiff's product liability failure-to-warn claims (Counts 1 and 4). The warranty claims (Counts 2-3) were properly excluded under UCC § 2-316 and, therefore, also must be dismissed.

Dated: White Plains, New York
          April 16, 2012

                                        Respectfully submitted,

                              By:     /s/  *John V. Tait*
                                        John Renzulli (JFR 2917)
                                        jrenzulli@renzullilaw.com
                                        Christopher Renzulli (CR 8840)
                                        crenzulli@renzullilaw.com
                                        John V. Tait (JT 4835)
                                        jtait@renzullilaw.com
                                        **RENZULLI LAW FIRM, LLP**
                                        81 Main Street, Suite 508
                                        White Plains, NY 10601

                                        Telephone: (914) 285-0700
                                        Facsimile:  (914) 285-1213

-and-

Michael Brave (*Pro Hac Vice*)
brave@laaw.com
Holly L. Gibeaut (*Pro Hac Vice*)
hgibeaut@taser.com
TASER International, Inc.
17800 North 85th Street
Scottsdale, AZ 85255
Telephone: (800) 978-2737
Facsimile:  (480) 905-2027

Attorneys for Defendant
TASER International, Inc.

# CERTIFICATE OF SERVICE

I hereby certify that on April 16, 2012, the foregoing document was filed with the Clerk of the Court and served in accordance with the Federal Rules of Civil Procedure, and/or the Eastern District's Local Rules, and/or the Eastern District's Rules on Electronic Service upon the following parties and participants:

Fredrick K. Brewington, Esq.
Ira F. Fogelgaren, Esq.
Law Offices of Frederick K. Brewington
556 Peninsula Boulevard
Hempstead, NY 11550

/s/  *John V. Tait*
John V. Tait (JT 4835)

26