# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

———————————

Nº 06-cv-3588 (JFB) (ARL)

———————————

## MARY HOLLMAN, AND THE ESTATE OF SAMUEL A. COX,

Plaintiffs,

VERSUS

## TASER INTERNATIONAL INCORPORATED,

Defendant.

———————————

**MEMORANDUM AND ORDER**
March 8, 2013

———————————

JOSEPH F. BIANCO, District Judge:

Plaintiff Mary Hollman, as the Administrator of the Estate of Samuel A. Cox, and the Estate of Samuel A. Cox (collectively, "plaintiff") brings this action against TASER International Incorporated ("TASER" or "defendant"), alleging that an Electronic Control Device ("ECD") manufactured by TASER was a contributing factor in the death of Samuel A. Cox ("Cox"). Specifically, plaintiff alleges that TASER was either strictly liable or negligent for failing to warn police officers that repeated applications of an ECD can result in fatal metabolic acidosis. Plaintiff also brings causes of action for wrongful death and breach of warranty.

On October 17, 2011, defendant filed motions to exclude the expert testimony of Dr. Michael Morse ("Morse"), Edward Mamet ("Mamet"), and Dr. William Manion ("Manion") as being inadmissible under

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). On February 1, 2012, the Court orally denied defendant's motions in limine, and indicated that a written opinion would be forthcoming. This is that written opinion.

TASER now moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Defendant also moves to strike the declaration of Manion, as well as certain exhibits that plaintiff submitted in support of her opposition to defendant's motion for summary judgment. For the reasons set forth below, the Court grants defendant's motion for summary judgment. Specifically, summary judgment must be granted on plaintiff's failure to warn claims because plaintiff has not submitted any evidence that defendant knew or should have known, at the time of Cox's death in April 2005, that ECD application in drive-stun mode could cause metabolic acidosis.

Without such evidence, no rational jury could conclude that defendant should have warned ECD users of the risk of metabolic acidosis. The Court also grants summary judgment on plaintiff's breach of warranty claims because plaintiff has not brought forth any evidence that the ECDs at issue contained defects in workmanship or materials that would constitute a breach of the limited express warranty; moreover, defendant properly disclaimed all implied warranties. Accordingly, defendant's motion for summary judgment is granted, and all of plaintiff's claims are dismissed.[1,2]

## I. BACKGROUND

### A. Factual Background

The Court has taken the facts set forth below from the parties' depositions, affidavits, and exhibits, and from the parties' respective Rule 56.1 Statements of Facts.[3] Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of N.Y.*, 422 F.3d 47, 50-51 (2d Cir. 2005).

Unless otherwise noted, where a party's 56.1 Statement is cited, that fact is undisputed or the opposing party has pointed to no evidence in the record to contradict it.[4,5]

The TASER X26 ECD ("X26") is a weapon used by police officers to subdue individuals. The X26 may be used in either probe deployment mode or drive-stun mode. (Decl. of Patrick Smith ("Smith Decl.") ¶ 8.) In probe deployment mode, "two small metal darts" are fired from the ECD into the target "via compressed nitrogen with electrical impulse transmitted into the target through very thin insulated trailing wires." (*Id.*) In this mode, the ECD is "designed to transmit stimuli through very short duration low charge electrical pulses that interfere with the command and control systems of the body at the motor-neuron level to temporarily incapacitate the target." (*Id.* ¶ 9.) The electrical pulse is intended to result in Neuro-Muscular Incapacitation ("NMI"). (*Id.*) The darts must be adequately spread out on the target to "ensure major muscle groups between the darts are affected by the charge." (*Id.* ¶ 10.) In drive-stun mode, "electrical impulses are transmitted superficially through two fixed electrodes on the ECD," which are then applied directly to the target. (*Id.* ¶ 11; *see also id.* ¶ 17.) TASER claims that use of the X26 in drive-stun mode is "strictly [for] pain compliance" and does not result in NMI. (*Id.* ¶ 11.) On

---

[1] As discussed below, having considered all of plaintiff's evidence (including the declaration and exhibits that defendant seeks to exclude), the Court grants defendant's motion for summary judgment. Thus, the Court denies defendant's motion to strike as moot.

[2] Plaintiff also claims that punitive damages are warranted in this case. Because the Court finds that summary judgment should be granted in defendant's favor and that all of plaintiff's other claims should be dismissed, plaintiff's cause of action for punitive damages must also be dismissed. *See Weinstein v. Natalie Weinstein Design Assocs., Inc.*, 86 A.D.3d 641, 644 (2d Dep't 2011) (holding that a cause of action seeking punitive damages "was properly dismissed in light of the dismissal of all causes of action asserted against [defendant]").

[3] Any citations to "Pl.'s 56.1" in this Memorandum and Order are a citation to "Plaintiff's Statement of Disputed Facts" and not Plaintiff's "Counter Statement of Facts."

[4] In addition, where the parties' Rule 56.1 Statements contain specific citations to the record to support their statements, the Court has cited to the Rule 56.1 Statements, rather than the underlying citation to the record.

[5] Plaintiff disputes many of the facts that defendant claims are undisputed, but then fails to cite to any evidence in the record to support her assertion, or instead, cites to evidence that does not actually contradict defendant's contentions. Where the Court has cited defendant's 56.1 Statement for a fact that is disputed, the Court has verified in the record that plaintiff has introduced no admissible evidence to contradict that fact.

August 5, 2004, the Suffolk County Police Department ("SCPD") purchased forty-five X26 ECDs from TASER. (Smith Decl. Ex. A.)

On April 22, 2005, SCPD Sergeant Kevin Lixfield ("Lixfield") received a call from another officer informing him that an ECD might be needed to arrest an individual inside a home in Bellport, New York. (Def.'s 56.1 ¶ 8.) According to Lixfield's incident report and deposition, a large group of people standing outside the home indicated to Lixfield as he arrived that someone was "busting up the house." (Decl. of John Tait ("Tait Decl.") Ex. 1, Dep. of Kevin Lixfield ("Lixfield Dep.") at 14.) When Lixfield entered the house, he observed five or six officers surrounding Cox, who was "bare chested, screaming, threatening and moving in a highly agitated state." (*Id.* at 14-15.) Lixfield warned Cox that he would use an ECD on him. (*Id.* at 15.) Cox lunged at Lixfield, and Lixfield fired the ECD at Cox in probe deployment mode. (*Id.*) Although the darts struck Cox in the chest, the ECD "had no apparent [e]ffect on him and he pulled both darts from his chest and continued to come at [Lixfield]." (*Id.*) Although the parties dispute how long the probes remained in Cox's chest, one of plaintiff's experts stated that they were "probably" removed "pretty quick" and he guessed that Cox removed the darts within "a few seconds." (Tait Decl. Ex. 10, Dep. of William Manion ("Manion Dep.") at 157.) Lixfield attempted to reload new darts into the ECD, but he accidentally discharged the darts into his hand. (Lixfield Dep. at 15.)

According to Lixfield, Cox and the officers then engaged in a "free-for-all" for approximately five minutes. (*Id.* at 37.) Cox punched and kicked the officers as they tried to arrest him. (*Id.*) During the scuffle, Lixfield used the ECD in drive-stun mode against Cox by placing it on Cox's "back,

buttocks, and the back of his legs." (*Id.* at 16.) Lixfield stated that the weapon appeared to have no effect on Cox. (*Id.* at 44.) Because Lixfield believed the ECD was not working, he tested it by pointing the device up in the air and firing. (*Id.* at 140.) Lixfield testified that he tested the ECD in that manner approximately four or five times. (*Id.* at 138-39.)

Although the officers were eventually able to handcuff Cox with his hands in front of him, Cox continued to resist. (*Id.* at 40.) As the officers attempted to carry him to a stretcher across the room, Cox kicked and attempted to stop the officers. (Tait Decl. Ex. 3, Dep. of David Doherty ("Doherty Dep.") at 32.) While attempting to secure Cox to the stretcher, Lixfield used the ECD in drive-stun mode on Cox's shoulder, while SCPD Sergeant David Doherty ("Doherty") used an X26 on Cox's lower back. (Def.'s 56.1 ¶ 21.)[6] The officers were able to place Cox into an ambulance and he was transported to Brookhaven Hospital. (*Id.* ¶ 24.) Once Cox was placed into the ambulance, the officers did not use the ECD on him again. (*Id.* ¶ 25.)

The X26 has data download capabilities that record the date, time, and duration of each trigger pull. (*Id.* ¶ 6.) The data does not record whether the device made contact with the target. (*Id.*) The data for Lixfield's X26 demonstrates that the trigger was pulled ten times during a 17-minute 40-second time span. (Tait Decl. Ex. 2, Data Download Report for Sgt. Lixfield's X26 ECD.) The first nine pulls occurred within a 2-minute

---

[6] Plaintiff claims that Cox was actually secured to the stretcher when the ECDs were used, but then cites to material in the record which does not actually support her assertion. (*See* Pl.'s 56.1 ¶ 21.) In any event, even assuming *arguendo* that plaintiff was secured to the stretcher during some of the ECD applications, this would not affect the Court's analysis because this fact is not relevant to the claims against TASER.

and 43-second span, and the final pull occurred nearly 15 minutes after the ninth pull.[7] (*Id.*) The data from Doherty's device demonstrates that his ECD was only fired once. (*Id.* Ex. 4, Data Download Report for Sgt. Doherty's X26 ECD.) The X26 does not record whether the device was used in probe deployment mode or drive-stun mode. (*See id.* Exs. 2, 4.) Defendant states that all applications of the ECDs to Cox were in drive-stun mode except for Lixfield's first trigger pull in probe deployment mode. (Def.'s 56.1 ¶ 12.) Plaintiff appears to dispute this fact, but provides the Court with no evidence demonstrating that more than one of the ECD applications against Cox was in probe deployment mode. (*See* Pl.'s 56.1 ¶ 12.)

There is conflicting evidence regarding Cox's physical state during the ambulance ride to the hospital. Lindsey Smith, an EMT who was in the ambulance with Cox, said that Cox was "still flailing, yelling and screaming" while en route to the hospital. (Tait Decl. Ex. 5, Statement of Lindsey Smith at 4.) However, SCPD Officer Sean Neknez, who was also in the ambulance, said that Cox did not speak or cry out, and although Cox tried to move his left leg in a backwards kicking motion, Neknez held it

down so he could not kick anyone. (Decl. of Frederick K. Brewington, May 31, 2012 ("Brewington May 31 Decl.") Ex. D, Dep. of Sean Neknez at 226-29.) Shortly after Cox was brought into the trauma room at the hospital, a nurse realized that Cox was not breathing. (Brewington May 31 Decl. Ex. V, Dep. of Carol Burke at 28.) The hospital staff initiated CPR, but resuscitation efforts were not successful and Cox was pronounced dead. (Def.'s 56.1 ¶ 28.)

Suffolk County Deputy Medical Examiner Dr. Gwen Harleman ("Dr. Harleman") performed an autopsy on Cox. (*Id.* ¶ 29.) Dr. Harleman observed five sites of TASER ECD marks on Cox's body. (*Id.* ¶ 33.) Dr. Harleman concluded that the cause of Cox's death was "excited delirium syndrome" and that contributory factors were "cocaine intoxication," "arteriosclerotic and hypertensive type cardiovascular disease," and "chronic psychotic disorder." (Tait Decl. Ex. 8, Report of Autopsy at 1.) After reviewing this autopsy, as well as an autopsy performed by plaintiff's former expert that has subsequently been withdrawn, other evidence in the record, and studies that have been released since Cox's death regarding the risks posed by ECDs, plaintiff's expert Manion concluded:

> It is my opinion with a reasonable degree of medical certainty that the manner of death of John Cox was irreversible metabolic acidosis caused by an extremely combative altercation with police officers causing a great deal of physical stress along with pain caused by multiple applications of the TASER in both probe and stun mode which increased the pain and stress level and muscle contraction on Mr. Cox, along with positional asphyxia caused by the police officers on Mr.

---

[7]Plaintiff correctly points out that the data concerning the first trigger pull on Lixfield's device is not consistent with Lixfield's testimony: the device recorded that the first trigger pull lasted fourteen seconds, while Lixfield testified that Cox quickly ripped out the darts and Lixfield reloaded his ECD immediately before accidentally firing the second set of darts into his own hand. The Court also notes that the data shows that the second trigger pull occurred only six seconds after the first pull, indicating that the second pull occurred while the first pull was still continuing. This leads to the conclusion that the data concerning the length of the first pull may have been recorded inaccurately. However, this inconsistency has no relevance to plaintiff's claims against TASER.

Cox's back while in a prone position; that all were all contributing and substantial factors in causing his death.

(Brewington May 31 Decl. Ex. JJJ, Decl. of William L. Manion, M.D. ("Manion Decl.") ¶ 27; *see also* Tait Decl. Ex. 9, Export Report and CV of William Manion ("Manion Report") at 6 (stating that Cox was "already in a life threatening situation" prior to the ECD applications and that the "multiple forceful restraint methods and weapons of the police officers including their Tasers were significant contributing factors to and hastened Mr. Cox's death"); Manion Report at 5 ("As a result of these [TASER] shocks an acute metabolic acidosis resulted because of the extreme muscle exhaustion.").)[8]

## B. Procedural Background

Plaintiff filed the complaint in this action on July 21, 2006. Defendant answered the complaint on August 22, 2006. On April 30, 2009, defendant originally moved for summary judgment, but the motion was terminated on consent without prejudice to allow for the conclusion of discovery. On October 17, 2011, defendant filed motions in limine to exclude the opinions of Morse, Mamet, and Manion. On December 1, 2011, plaintiff filed her opposition to those motions, and defendant replied on December 15, 2011. On January 27, 2012, the Court held oral argument on the motions in limine. On February 1, 2012, the Court ruled orally that defendant's motions were denied, and that a written opinion would be forthcoming. On April 16, 2012, defendant filed a new

motion for summary judgment. Plaintiff filed her opposition on May 31, 2012, and defendant replied on June 21, 2012. Defendant also filed, on June 21, 2012, a motion to strike the declaration of Manion and certain exhibits that plaintiff filed in connection with the opposition to summary judgment. Plaintiff filed her opposition to the motion to strike on July 16, 2012, and defendant replied on July 23, 2012. On July 24, 2012, defendant filed a supplemental reply in support of its motion for summary judgment to respond to plaintiff's arguments regarding the summary judgment motion contained in plaintiff's opposition to the motion to strike. The Court held oral argument on August 3, 2012. At oral argument, the Court requested additional information from plaintiff in support of her opposition to summary judgment, and on August 13, 2012, plaintiff submitted a letter containing that information. On August 23, 2012, defendant replied to plaintiff's submission. The Court has fully considered the submissions of the parties.

## A. Summary Judgment

The standard for summary judgment is well settled. Pursuant to Federal Rule of Civil Procedure 56(a), a court may only grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that he or she is entitled to summary judgment. *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits

---

[8] Although in the fact section of her opposition papers plaintiff references the Report of Dr. Lone Thanning that she previously withdrew, the Court need not consider that withdrawn report because plaintiff is no longer relying upon it in connection with her claims.

or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The court "'is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments.'" *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Group, Inc. v. Horn &*

*Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "'merely to assert a conclusion without supplying supporting arguments or facts.'" *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

B. Admissibility of Expert Testimony

In deciding whether a motion for summary judgment should be granted, a district court may only consider admissible evidence. *See Nora Beverages, Inc., v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998) ("On a summary judgment motion, "[a] district court properly considers only evidence that would be admissible at trial." (citation omitted)). Thus, as the Second Circuit has explained, it is the proper role of the district court to consider the admissibility of expert testimony in determining whether summary judgment is warranted:

Because the purpose of summary judgment is to weed out cases in which 'there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law,' Fed. R. Civ. P. 56(c), it is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment. Although disputes as to the validity of the underlying data go to the weight of the evidence, and are for the fact-finder to resolve, questions of admissibility are properly resolved by the court. The resolution of evidentiary questions on summary

judgment conserves the resources of the parties, the court, and the jury.

*Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) (alteration in original and internal citations omitted). In other words, "[t]he court performs the same role at the summary judgment phase as at trial; an expert's report is not a talisman against summary judgment." *Id.* at 66. Thus, if the expert testimony is excluded as inadmissible under the Rule 702 framework articulated in *Daubert* and its progeny, the summary judgment determination is made by the district court on a record that does not contain that evidence. *Id.* at 66-67. Such an analysis must be conducted even if precluding the expert testimony would be outcome determinative. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142-43 (1997). Accordingly, pursuant to Rule 104 of the Federal Rules of Evidence, the court must examine the admissibility of plaintiff's expert testimony in ruling on defendant's motion for summary judgment.

The admissibility of expert testimony is analyzed under Rule 702 of the Federal Rules of Evidence, which provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The proponent of the expert testimony bears the burden of establishing the admissibility of such testimony under the *Daubert* framework by a preponderance of the evidence standard. *See Daubert*, 509 U.S. at 592 n.10 ("These matters should be established by a preponderance of proof." (citing *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987))); *see also Barrett v. Rhodia, Inc.*, 606 F.3d 975, 980 (8th Cir. 2010) ("[T]he party offering the expert testimony must show by a preponderance of the evidence both that the expert is qualified to render the opinion and that the methodology underlying his conclusions is scientifically valid." (internal citations and quotation marks omitted)); *accord Baker v. Urban Outfitters, Inc.*, 254 F. Supp. 2d 346, 353 (S.D.N.Y. 2003); Fed. R. Evid. 702 advisory committee's note ("[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.").

"The district court is the ultimate 'gatekeeper,'" *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007), and must ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable," *Daubert*, 509 U.S. at 589; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (holding that whether the witness' area of expertise is technical, scientific, or more generally "experience-based," the district court, in its "gatekeeping" function, must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"); *Nimely v. City of N.Y.*, 414 F.3d 381, 396 (2d Cir. 2005) ("The shift

under the Federal Rules to a more permissive approach to expert testimony [] did not represent an abdication of the screening function traditionally played by trial judges.").

Thus, under Rule 702, the district court must make several determinations before allowing expert testimony: (1) whether the witness is qualified to be an expert; (2) whether the opinion is based upon reliable data and methodology; and (3) whether the expert's testimony on a particular issue will assist the trier of fact. *See Nimely*, 414 F.3d at 396-97. Moreover, if the requirements of Rule 702 are met, the district court must also analyze the testimony under Rule 403 and may exclude the testimony "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." Fed. R. Evid. 403; *accord Nimely*, 414 F.3d at 397.

Under the *Daubert* standards, the Court must first determine whether the expert has sufficient qualifications to testify. *See Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 360 (2d Cir. 2004) (stating that, where the witness lacked qualifications, an analysis of the remaining *Daubert* factors "seems almost superfluous"). Specifically, under Rule 702, the Court must determine whether the expert is qualified "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. A court should look at the totality of the witness' qualifications in making this assessment. *See, e.g., Rosco, Inc. v. Mirror Lite Co.*, 506 F. Supp. 2d 137, 144-45 (E.D.N.Y. 2007) ("A court must consider the 'totality of a witness'[] background when evaluating the witness'[] qualifications to testify as an expert.'" (quoting 29 Wright & Gold, Fed. Prac. & Proc. § 6265, at 246 (1997))); *accord Arista Records LLC v. Lime Group LLC*, 06 CV 5936, 2011 WL 1674796, at *2 (S.D.N.Y. May 2, 2011). In addition, the Court must ensure that the expert will be proffering opinions on issues or subject matters that are within his or her area of expertise. *See Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 81 (2d Cir. 1997).

With respect to reliability, "the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case." *Williams*, 506 F.3d at 160 (internal citation and quotation marks omitted). As the Second Circuit has explained, the *Daubert* Court "has identified a number of factors bearing on reliability that district courts may consider, such as (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) a technique's known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation; and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) (internal citations and quotation marks omitted); *accord Nimely*, 414 F.3d at 396. These criteria are designed to be instructive, but do not constitute a definitive test in every case. *See Kumho*, 526 U.S. at 151; *Nimely*, 414 F.3d at 396. Moreover, in addition to these criteria for determining whether the methodology is reliable, Rule 702 also requires that there be a sufficiently reliable connection between the methodology and the expert's conclusions for such conclusions to be admissible. *See Gen. Elec. Co.*, 522 U.S. at 146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the

expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); *see also Amorgianos*, 303 F.3d at 266 ("[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony.").

With respect to whether the expert's testimony will assist the trier of fact, the Second Circuit has repeatedly emphasized that "expert testimony that usurps either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it, by definition does not aid the jury in making a decision; rather, it undertakes to tell the jury what result to reach, and thus attempts to substitute the expert's judgment for the jury's." *Nimely*, 414 F.3d at 397 (internal alterations, citations, and quotation marks omitted).

### III. DISCUSSION

#### A. Motions in Limine

##### 1. Dr. Michael Morse, Ph.D.

Plaintiff offers Morse as an expert in biomedical and electrical engineering, with a specific expertise in the area of electric shock injury. (Tait Decl. Ex. 12, Report and CV of Michael Morse ("Morse Report") at 1.) Defendants filed a motion in limine to exclude Morse's report as it relates to the warnings that TASER should have given to law enforcement personnel. (Def.'s Mot. to Exclude Design and Warnings Opinions of Michael Morse, Ph.D. ("Def.'s Morse Mot.") at 1.) On February 1, 2012 the Court orally denied defendant's motion.

Defendant argues that Morse is not qualified to offer opinions on warnings because he is "not an expert in law enforcement policy, use of force, or warnings." (*Id.* at 17.) The Court disagrees. Morse has a Bachelor's Degree and a Master's Degree in Biomedical Engineering from Tulane University, and a Ph.D in Engineering from Clemson University. He is a professor of electrical engineering at the University of San Diego. Morse has performed research on ECDs and written peer reviewed articles on electrical injuries. (Morse Report at 1-2.) Although he does not have any specific experience with product warnings, Morse has sufficient experience regarding the effects of ECDs and the possible lethality of electricity. *See Wheeler v. John Deere Co.*, 935 F.2d 1090, 1100 (10th Cir. 1991) ("In a products liability action, an expert witness is not strictly confined to his area of practice, but may testify concerning related applications; a lack of specialization does not affect the admissibility of the opinion, but only its weight."); *Santoro v. Donnelly*, 340 F. Supp. 2d 464, 473 (S.D.N.Y. 2004) ("The question is not whether the engineer is an expert on the exact issues presented in the case, but rather, whether his general engineering experience qualifies him to testify in an area in which he does not have extensive experience."); *Lappe v. Am. Honda Motor Co., Inc.*, 857 F. Supp. 222, 227 (N.D.N.Y. 1994) ("Liberality and flexibility in evaluating qualifications should be the rule; the expert should not be required to satisfy an overly narrow test of his own qualifications." (footnote omitted)), *aff'd sub nom. Lappe v. Honda Motor Co. Ltd. of Japan*, 101 F.3d 682 (2d Cir. 1996) (unpublished opinion).

Defendant also contends that Morse's opinions are unreliable because Morse failed to adequately review TASER's training materials before issuing his report. (Def.'s

Morse Mot. at 18-23.) Morse's conclusions regarding the effects of ECDs are sufficiently reliable, and if Morse testified specifically about the TASER warnings, defendant's argument would be a proper avenue of cross-examination. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Defendant's narrow arguments pertaining to alleged faults in Morse's methodology go to the weight of his testimony, not its admissibility. *See McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995) ("Disputes as to . . . faults in [the expert's] use of differential etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony."); *see also Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 181 (6th Cir. 2009) ("Admissibility under Rule 702 does not require perfect methodology.").

In its reply, defendant argues that it is not actually challenging Morse's qualifications regarding electricity and its effects on the body, but rather, the relevance of his opinions "since Cox undeniably did not suffer an electrical death." (Def.'s Reply in Supp. of Def.'s Morse Mot. at 1.) Morse's testimony is relevant for explaining the possible effects of electrical injuries on the human body and the risks associated with ECD application. Defendant's argument that Morse's opinions do not shed insight into Cox's death may be persuasive to the jury, but is not the role of the Court at this stage to determine which party's experts have the better of the argument. *See Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1293 n.7 (11th Cir. 2005) ("[A] district court may not exclude an expert because it believes one expert is more persuasive than another expert."). "[T]he requirement that expert evidence 'fit' the facts of the case is really an issue of relevance", and Morse's testimony meets the "any tendency" threshold of Rule 401. *Adesina v. Aladan Corp.*, 438 F. Supp. 2d 329, 343 (S.D.N.Y. 2006).

Therefore, plaintiff has demonstrated by a preponderance of the evidence that Morse's opinions are admissible under *Daubert*.

### 2. Edward Mamet

Plaintiff offers Mamet as an expert in police practices. (Tait Decl. Ex. 15, Report and CV of Edward Mamet ("Mamet Report") at 5, 11.) Defendant filed a motion in limine to exclude Mamet's testimony, arguing that his opinions have no bearing on the issues in the case. (Mot. to Exclude Warnings and Training Opinions of Plaintiff's Police Practices Expert Edward Mamet as They Relate to TASER ("Def.'s Mamet Mot.") at 1.) On February 1, 2012 the Court orally denied defendant's motion.

Defendant argues that Mamet is not qualified to offer opinions in this matter because he is not sufficiently familiar with ECDs. For example, Mamet has neither used an ECD nor attended an ECD training program. (*Id.* at 2-3.) The Court disagrees. Mamet was a police officer with the New York City Police Department for nearly forty years. (Mamet Report at 5.) After he became a captain, Mamet attended a training course regarding emotionally disturbed persons, which involved the demonstration of electronic weapons. Mamet has also attended a training course regarding the use of less than lethal force. (Decl. of Fredrick Brewington, Nov. 30, 2011 ("Brewington Nov. 30 Decl.") Ex. X, Feb. 16, 2010 Dep.

of Edward Mamet at 47-49.)[9] Mamet is also widely read on the subject. (Mamet 2011 Dep. at 86-88.) Therefore, Mamet has sufficient experience regarding police officers using electronic weapons to testify in this matter. *See Wheeler*, 935 F.2d at 1100; *see also Gardner v. General Motors Corp.*, 507 F.2d 525, 528 (10th Cir. 1974) ("[An expert] can through reading, calculations, and reasoning process from known scientific principles make himself very much expert in the particular product even though he has not had actual practical experience in its manufacture." (citation omitted)); *Arista*, 2011 WL 1674796, at *2 ("Courts within the Second Circuit have liberally construed expert qualification requirements when determining if a witness can be considered an expert." (internal citations and quotation marks omitted)).

Defendant also claims that Mamet's opinions are unreliable because he has no factual basis to provide any opinions on the necessary warnings. (Def.'s Mamet Mot. at 5-8.) "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination. Only if the expert's opinion is

so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *First Union Nat'l Bank v. Benham*, 423 F.3d 855, 862 (8th Cir. 2005) (internal citations and quotation marks omitted). Plaintiff has demonstrated that Mamet's opinions are sufficiently supported; defendant's argument on the lack of factual basis is more properly asserted during cross-examination. *See Daubert*, 509 U.S. at 596.

Therefore, plaintiff has demonstrated by a preponderance of the evidence that Mamet's opinions are admissible under *Daubert*.

### 3. Dr. William Manion

Plaintiff has designated Manion to offer an expert opinion regarding Cox's cause of death. Defendants filed a motion in limine to exclude Manion's opinions, arguing that not only is Manion not qualified to render opinions on the physiological effects of ECDs, but that Manion's opinions are "wholly speculative" and rely on "fundamentally false assumptions." (Def.'s Mot. to Exclude Medical Causation Opinions of William Manion, M.D. ("Def.'s Manion Mot.") at 1.) On February 1, 2012 the Court orally denied defendant's motion.

Defendant argues that Manion is not qualified to give opinions regarding whether an ECD caused Cox's death because he has neither performed an autopsy on an individual following the use of an electronic weapon, nor is he an expert on the flow of electrical current into the human body. (*Id.* at 12-13.) The Court disagrees. Dr. Manion graduated from West Virginia School of Medicine and is board certified in anatomic, clinical, and forensic pathology. He is an assistant medical examiner and he was previously the Chairman of the Department of Pathology at Memorial Hospital in Ohio.

---

[9] Although this deposition was taken in another matter in the Eastern District of New York involving the death of an individual following ECD application by a TASER product, plaintiff submitted this deposition as evidence. The attorneys for both parties were the same as in this action. At the earlier deposition in the separate action, defense counsel asked the witness about his experience with ECDs. Because defense counsel at the deposition in this matter asked the witness about his experience with ECDs since that prior deposition, the Court references the earlier deposition even though it was taken in a different matter. (*See* Brewington Nov. 30 Decl. Ex. Z, Feb. 1, 2011 Dep. of Edward Mamet ("Mamet 2011 Dep.") at 86 (Q: "[P]lease tell me everything you have done, specifically in regard to electronic control devices, since February 16, 2010, the last deposition.").)

He has also held positions as a pathologist at numerous other hospitals and has taught courses on pathology, microbiology, biology, anatomy, and physiology. (*See* Manion Report at 9-12.)[10] Manion clearly has the qualifications necessary, under the liberal standard of Rule 702, to testify regarding Cox's cause of death. *See McCullock*, 61 F.3d at 1043 (upholding admission of medical doctor's testimony and stating that defendant's suggestion that the doctor "had to be a specialist in environmental medicine to provide expert testimony in this case is an unwarranted expansion of the gatekeeper role announced in *Daubert*"); *see also Quinton v. Farmland Indus., Inc.*, 928 F.2d 335, 337 (10th Cir. 1991) (upholding admission of expert testimony of doctor of veterinary medicine to testify regarding toxic effects of substances on animals, even though expert was not a specialist in the field of toxicology).

Defendant also argues that Manion's opinions are unreliable. First, defendant states that Manion's metabolic acidosis theory "is factually dependent on the ECD causing significant muscle contractions" but that "there is no evidence that the ECD exposures as applied to Cox caused any such muscle contractions." (Def.'s Manion Mot. at 14.) Defendant also contends that Manion's "metabolic acidosis opinions are wholly unsupported by any medical or scientific study published to date." (*Id.* at 20.) Defendant is attempting to demonstrate that Manion's opinions are incorrect. However, plaintiffs do not "have to demonstrate . . . by a preponderance of the evidence that the assessments of their experts are *correct*, they only have to demonstrate by a preponderance of evidence

that [the experts'] opinions are reliable." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994) (footnote omitted). Defendant's arguments regarding Manion's assumptions and lack of authority go to the weight, not the admissibility, of his testimony. *See Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (stating that as long as expert's assumptions are not "so unrealistic and contradictory as to suggest bad faith," arguments that the "assumptions are unfounded go to the weight, not the admissibility, of the testimony" (internal citations and quotation marks omitted)); *see also McCullock*, 61 F.3d at 1044 ("Disputes as to . . . [a] lack of textual authority for [an] opinion[] go to the weight, not the admissibility, of [the] testimony."). Accordingly, defendant's unreliability argument is not a sufficient basis to exclude the testimony under *Daubert*.

Defendant also seeks to have Manion's opinions regarding positional asphyxia excluded. (Def.'s Manion Mot. at 23-25.) Specifically, Manion stated in his report that the police officers restricted Cox's respiratory muscles, and that this caused "a reduction in lung capacity and [made] it impossible for Mr. Cox to relieve his metabolic acidosis." (Manion Report at 6.) Defendant's contention that Manion incorrectly understands the facts regarding Cox's confrontation with the police is a proper basis for cross-examination, but there is no basis to preclude this testimony.[11]

---

[10] Because the pagination restarts in this exhibit, these page numbers refer to ECF page numbers assigned to the document.

[11] Defendant claims that Manion's opinions regarding positional asphyxia actually support its position because Manion testified at his deposition that "if the Taser hadn't been used on [Cox], and [the police officers] had still strapped him down and sat on him, he still would have died." (Brewington Nov. 30 Decl. Ex. FF, Dep. of William Manion ("Manion Dep.") at 216.) Therefore, defendant argues, plaintiff cannot prove that an ECD was the proximate cause of Cox's

Therefore, plaintiff has demonstrated by a preponderance of the evidence that Manion's opinions are admissible under *Daubert*.[12]

### B. Summary Judgment

#### 1. Failure to Warn

Plaintiff alleges that TASER negligently failed to adequately warn law enforcement of the risks associated with its products, specifically that multiple applications of an ECD in drive-stun mode can cause fatal metabolic acidosis. Plaintiff also brings a cause of action sounding in strict liability.[13]

#### a. Applicable Law

Under New York law, in order to make a *prima facie* case for failure to warn, a plaintiff must show the following: (1) the manufacturer had a duty to warn; (2) the manufacturer breached the duty to warn in a manner that rendered the product defective, *i.e.*, reasonably certain to be dangerous; (3) the defect was the proximate cause of the plaintiff's injury; and (4) the plaintiff suffered loss or damage. *See McCarthy v. Olin Corp.*, 119 F.3d 148, 156 (2d Cir. 1997) (citing *Becker v. Schwartz*, 46 N.Y.2d 401, 410 (1978)); *see also Mustafa v. Halkin Tool, Ltd.*, No. 00-CV-4851, 2007 WL 959704, at *17 (E.D.N.Y. Mar. 29, 2007). With respect to failure to warn claims, there is no distinction between the *prima facie* elements under New York law of such a claim, regardless of whether it is sounding in negligence or strict liability. *See Martin v. Hacker*, 83 N.Y.2d 1, 8 n.1 (1993); *see also Fane v. Zimmer, Inc.*, 927 F.2d 124, 130 (2d Cir. 1991) ("'Regardless of the descriptive terminology used to denominate the cause of action . . . where the theory of liability is failure to warn, negligence and strict liability are equivalent.'" (quoting *Wolfgruber v. Upjohn Co.*, 72 A.D.2d 59, 62 (4th Dep't 1979))).

It is well-settled that a manufacturer has a duty to warn (1) "against latent dangers resulting from foreseeable uses of its product of which it knew or should have known," and (2) "of the danger of unintended uses of a product provided these uses are reasonably foreseeable." *Liriano v. Hobart Corp.*, 92 N.Y.2d 232, 237 (1998). "Under New York law, the jury does not need expert testimony to find a warning inadequate, but may use its own judgment concerning all the circumstances." *Billiar v.*

---

death. (Def.'s Manion Mot. at 23.) However, Manion clarified that comment by stating that "more likely than not, [Cox] would have survived" if an ECD was not used on him. (Manion Dep. at 218.) The Court concludes that Manion's qualifications and methodology in this case are sufficient to satisfy *Daubert*, and thus, there is no basis to preclude his opinion that defendant's product proximately caused Cox's death. However, as discussed *infra*, even with that expert conclusion, plaintiff has not introduced any evidence that defendant knew or should have known in April 2005 of the specific risk that caused Cox's death, and therefore, no rational jury could find that defendant's failure to warn of the risk was the proximate cause of Cox's death.

[12] In connection with its reply papers, defendant also moves to strike the declaration of Manion, as well as certain accompanying exhibits, that plaintiff submitted in support of her opposition to summary judgment. As stated *supra* n.1, the Court declines to address defendant's motion to strike because the Court has considered the declaration and exhibits that defendant seeks to exclude, and the Court nonetheless grants defendant's motion for summary judgment. Thus, the motion to strike is moot.

[13] Plaintiff also alleges in her complaint that TASER negligently designed and manufactured the X26 ECD. Plaintiff summarily reiterates these claims in her opposition to summary judgment, even though at the January 27, 2012 *Daubert* hearing plaintiff's counsel conceded that plaintiff's product liability claims sounded entirely in a duty to warn theory of liability. Plaintiff has introduced no evidence to support a *prima facie* claim of a design defect or a manufacturing defect. Therefore, even if not

---

withdrawn, these claims must also be dismissed because there is no evidence to support them.

*Minn. Mining & Mfg. Co.*, 623 F.2d 240, 247 (2d Cir. 1980) (citing *Rainbow v. Albert Elia Bldg. Co.*, 49 A.D.2d 250, 253 (4th Dep't 1975) ("[R]ecovery [under a failure to warn theory] ultimately depends upon a subjective determination by the trier of the facts of what constitutes reasonable warning under all the circumstances.") and *Young v. Elmira Transit Mix, Inc.*, 52 A.D.2d 202, 205 (4th Dep't 1976)). Moreover, the New York Court of Appeals has described the standard for evaluating failure to warn liability as "intensely fact-specific, including but not limited to such issues as feasibility and difficulty of issuing warnings in the circumstances; obviousness of the risk from actual use of the product; knowledge of the particular product user; and proximate cause." *Liriano*, 92 N.Y.2d at 243 (citation omitted). Given this fact-intensive inquiry, as the Second Circuit has emphasized, "'[t]he adequacy of the instruction or warning is generally a question of fact to be determined at trial and is not ordinarily susceptible to the drastic remedy of summary judgment.'" *Urena v. Biro Mfg. Co.*, 114 F.3d 359, 366 (2d Cir. 1997) (quoting *Beyrle v. Finneron*, 199 A.D.2d 1022, 1023 (4th Dep't 1993)).

However, there are certain circumstances where failure to warn claims can be decided as a matter of law: (1) "where the injured party was fully aware of the hazard through general knowledge, observation or common sense, or participated in the removal of the safety device whose purpose is obvious"; or (2) where the hazards are "patently dangerous or pose open and obvious risks." *Liriano*, 92 N.Y.2d at 241; *accord Bah v. Nordson Corp.*, No. 00-CIV-9060, 2005 WL 1813023, at *14 (S.D.N.Y. Aug. 1, 2005). Summary judgment is also appropriate when plaintiff has introduced no evidence that a manufacturer knew or should have known of the danger at issue. *See Colon ex rel. Molina*

*v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 93-94 (S.D.N.Y. 2001); *see also Wolfgruber*, 72 A.D.2d at 62-63 (granting defendant summary judgment in a failure to warn case when there were no disputed facts).

b. Analysis

i. Evidence in the Record in This Case

TASER trains select law enforcement personnel to become certified ECD instructors. (Def.'s 56.1 ¶ 36.) These instructors then train ECD users within their departments. (*Id.*) Instructors receive materials during their training to assist them with instructing end users of the ECDs. (Smith Decl. ¶ 28.) TASER also distributes operating manuals with the ECD units to law enforcement personnel. (Def.'s 56.1 ¶ 39.)

The parties dispute which version of the training materials the Court should consider. Defendant states that TASER's Version 11 Training CD and the 2003 X26 ECD Operating Manual were packaged with the ECD units distributed to the Suffolk County Police Department in August 2004. (*Id.*)[14] The 2003 Operating Manual states in part:

> The TASER X26 is a less-lethal weapon. It is designed to incapacitate a target from a safe distance without causing death or permanent injury. While the extensive medical evidence strongly supports the TASER X26 will not cause lasting aftereffects or fatality, it is important to remember that the very nature of

---

[14] Plaintiff disputes that the SCPD offices received these training materials. (*See* Pl.'s 56.1 ¶ 39.) However, this dispute is immaterial for purposes of this motion because, as discussed *infra*, the contents of the warnings or whether SCPD officers received any warnings have no effect on the Court's summary judgment decision as to TASER.

physical confrontation involves a degree of risk that someone will get hurt or may even be killed due to unforeseen circumstances and individual susceptibilities. Accordingly, the TASER X26 should be treated as a serious weapon and should only be deployed in situations where the alternative would be to use other force measures which carry similar or higher degrees of risk.

(Smith Decl. Ex. C, X26 Operating Manual at 1.) The Version 11 Training CD contains numerous warnings and statements relevant to the issues in this case. The materials contain a slide entitled "In Custody Death Warnings Signs" which states in part: "Instruct your officers to watch for these danger signs. If a suspect exhibits any of these signs, get them to medical attention as quickly as possible as these people are at elevated risk for an in-custody death." (Smith Decl. Ex. D, Instructor Certification Course TASER X26 and TASER M26 Less-Lethal Weapons Version 11.0 Released January 2004 ("Version 11 Training CD") at 129.) However, the materials also indicate that drive-stun mode is not fatal: "The drive stun mode affects the sensory nervous system ONLY making it a pain compliance weapon that will not cause EMD." (*Id.* at 142.) The materials also state that drive-stun mode will have limited effect on individuals in a mental health crisis. "Someone in a mental health crisis state, under the influence of a mind altering substance, or extremely focused are prone to 'mind-body disconnection.' If only the stun mode is used, the X/M26 becomes a pain compliance technique with limited threat reduction potential for subjects at the high end of the three mind-body disconnect categories." (*Id.* at 143.)

The Version 12 CD contains the same warnings and instructions as the Version 11 CD, *i.e.*, the possible warning signs of a fatality, that drive-stun mode will not cause EMD, and that the use of an ECD on someone in a mental health crisis may have a limited effect. However, the materials also contain some expanded warnings. In a slide entitled "Warnings and Risks," which instructors must sign before voluntary exposure to an ECD, the materials state:

The TASER devices are non-lethal devices. They are designed to incapacitate a person from a safe distance without causing death or permanent injury. While the extensive medical evidence strongly supports the TASER devices will not cause lasting aftereffects or fatality, it is important to remember that the very nature of physical incapacitation involves a degree of risk that someone will get hurt or may even be killed due to physical exertion, unforeseen circumstances and individual susceptibilities. As with any weapon system, there can be unforeseen and severe consequences and there will always be risk involved in this use of force.

. . .

The TASER device causes temporary incapacitation and the inability to catch yourself as you fall. This incapacitation and the resulting fall can be dangerous and even fatal under specific circumstances.

. . .

The TASER device causes strong muscle contractions which may be severe and may cause physical exertion athletic type injuries to

some people. These muscle contractions may result in injuries to muscles, tendons, ligaments, backs, joints and stress fractures.

The TASER devices cause pain which can be stressful. This stress may be injurious to some people.

(Smith Decl. Ex. F, User Certification Course TASER X26 Non-Lethal Weapon Version 12.0 Released November 2004 ("Version 12 Training CD") at 44.)

The materials also warn officers that "[e]specially when dealing with persons in a health crisis such as excited delirium, it is advisable to minimize the physical and psychological stress to the subject to the greatest degree possible." (*Id.* at 110.) The warning continues: "If repeated TASER applications are not having the desired effect . . . it may be reasonable to redeploy to a different location on the body or transition to another force option rather than continue to expose the subject to the stress of further TASER applications . . . ." (*Id.*)

Plaintiff is correct that there is a disputed issue of fact regarding which version of the training materials SCPD officers were operating under at the time of Cox's death. TASER used the Version 11 Training CD while training SCPD officers to become instructors in September 2004. (Smith Decl. ¶ 28.) Doherty testified that ECD end users within the department received training in November 2004, indicating that they therefore would have been trained under the Version 11 CD. (Doherty Dep. at 11.) TASER states that it mailed instructors within the SCPD the Version 12 Training CD on December 23, 2012, and that the updated materials became effective on January 1, 2005. (Smith Decl. ¶¶ 31-32.) Therefore, while the Version 12 materials were in effect when Cox died, it is unclear whether Lixfield and Doherty received training with the updated materials before Cox's death.

However, this disputed issue is not material to TASER's motion. Specifically, regardless of which version the Court considers, and regardless of the contents of the warnings themselves, plaintiff's claim still fails to survive summary judgment because plaintiff has not introduced any evidence that defendant knew, or should have known, that multiple applications of an ECD in drive-stun mode could contribute to fatal metabolic acidosis. It is well-settled that a manufacturer cannot insure against all injuries that arise from the use of its products. *See Micallef v. Miehle Co., Div. of Miehle-Goss Dexter, Inc.*, 39 N.Y.2d 376, 386 (1976); *see also DeRosa v. Remington Arms Co.*, 509 F. Supp. 762, 768 (E.D.N.Y. 1981) (stating that "[a] manufacturer in New York is not . . . required to act as an insurer with respect to its product" (citation omitted)). Instead, "[a] manufacturer has a duty to warn against latent dangers resulting from foreseeable uses of its product of which it knew or should have known . . . [and] a duty to warn of the danger of unintended uses of a product provided these uses are reasonably foreseeable." *Liriano*, 92 N.Y.2d at 237 (citations omitted).

During oral argument, the Court asked plaintiff's counsel to identify any study published before Cox's death or other evidence that would have placed defendant on notice of the risk that multiple applications of an ECD in drive-stun mode could contribute to metabolic acidosis. Counsel was unable to do so. The Court gave plaintiff an opportunity following oral argument to submit any studies in the record or court cases that would have placed defendant on notice of this risk. Although plaintiff submitted several exhibits, none of them actually provide any evidence (even

construed most favorably to plaintiff) from which a rational jury could find that defendant knew or should have known of this risk in April 2005, and therefore could have placed a warning regarding such risk in its training materials.[15]

Plaintiff submitted a medical presentation authored in 2002 by Mark Johnson ("Johnson"), the Director of Technical Programs at TASER from 2003-2007. (*See* Letter Pursuant to the Court's Order of Aug. 3, 2012, ECF No. 126-1 ("Pl.'s Aug. 13 Letter"), Ex. A, at 2; *Id.* Ex. B, at 20.)[16] Johnson worked at the Hennepin County Medical Center in Minnesota ("Hennepin") at the time of the presentation. (*Id.* Ex. A at 2.) As a threshold matter, this exhibit should not be considered by this Court because plaintiff failed to introduce it

---

[15] Defendant argues that plaintiff must demonstrate that TASER knew or should have known of the risk at the time of the product's marketing, not at the time of Cox's death. (*See* Def.'s Mem. at 16 (citing *Geressy v. Digital Equip. Corp.*, 980 F. Supp. 640, 649 (E.D.N.Y. 1997) ("Whether [a product] is reasonably safe 'when marketed' depends in part on what the manufacturer knew or should have known at the time of marketing . . . .")).) Defendant fails to cite the next sentence of *Geressy*, which states that a "manufacturer may be found to be unreasonable even after the product has been marketed if it should have been aware of dangers and it was reasonable to try to bring them to the attention of users of the product in the field." 980 F. Supp. at 649. New York law clearly imposes a post-sale duty to warn on manufacturers. *See Cover v. Cohen*, 61 N.Y.2d 261, 275 (1984) ("Although a product be reasonably safe when manufactured and sold and involve no then known risks of which warning need be given, risks thereafter revealed by user operation and brought to the attention of the manufacturer or vendor may impose upon one or both a duty to warn." (citations omitted)). However, even if defendant's duty to warn extended until Cox's death in April 2005, plaintiff has not introduced sufficient evidence for a rational jury to conclude that defendant knew or should have known of this risk at that time.

[16] Because the pagination is not clearly labeled for plaintiff's submission, the Court has used the page numbers assigned to the documents by ECF.

into the record with proper foundation before discovery closed. *See Morritt v. Stryker Corp.*, No. 07-CV-2319, 2011 WL 3876960, at *5-8 (E.D.N.Y. Sept. 1, 2011) (holding that a party may not submit evidence for the first time in connection with their opposition to a summary judgment motion). However, even assuming the Court could consider this exhibit, nothing in it suggests a link between multiple drive-stun applications and metabolic acidosis. The excerpt of the presentation provided to the Court mentions TASERs on only one occasion, stating that the objective of the presentation is to "[i]llustrate the effects of TASER deployment on acidotic subjects." (Pl.'s Aug. 13 Letter, Ex. A, at 3.) The only information in the presentation that the Court believes could be construed to favor plaintiff's position is the statement that a study "demonstrated that severe metabolic acidosis is associated with cardiac arrest following exertion in a restrained position." (*Id.* at 16.) However, this broad statement that does not even discuss ECDs is not sufficient to place defendant on notice of the possible risks of its product.

Plaintiff also submitted an excerpt from a 2006 deposition of Patrick Smith ("Smith"), the TASER executive who submitted a declaration in this case, that was taken in connection with an action in the Northern District of California. (*See id.* Ex. C.) Not only is this testimony not in the record in the action before this Court, but it also does not support plaintiff's position. During the deposition, Smith merely confirms that Johnson worked on a study at Hennepin to test for ventricular fibrillation on sheep following ECD application. (*Id.* at 28.) Smith does not state that the study concluded that ECD application induced ventricular fibrillation, a condition not at issue in this case, let alone caused metabolic acidosis. (*Id.* at 28-29.)

Plaintiff also submitted a chart listing twenty-five incidents prior to Cox's death in which an individual died after receiving an ECD application in drive-stun mode. (*Id.* Ex. D.) Plaintiff states that the list is derived from the book *Taser Electronic Control Devices and Sudden In-Custody Death* by Howard E. Williams (2008). The information contained in this chart is clearly hearsay. *See Williamson v. Recovery Ltd. P'ship*, No. 06-Civ-5724, 2007 WL 102089, at *4 (S.D.N.Y. Jan. 16, 2007). Even if the Court could consider this exhibit, the chart does not state that a medical examiner concluded in any of these instances that the proximate cause of these individuals' deaths was an ECD, or that they died from metabolic acidosis. Thus, this exhibit also does not assist plaintiff's case.

The Court also allowed plaintiff to submit court cases that alleged incidents that would have placed defendant on notice. While plaintiff cited to four cases in various federal courts throughout the United States, none of these cases actually support plaintiff's argument.

In *Goebel v. TASER International, Inc.*, 07-CV-28 (N.D. Ohio), plaintiff voluntarily dismissed the action without prejudice just one month after filing the complaint, even before TASER had the opportunity to appear in the action. In addition, the complaint does not allege a medical diagnosis regarding the cause of death.

The other three cases, *Bolander v. TASER International, Inc.*, No. 07-CV-80789 (S.D. Fla.), *Woolfolk v. Columbia County, Florida*, No. 07-CV-137 (M.D. Fla.), and *Williams v. TASER International, Inc.*, 06-CV-51 (N.D. Ga.), all concern incidents that occurred prior to Cox's death. However, plaintiff has not pointed to, and the Court in its independent review did not find, any document in those cases indicating that a medical professional determined that metabolic acidosis contributed to any of the decedents' causes of death.

Although not discussed in plaintiff's memorandum of law, or in the exhibit submitted following oral argument, plaintiff's counsel stated at oral argument that *Glowczenski v. TASER International, Inc.*, No. 04-CV-4052 (E.D.N.Y.), and *Rosa v. City of Seaside*, No. C 05-3577 (N.D. Cal.) should have placed defendant on notice. In those cases, the decedents died in a manner similar to Cox following ECD application by the police, and the plaintiffs' experts in those cases stated that metabolic acidosis contributed to their deaths. While the incidents alleged in these cases happened prior to Cox's death, there is no evidence that TASER knew in April 2005 that metabolic acidosis contributed to these fatalities. For example, in *Glowczenski*, plaintiff's counsel also introduced Manion as an expert to support a metabolic acidosis theory. However, Manion was not submitted as an expert in the case until 2011, six years after Cox's death. *See Glowczenski v. TASER Int'l, Inc.*, No. 04-CV-4052 (E.D.N.Y.), ECF No. 191. Similarly, the *Rosa* lawsuit was not filed until months after Cox's death.

The only other incident relied on by plaintiff involves the death of a 7-month-old infant after the child's foster mother repeatedly shocked him with a non-TASER stun gun. (*See* Brewington May 31 Decl. Ex. EE, Stun Gun Injuries in the Abuse and Death of a Seven-Month Old Infant, J. Forensic Sci., Jan 2003, Vol. 48, No. 1 at 1.) Although this incident became public well before defendant marketed the ECDs at issue in this case, no rational jury could find that defendant should have known of the risk of metabolic acidosis in adults based on

the death of a 7-month-old infant weighing less than 13 pounds from another manufacturer's stun gun.[17]

Plaintiff essentially alleges that TASER should have known of the risks of fatal metabolic acidosis because "a manufacturer has a duty to test fully and inspect its products to uncover all dangers that are scientifically discoverable." *George v. Celotex Corp.*, 914 F.2d 26, 28 (2d Cir. 1990) (citations omitted).[18] In fact, under New York law, a manufacturer does not have an unqualified duty to uncover all dangers that are scientifically discoverable. *See In re Joint E. & S. Dists. Asbestos Litig.*, 762 F. Supp. 519, 526 (E.D.N.Y. & S.D.N.Y. 1991) (stating that the Second Circuit in *Celotex* "was not suggesting that an unqualified [jury] charge of a 'duty to test fully and inspect' their 'products to uncover all dangers that are scientifically discoverable' was the only proper charge"). Instead, New York law holds that a manufacturer "must keep abreast of knowledge of its products as gained through research, adverse reaction reports, scientific literature and other available methods." *Baker v. St. Agnes Hosp.*, 70 A.D.2d 400, 406 (2d Dep't 1979). As discussed *supra*, plaintiff has introduced no evidence that defendant should have known in 2005, either through its own testing or by closely monitoring medical studies and reports of fatalities following ECD use, of the risk of fatal metabolic acidosis from ECDs. *Cf. Rodriguez v. Stryker Corp.*, No. 08-0124, 2011 WL 31462, at *10 (M.D. Tenn. Jan. 5, 2011) (stating that under Tennessee law a manufacturer is not negligent for failing to "test for every possible risk that, with the benefit of hindsight, could be envisioned from use of the product").

ii. The *Rosa* Decision

In *Rosa v. Taser International Inc.*, 684 F.3d 941 (9th Cir. 2012), the Ninth Circuit recently affirmed summary judgment in favor of TASER under extremely similar circumstances to those of the instant case. Although obviously non-binding, this Court finds that analysis in *Rosa* to be well-reasoned, persuasive, and consistent with this Court's conclusion under New York law.

On August 29, 2004, Michael Rosa died after receiving multiple ECD applications by police officers in both probe deployment and drive-stun mode. *Id.* at 944-45. The medical examiner concluded that the cause of death was "ventricular arrhythmia . . . due to methamphetamine intoxication," with "Taser application and arrest by police" as contributing conditions. *Id.* at 945 (internal quotation marks omitted). Rosa's death "was subsequently linked to metabolic acidosis . . . ." *Id.* Plaintiff alleged that TASER was liable under both negligence and strict liability theories for failing to warn of the potential fatal side effects of its products. *Id.* To demonstrate that TASER should have known that its products could cause fatal metabolic acidosis, plaintiff submitted four peer-reviewed articles. However, the Ninth Circuit found that the studies did "not establish a triable issue of fact that the risk of metabolic acidosis was knowable at the time of [the product's] distribution" because two of the articles did not link its findings to the use of ECDs, and the other two merely speculated that ECDs could cause acidosis, without actually testing the hypothesis and establishing a causal link. *Id.* at 948-49.

---

[17] Defendant seeks to exclude this exhibit in their motion to strike. However, as stated *supra* n.1, the Court need not resolve whether this exhibit should be excluded because even considering this exhibit, the Court still grants defendant's motion for summary judgment.

[18] Although plaintiff does not cite *Celotex*, it appears that plaintiff intended to recite this proposition of law. (*See* Pl.'s Opp'n at 20.)

Thus, summary judgment in favor of TASER was appropriate because "the risk of lactic acidosis was not knowable in 2003." *Id.* at 950.

In *Rosa*, plaintiff argued that TASER should be held liable because TASER issued a warning in 2009 discussing the risk of metabolic acidosis. *Id.* at 948. The Ninth Circuit, citing Federal Rule of Evidence 407, stated that "[b]ecause the fact of this 2009 warning is not admissible to establish what was knowable in December 2003, it cannot aid [plaintiff] in avoiding summary judgment." *Id.* As in *Rosa*, this Court may only consider evidence that defendant should have known of this risk in April 2005, and like the plaintiff in *Rosa*, plaintiff has failed to introduce any evidence, admissible or otherwise, to support her contention. Thus, no rational jury could find that TASER knew, or should have known, of the risk of fatal metabolic acidosis in 2005. *See Basko v. Sterling Drug, Inc.*, 416 F.2d 417, 426 (2d Cir. 1969) (holding that a manufacturer is not "expected to warn of unknown dangers").

Plaintiff urges the Court to ignore the *Rosa* decision and find it to be unpersuasive because the case (1) was decided under California law, and (2) involved what TASER should have known in December 2003, while the products were sold in this case in August 2004 and Cox did not die until April 2005. There are some small differences between California and New York products liability law, and this Court has evaluated (as required under New York law) whether there is any evidence in the record that TASER should have known of the risk at the time of Cox's death in April 2005, rather than at the time of sale (as required under California law). However, the law in both states dictates that a manufacturer may only be held liable if it knew or should have known of the danger

posed by its product. *Compare Rosa v. City of Seaside*, 675 F. Supp. 2d 1006, 1011 (N.D. Cal. 2009) (stating that under California law a plaintiff must prove that "the defendant knew or reasonably should have known that the product was dangerous or was likely to be dangerous when used in a reasonably foreseeable manner" or "the product had potential risks that were known or knowable at the time of manufacture or distribution" (citations omitted)) *with Liriano*, 92 N.Y.2d at 237 ("A manufacturer has a duty to warn against latent dangers resulting from foreseeable uses of its product of which it knew or should have known . . . [and] a duty to warn of the danger of unintended uses of a product provided these uses are reasonably foreseeable." (citations omitted)). Thus, under that standard, the *Rosa* decision held that, because there are no studies or evidence to suggest that TASER should have known of the risk of metabolic acidosis at the time in question, summary judgment is appropriate. This Court similarly concludes under New York law that, because there are no studies or other evidence to suggest that TASER should have known of the risk of metabolic acidosis in April 2005, summary judgment for TASER is warranted.

Plaintiff states that a footnote in *Rosa* actually supports her position that defendant should have known of the risk. In that footnote, the Ninth Circuit stated that "[t]he parties conceded at oral argument that the study that most strongly supported [plaintiff's] position, James R. Jauchem, et al., *Acidosis, Lactate, Electrolytes, Muscle Enzymes, and Other Factors in the Blood of Sus Scrofa Following Repeated TASER Exposures*, 161 FORENSIC SCI. INT'LL 20, 28 (2006), was first presented at a conference in late 2004, several months after [plaintiff's] death. It was not published for an additional two years." *Rosa*, 684 F.3d at

949 n.8. This study has been introduced as evidence in this matter. (*See* Brewington Nov. 30 Decl. Ex. V.) Not only has plaintiff not introduced evidence that this research was publicly available before Cox's death (it was apparently presented at a conference in late 2004, but was not published online until months after Cox's death), but this study involved extreme testing of ECD application in probe deployment mode on pigs, not drive-stun mode on humans. (*See id.* at 20-22.)

*Rosa* would have absolutely no bearing on this case had plaintiff been able to identify any evidence that defendant knew or should have known of this risk in April 2005 and nevertheless failed to warn users of its product. However, having been given multiple opportunities by the Court to present a study or a case supporting her position, plaintiff has only submitted inadmissible exhibits that, even if admissible, would not allow a rational jury to conclude that defendant knew or should have known of the risk.

\*\*\*

The Court recognizes that it must proceed with great caution in granting summary judgment in a failure to warn products liability case as "[t]he adequacy of the instruction or warning is generally a question of fact to be determined at trial . . . ." *Beyrle*, 199 A.D.2d at 1022. However, a Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Wolfgruber*, 72 A.D.2d at 62-63. New York law requires plaintiff to prove by a preponderance of the evidence that a manufacturer knew or should have known of a particular risk and failed to warn of that risk. However, plaintiff has not submitted

any evidence that defendant knew or should have known *in April 2005* that ECD application in drive-stun mode could cause metabolic acidosis.[19] Therefore, no rational jury could conclude that defendant TASER knew or should have known of this risk at the time of Cox's death when plaintiff has not submitted any evidence, through medical studies or otherwise, which would have placed defendant on notice in April 2005. Accordingly, the Court grants defendant's motion for summary judgment on the negligence and strict liability claims.[20]

2. Breach of Warranty

Defendant also moved for summary judgment on plaintiff's breach of express warranty and breach of implied warranty claims. Although plaintiff did not oppose this portion of defendant's motion in her opposition to summary judgment, plaintiff's counsel stated at oral argument that these claims had not been withdrawn.

_____

[19] For example, plaintiff and plaintiff's expert repeatedly cite a Canadian report commissioned by the provincial government of British Columbia that is strongly critical of the use of ECDs. (*See* Brewington May 31 Decl. Ex. B, Braidwood Commission Report at 19-25.) The report states that "several researchers have raised concerns" that the electrical current from ECDs can interfere with the ability to breathe, which can lead to acidosis. (*Id.* at 14.) However, this report was released in June 2009, more than four years after Cox's death. Any citation to this report "is not admissible to establish what was knowable" in April 2005, and "it cannot aid [plaintiff] in avoiding summary judgment." *Rosa*, 684 F.3d at 948.

[20] Defendant also moves for summary judgment on the failure to warn claim by arguing (1) that the warnings were adequate as a matter of law, and (2) that the danger here was open and obvious, and therefore, there was no duty to warn. (*See* Def.'s Mem. at 14-15, 19-21.) Because the Court finds that defendant should prevail on summary judgment, given that no rational jury could have known of the risk in April 2005, it need not decide whether the warnings were adequate as a matter of law or whether the danger was open and obvious.

### a. Applicable Law

An express warranty is created by "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain," "[a]ny description of the goods which is made part of the basis of the bargain," or "[a]ny sample or model which is made part of the basis of the bargain." N.Y. U.C.C. § 2-313(1)(a); *see also Scientific Components Corp. v. Sirenza Microdevices, Inc.*, 399 F. App'x 637, 639 (2d Cir. 2010) (summary order). "Under that provision, in order to demonstrate that an express warranty was created under New York law, a plaintiff must prove that the statement falls within the definition of a warranty, that he or she relied on it, and that it became part of the basis for the bargain." *Kaplan v. Home Depot USA, Inc.*, No. 11 Civ. 2125, 2012 WL 3283456, at *4 (S.D.N.Y. Aug. 13, 2012) (internal alterations, citations, and quotation marks omitted).

The implied warranty of merchantability is governed by New York Uniform Commercial Code Section 2-314(1), which provides that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." N.Y. U.C.C. § 2-314(1). In order for goods to be merchantable, they must be "fit for the ordinary purposes for which such goods are used." *Id.* § 2-314(2)(c). Therefore, "[t]o establish that a product is defective for purposes of a breach of implied warranty of merchantability claim, a plaintiff must show that the product was not reasonably fit for its intended purpose, an inquiry that focuses on the expectations for the performance of the product when used in the customary, usual and reasonably foreseeable manners." *Wojcik v. Empire*

*Forklift, Inc.*, 14 A.D.3d 63, 66 (3d Dep't 2004) (internal alterations, citations, and quotation marks omitted); *accord Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 259-60 (1995). "A warranty of fitness for ordinary purposes does not mean that the product will fulfill a buyer's every expectation." *Denny*, 87 N.Y.2d at 258 n.4 (internal alterations, citation, and quotation marks omitted). Instead, recovery for breach of the implied warranty of merchantability is warranted "upon a showing that the product was not minimally safe for its expected purpose – without regard to the feasibility of alternative designs or the manufacturer's 'reasonableness' in marketing it in that unsafe condition." *Id.* at 259.

Although "a cause of action for breach of warranty is a contractual remedy . . . which seeks to provide the parties with the benefit of their bargain," *Martin v. Julius Dierck Equip. Co.*, 43 N.Y.2d 583, 589 (1978), a warranty extends to a person "if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty." N.Y. U.C.C. § 2-318.

### b. Analysis

In TASER's "Sales Terms and Conditions," TASER included a limited warranty that states: "TASER warrants that its products are free from defects in workmanship and materials for a period of one year from the date of purchase." (Smith Decl. Ex. B, at 2.) TASER stated that this was the "exclusive warranty" and "disclaim[ed] any and all other warranties, whether express, implied or statutory, including, without limitation, any implied warranties of merchantability, design or fitness . . . ." (*Id.*)

Plaintiff's claim of a breach of an express warranty must be dismissed as a

22

matter of law because plaintiff has not brought forth any evidence that the ECDs at issue contained any defects in workmanship and materials. Even assuming that plaintiff introduced evidence of defects in workmanship and materials, plaintiff's claim must fail because she has not introduced any evidence that the SCPD relied on this statement when purchasing the ECDs. *See Traub v. Cornell Univ.*, No. 94-CV-502, 1998 WL 187401, at *11 (N.D.N.Y. Apr. 15, 1998) (holding that "express warranty claims must be dismissed because [plaintiffs] cannot show that any purchaser relied on the statement . . . ."). Therefore, no rational jury could find that defendant breached the express warranty.

Plaintiff's claim of a breach of the implied warranty must also fail because TASER clearly disclaimed all implied warranties. The U.C.C. allows sellers to exclude implied warranties. To exclude the implied warranty of merchantability, the language disclaiming the warranty must use the word "merchantability," and if the exclusion is in writing, it must be "conspicuous." N.Y. U.C.C. § 2-316(2). To exclude the implied warranty of fitness, the exclusion "must be by a writing and conspicuous." *Id.*; *see also Maltz v. Union Carbide Chems. & Plastics Co.*, 992 F. Supp. 286, 304 (S.D.N.Y. 1998) ("It is well-settled that under New York law, parties to a contract may exclude or modify implied warranties so long as the warranty disclaimer is conspicuous and specific."). "The question of whether a particular disclaimer is conspicuous is a question of law to be determined by the Court." *Kolle v. Mainship Corp.*, 04-CV-711, 2006 WL 1085067, at *3 (E.D.N.Y. Apr. 20, 2006).

In this case, it is clear that TASER properly disclaimed all implied warranties. The language in the Sales Terms and Conditions is unambiguous and tracks the requirements imposed by the U.C.C. In addition, the disclaimer exclusion is conspicuous. It appears directly below the limited warranty, with a bold-face and underlined heading entitled "Warranty Exclusions." (Smith Decl. Ex. B at 2.) The exclusion is in a larger font and in all capital letters. *See Kolle*, 2006 WL 1085067, at *4 (holding that an exclusion was conspicuous when it was "printed in boldface type, in all capital letters, under [a] boldface heading"); *Sky Acres Aviation Servs., Inc. v. Styles Aviation, Inc.*, 210 A.D.2d 393, 393 (2d Dep't 1994) (disclaimer "in bold type and readily noticeable" is conspicuous).

Therefore, defendant's motion for summary judgment is granted on plaintiff's breach of warranty claims.

### 3. Wrongful Death

Plaintiff also asserts a claim for wrongful death under N.Y. Estate Powers & Trusts Law § 5-4.1. To make out a *prima facie* claim of wrongful death, a plaintiff must establish "(1) the death of a human being, (2) the wrongful act, neglect or default of the defendant by which the decedent's death was caused, (3) the survival of distributees who suffered pecuniary loss by reason of the death of decedent, and (4) the appointment of a personal representative of the decedent." *Chong v. N.Y.C. Transit Auth.*, 83 A.D.2d 546, 547 (2d Dep't 1981).

Because no rational jury could find that defendant failed to warn of the risks of its product or breached a warranty, plaintiff cannot satisfy the second element of the tort, which requires a "wrongful act [or] neglect." Therefore, summary judgment is awarded to defendants, and plaintiff's wrongful death claim against TASER is dismissed. *See Cerbelli v. City of N.Y.*, 600 F. Supp. 2d 405, 429 (E.D.N.Y. 2009) (adopting Report and Recommendation) (stating that because

"plaintiff fails to sustain a negligence or medical malpractice cause of action . . . [plaintiff] . . . cannot prove the second element of a wrongful death claim"); *Tuosto v. Philip Morris USA Inc.*, 05-CIV-9384, 2007 WL 2398507, at *16 (S.D.N.Y. Aug. 21, 2007) (dismissing plaintiff's wrongful death claim because all of plaintiff's other claims had been dismissed).

## IV. CONCLUSION

For the foregoing reasons, defendant TASER's motion for summary judgment is granted in its entirety. The Clerk of the Court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: March 8, 2013
        Central Islip, NY

\* \* \*

Plaintiff is represented by Frederick K. Brewington and Ira Fogelgaren, Law Offices of Frederick K. Brewington, 556 Peninsula Boulevard, Hempstead, NY 11550. The attorneys for defendants are John V. Tait, Christopher Renzulli, and John Renzulli, Renzulli Law Firm, LLP, 81 Main Street, White Plains, NY 10601 and Michael Brave and Holly L. Gibeaut, TASER International, Inc., 17800 North 85th Street, Scottsdale, AZ 85255.